UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

```
*************************************************
PHILIP CARRILLO * CIVIL ACTION NO.: 2:25-cv-01787
      Plaintiff, *
                 * JUDGE: SARAH VANCE
VERSUS           *
                 *
CRESCENT PAYROLL * MAGISTRATE JUDGE:
SOLUTIONS, INC., * EVA DOSSIER
ET AL.           *
*************************************************
```

The deposition of PHILIP CARRILLO, taken on Wednesday, June 3, 2026, commencing at 9:08 a.m., in the offices of Adams & Reese, LLP, 701 Poydras Street, Suite 4500, New Orleans, Louisiana 70139.

* * *



EXHIBIT
A

ideas.

Q. Was your position at Catholic Charities a full-time job?

A. It started out relatively full-time. I was in grad school as well, so I was gone most weekends, so...

Q. So you were getting your MBA at Tulane at that time?

A. Uh-huh.

Q. So were you traveling back and forth from Houston to New Orleans?

A. Yes, and there was a campus as well here -- there in Houston. So sometimes I was in Houston. Sometimes I was in New Orleans.

Q. When did you start at Tulane?

A. It was spring of 2017.

Q. And your resume reflects you graduated August 2017?

A. Or winter of 2017. Yes.

Q. Okay. What did you earn at your job with Catholic Charities?

A. I think I was making $45 an hour.

Q. And what about at TELA Construction?

A. That was a somewhat different comp plan that I could not articulate. Different.

in -- I don't remember exactly dates. It's been so long. But they called me back multiple times to come and work on two particular items in their HCM suite, particularly the learning management system and the performance management system.

So in both of those cases, there were many times that I would be called back to work to do, you know, sort of discrete projects.

Q. So did you just choose, once you completed the implementation of those projects, to stop taking on new projects because of what else was going on in your life, or --

A. Well, so at that point I was still in grad school. And, yeah, I suppose so. I mean, there was certainly no -- I mean, I was called to multiple times well into 2022, probably by then, to come back and do project work for them. So I don't remember.

Q. So by August of 2020, you moved to New Orleans?

A. Uh-huh.

Q. When did you meet your ex?

A. I met him in 2018.

Q. What is his name?

A. Brad Taylor.

Q. Did the two of you ever marry?
A. No.
Q. Do you know where he lives now?
A. No.
Q. Do you know his cell phone number?
A. No, not off the top of my head.
Q. How did you learn about the job at Crescent?
A. I don't remember, actually. I don't remember.
Q. Did you interview for the position?
A. I did.
Q. Do you remember with whom?
A. I believe I was called at first by Sanders.
Q. Had you met him before you applied for employment with the company?
A. No.
Q. Tell me what you recall about him calling you and reaching out.
A. Not much, really. I mean, it was a cursory conversation just ascertaining my background and interest, trying to explain, I think, his understanding of what they were attempting to do there.

Q. I realize I asked you the question about how you learned about the job at Crescent. You said you didn't remember. Tell me in general terms what you remember about the application process.

A. Actually, I think I may have reached out to them on LinkedIn. I'm not really sure if I saw a job thing or if it was one of those situations where you see a company that maybe -- I just don't know.

Q. Okay. But at some point, Sanders -- you -- the first thing you remember is having some conversation with Sanders?

A. Yes.

Q. And he was telling you what the business was trying to do?

A. Yes.

Q. Do you remember what he told you?

A. That they were attempting to build out an HR Advisory Department service.

Q. Okay. At that point, you had gotten your master's degree, you were done with that work, right?

A. Uh-huh.

Q. Were you working for anyone else?

A. No, I was actively flipping a couple of houses in Houston and was nearing the conclusion of those projects.

Q. Were you seeking a new job?

A. Yes. I was moving here to New Orleans, and I wanted to find employment here.

Q. After you had that phone call with Sanders, did you meet with anybody else at Crescent before you were offered employment with the company?

A. Oh gosh. I don't -- I don't remember that.

Q. All right. Let me show you a document we'll mark as Exhibit 2, which is your employment agreement. You're welcome to take your time to look at this document, but I assume you're familiar with it, yes?

(Exhibit No. 2 marked.)

A. Yes.

Q. All right. This reflects that the position that you were offered was human resources advisor. Does that agree with your recollection?

A. Uh-huh.

Q. What was your understanding of the job you were being hired to do?

A. To build out a product from scratch and all the associated features that were needed to market and sell and deploy.

Q. What was the product?

A. The product was HR Advisory Services.

Q. Was it --

A. For small to medium-sized businesses. That's how I would characterize it.

Q. Would it be the same thing that people sometimes refer to as, like, a fractional HR Service?

A. Perhaps. I mean, definition of a word like fractional is understood, I'm sure, by many people differently. I would call it an HR Advisory Service.

Q. All right.

A. Give advice to customers.

Q. How was -- well, we'll -- I want to talk about what the product was that was ultimately delivered, but just so -- prepared and delivered. Was it ultimately clients would pay on either a flat rate or a fee-for-service basis as they needed advice from the company? Is that essentially what the objective was?

A. Yeah. So I think the -- the goal was to

have folks on recurring understood terms, and the -- in actuality, it sort of was effectuated sometimes differently, you know, if there were special projects that occurred.

Q. At the time you were hired to start with the company, what services did it deliver to customers at that time?

A. My understanding of what Crescent Payroll Solutions was founded to do and did do was they leased a license to a software, to resell a software, to maintain their instance of that software in the HCM space.

Q. What software?

A. iSolved is -- when I came along, they were on iSolved.

Q. And so they leased that license, and what service did they deliver to their customers?

A. This instance of iSolved.

Q. Okay. Whatever functionality that software service could deliver?

A. Yes.

Q. All right. Do you recall who offered you the job at Crescent?

A. No, I don't.

Q. The employment agreement indicates you

were -- you were expected to work a standard 40-hour work week. Was that your understanding?
A. Yes.
Q. That it was an in-office type of job?
A. Yes.
Q. How many --
A. That varied because it was during all the COVID.
Q. Right. It was post-COVID?
A. Uh-huh.
Q. After the COVID pandemic sort of died down, it was generally a 40-hour-a-week in-office job; is that fair to say?
A. I think by the time that COVID died down, they had gone to a somewhat hybrid schedule.
Q. Okay. And so is that the way that you worked, on a hybrid basis?
A. Most of the time I was there on Tuesday, I believe, when -- which was a day off, or whatever the day, I don't remember.
Q. All right. Help me understand that. You said Tuesday was a day off?
A. When I say "day off," what I mean is they would allow folks to work from home, employees to work from home.

weekends and evenings at sales events and HR events and so on.

Q. But the best of your recollection is that for others in the office, Tuesday was a work-from-home day typically?

A. Yes.

Q. When you were hired for the company, the compensation arrangement was that for the first 180 days you were going to earn a salary of $60,000, right?

A. Yes. Uh-huh.

Q. And then after six months, it would increase to $75,000, right?

A. Uh-huh. Uh-huh.

Q. Yes?

A. Yes.

Q. And then after another six-month period, it would increase to $90,000, right?

A. Yes.

Q. And after that, it would be at the company's discretion whether to give you an additional salary increase, right?

A. Yes.

Q. At the time you were hired, you did not have any incentive plan in place with the company;

which you think you made financial contributions to the company?

A. We have discussed as many ways as I can remember at this moment.

Q. Looking at Exhibit 2, which is your employment agreement, it contains a non-compete agreement, correct?

A. Sure. I don't know if it details the required -- I don't know. Sure.

Q. My question is, Crescent has never sought to enforce that non-compete agreement, has it?

A. I don't know. I don't have any knowledge of what they've attempted to do.

Q. Okay. Are you aware in this lawsuit that Crescent has stated that it would stipulate that it is not going to seek to enforce that non-compete agreement?

A. No.

Q. You haven't received any letters from Crescent relating to the non-compete agreement, right?

A. No.

Q. You haven't received any communications from Crescent since you left the company relating

to that non-compete agreement, have you?
A. As far as I know, no.
Q. All right. I'm going to show you another document we'll mark as Exhibit 3. Exhibit 3 is your acknowledgment of the receipt of Crescent's employee handbook. Is that your signature on the document?
(Exhibit No. 3 marked.)
A. Uh-huh. Yes.
Q. Did you sign this the day that you on-boarded with the company?
A. Yes.
Q. In the second paragraph, it states, "I further understand that I am employed at will." Did you understand that?
A. Yes.
Q. It states, "My employment can be terminated at any time without -- with or without cause and with or without prior notice, either by the company or myself." Did you understand that?
A. Yes.
Q. When you first started working for Crescent, did you supervise anyone?
A. No.
Q. When did you first begin to supervise a

to it.

Q. Okay. Do you, as you sit here today, have an independent recollection of what -- of how you changed it? Did you increase contribution, decrease the contribution?

A. I think it could have gone either way. I mean, I don't -- to my recollection, I think it probably went up at one point and probably went down at one point. I don't know.

Q. Was there ever a time you didn't participate in the 401(k) plan?

A. Possibly. Possibly. I don't know.

Q. All right. I'm going to go ahead and show you Exhibit 6, which we've already discussed, which is the compensation agreement. My understanding from your prior testimony is that you are the person who drafted this agreement; is that right?

(Exhibit No. 6 marked.)

A. Yes.

Q. And your testimony is that you understood that this agreement gave you an ownership interest in the company?

A. Yes.

Q. Identify the language in this agreement

that you understand reflects that you were receiving an ownership interest in the company.

A. This revenue share of empact hr is where this -- this understanding sort of centers.

Q. Which paragraph are you referring to?

A. This is point five.

Q. Okay. All right. So your understanding is that paragraph five gave you an ownership interest in Crescent?

A. As well as the share of the net profits. I mean, these are implicit, obviously, and have a very high degree of conversational assertions and implicit and explicit conversations about the -- how they wanted me to feel about the business, which was constantly, "You are Crescent HR. You are empact HR. We want you to see this as your own business. You do have a stake here in the -- the success of the business. You have a stake."

I had -- the reason why this entire thing happened, this whole agreement came up, because I had worked for several legal services companies. In each of those instances, we had gone through multiple M&A activities. When I say -- when I use the word "consolidation" or "recapitalization," this is all within that

business ownership, the transactional space. And I had always found that it was those who had agreements of profit share as well as revenue sharing in terms of -- not revenue sharing, I'm sorry, excuse me -- a stake in the event of a financial transaction that had something to do with the ownership of the company, that those are the only ones who ever made out with anything worth their time.

And at this point, having only made up to $90,000 a year, that -- I can definitively say to that point it was not worth my time. There was, you know, so this was, this was a -- and in -- within that context, that's where this came from.

Q. Okay. And I appreciate the explanation, but just so the record is clear, can you identify the paragraphs by number in the Compensation Agreement that you contend gave you an ownership interest in Crescent?

A. Yes. Three, four, and five.

Q. And effective what date did you acquire an ownership interest in Crescent?

A. Well, it appears November 17th, but I don't believe this went into effect until January,

that first quarter of 2022.
Q. Okay. So --
A. Whatever the date was. What was it?
Q. So is it your contention that you acquired an ownership interest in the company effective January 1st, 2023?
A. Yes.
Q. Did you ever sign -- let me ask you, did you ever see a copy of the company's operating agreement?
A. No.
Q. Did you ever sign a copy of an operating agreement?
A. To my recollection, I never saw it, nor did I sign anything.
Q. Did you ever -- have you ever seen any articles of organization or articles of incorporation for the company?
A. No.
Q. Have you ever executed documents like that?
A. To my recollection, no.
Q. Have you ever seen any document that prior to November 17th, 2022 reflected who owned the company?

Q. To do what?
A. Fiscally manage the company.
Q. Who did you understand owned Crescent prior to November 17th, 2022?
A. There was a CPA, local CPA, who had some ownership stake -- I can't remember his name -- Justin, and Sanders.
Q. Where did you get that understanding?
A. It was ambient. It was -- I mean, we all understood that there were -- who the owners were.
Q. Do you know how they acquired their ownership interest in the company?
A. No.
Q. empact hr was the division that you managed, right?
A. Yes.
Q. Was it also the name of the product that you developed?
A. Well, it went through an evolution of names as well, so I don't -- yes, essentially it was representative of the HR Advisory Services products and services that I developed. Yes.
Q. Do you remember -- sorry. I forgot to cover this up. Do you remember having a

performance evaluation 90 days after you started with the company?
A. Yes, I do.
Q. And Rema Gray gave you that performance evaluation?
A. Yes. I think there were multiple people in the room.
Q. Was she at that time your supervisor?
A. Yes, she was.
Q. And so if I understood your testimony earlier, at some point that changed and you became her supervisor?
A. Correct.
Q. All right. I want to talk about the compensation agreement. Before the compensation agreement was put into writing, it's my understanding that you went to Justin and Sanders and you requested a pay raise. Is that true?
A. I think so, yes.
Q. Did you request to be paid $120,000 up from $90,000?
A. I don't remember exactly what the request was. I -- there was lots of back and forth. There were, I think, four -- three or four different offers that they made to me, options I

should say. I don't remember how those numbers came about.

Q. Who initiated the conversation about the pay raise? Was it you, or was it them?

A. It could have been me. I don't remember. It's certainly, you know --

Q. It's my understanding that in addition to requesting a pay raise, you requested a title change; is that correct?

A. Probably.

Q. And --

A. It's evident here in this compensation agreement, yes, that that was part of the transaction.

Q. Okay. And just to be clear, I'm -- I know this is what the end result was. I'm trying to ask about sort of what happened before that leading up to this.

A. Uh-huh.

Q. It's my understanding that you also asked for a bonus before this agreement was entered into; is that true?

A. I -- my memory, if it's correct, I did not ask for the bonus. That was a -- an offer by Sanders knowing that I was accepting a -- what he

Q. The culmination of the negotiation was this agreement that you drafted?

A. Yes.

Q. Looking at the agreement, it states that you all agreed there would be an increase to your pay from 90 to $100,000, right?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. And that was going to be effective the very -- that very pay period, November 16th, actually a day before you signed the agreement, right?

A. Can you -- I'm sorry. Can you ask that again?

Q. Sure. The pay increase to $100,000 was actually effective November 16th, the day before you signed this document, right?

A. Yeah, but I actually think there may have been some -- I want to say that it didn't start until the -- until January of the next year at Justin's insistence. But I could be wrong. I don't remember. I mean, it's -- I'm -- I'm thinking I got the bonus sometime in 2022, and the -- the pay increase started in 2023. It

became very convoluted.

Q. All right. In any event --

A. Hard memory here.

Q. In any event, you did get your pay increased from 90 to 100?

A. Yes, at some point I did. You're right.

Q. The second item on here is you were going to receive a one-time bonus of $5,000, correct?

A. Yes.

Q. That was to be paid to you in December of 2022, correct?

A. Yes.

Q. And you did receive that bonus payment, correct?

A. Yes.

Q. All right. And just for the record, I'm going to show you a document that we'll mark as Exhibit 7.

(Exhibit No. 7 marked.)

MS. ROUSSEL:

If you want to mark that one as 6, we can do that now, too.

BY MS. ROUSSEL:

Q. You want to keep 6 in front of you.

Exhibit 7 is the pay stub reflecting that you did receive the $5,000 bonus in December of 2022, correct?

A. Yes.

Q. All right. Exhibit 3 -- I'm sorry, Looking at Exhibit 6, item number three -- or let's come back to that. Let's look at item number 6, the title change to director of HR. This says your title is going to change to director of HR. Did that happen?

A. Yes.

Q. It says that change was going to be retroactively effective to the month before, October 17th, 2022. Is that when the change took effect?

A. I mean, that seems an odd term of phrase -- turn of phrase, but I -- you know...

Q. Do you know why you drafted it that way?

A. I'm sure there was a reason why that was explicitly stated that way. I don't remember, though.

Q. Did you prepare a new job description for this new title?

A. I don't remember.

MS. ROUSSEL:

directly doing here has to do with the -- well, the compensation benefits, although that was something that I was certainly involved in with my team. And then the -- when complex, specialized, and sensitive issues arise. I -- I was not directly responsible for internal teams on that except with my own team, obviously, but I was regularly consulted by various people at the business for HR advice, as no one had former HR experience.

Q. When you received the pay increase from 90,000 to 100,000 a year and the job title change to Director of Human Resources, did you consider that a promotion?

A. In -- nominally, yes. Otherwise, it was everything I had been doing already. I mean, so...

Q. Did your job responsibilities change at all, or did only your title change?

A. Well, I think shortly thereafter, I had made more hires, and so, you know, naturally things evolve and are responsive to market conditions, customer needs, and so on. Yeah, I mean, it would have evolved every day. Did it evolve directly as a result of this? Possibly.

And by the way, this document evolved quite a bit. You know, this was back and forth, back and forth with myriad, you know, changes, some minuscule, some grand. So I don't -- you know, I don't know where that happened.

Q. Okay. I guess the question I have is, we have two different job descriptions, one for Director of HR; one for Director of HR Services. My question is, did you have another title change from Director of HR to Director of HR Services?

A. I don't remember.

Q. After you signed this compensation agreement, you were still employed at will with Crescent, right?

A. Yes.

Q. And you could have left your employment with the company at any time, correct?

A. Yes. And let me give it, actually, a longer form answer to that. So I -- there was a point after having moved to New Orleans where I was iffy on whether I wanted to stay. I do not like this city. I do not like the dysfunction. I do not like any of it.

I was especially repelled by many experiences that I had, but in particular with

to leave, give me lead time." The same courtesy was not accorded. The same degree of civility was not accorded. Hat in hand in my office, sitting in a chair begging me not to leave surreptitiously quickly, you know. There's -- there's so much context here that it's very hard to -- hard to -- so much understanding.

Q. I appreciate your explanation, but in answer to my question, you did understand that you could leave the company at any time?

A. Yep. Yes.

Q. All right. Looking at paragraph three of Exhibit 6, the compensation agreement, it states that, of empact hr's net profits starting January 1st, 2023, you would be paid a quarterly percentage share of 10 percent, right?

A. Yes.

Q. All right. So I understand that to mean -- well, let me ask you, what is your understanding of net profits?

A. The net profits.

Q. Revenue minus expenses, correct?

A. Yes.

Q. All right. So you understood that on a quarterly basis, the company would look at the

revenue for empact hr, deduct the expenses, and pay you 10 percent of -- of the profits?

A. Yes.

Q. And it did that, didn't it?

A. I don't know.

Q. Okay. Let me show you some documents. All right. I'll mark the first one 10. All right. Exhibit 10 is your pay stub. Looking back at Exhibit 6, the understanding was you would receive this profit-sharing payment for empact hr's net profits in the second check following the quarter for which you earned that profit-sharing payment, right?

(Exhibit No. 10 marked.)

A. Yes.

Q. All right. And so if we look at Exhibit 10, this is the second check that was issued in the month following the first quarter of 2023, correct?

A. Yes.

Q. And it reflects a commission payment?

A. Yes.

Q. Of $3,282.59?

A. Yes. And commission, by the way, is a designation within a payroll system. It could

have been designated in myriad different ways for tax purposes. I'm not really sure why the commission was -- was chosen. It was not what I would consider a commission.

Q. Understood. But you understood this was the payment to you --

A. Yes.

Q. -- for the amount that you were owed pursuant to either paragraph three or four of the compensation agreement, correct?

A. Yes.

Q. All right. All right. I'll hand you another document we'll mark as 11. All right. Exhibit 11 is another pay stub that reflects the profit-sharing payment that was made to you for the second quarter of 2023, correct?

(Exhibit No. 11 marked.)

A. Yes.

Q. All right. I'll hand you a document we'll mark as Exhibit 12. Exhibit 12 is a pay stub that reflects the profit-sharing payment that was made to you for the third quarter of 2023, correct?

(Exhibit No. 12 marked.)

A. Yes.

Q. All right. I'm going to hand you Exhibit 13. Exhibit 13 is the profit-sharing payment that was made to you for the fourth quarter of 2023, correct?

(Exhibit No. 13 marked.)

A. Yes.

Q. All right. I'm going to hand you a document we'll mark as Exhibit 14. Exhibit 14 is the profit-sharing payment that was made to you for the first quarter of 2024, correct?

(Exhibit No. 14 marked.)

A. Yes.

Q. All right. I'm handing you a document marked as Exhibit 15. Now, Exhibit 15 reflects "bonus" instead of commission. This is a paycheck issued July 19th, 2024. That is after you separated from employment at the company, correct?

(Exhibit No. 15 marked.)

A. Uh-huh.

Q. It is my understanding that although it is marked as a bonus, this is the profit-sharing payment that was made to you for the second quarter of 2024. Do you agree?

A. I don't know why that would have been. I hesitate to make any assertion on this. Bonuses

are taxed differently than commissions. It just -- to me, this reflects more of the same sort of strange practices.

Q. Do you have any reason to disagree that the amount reflected on the bonus here is the fourth -- the second quarter 2024 profit-sharing payment that was made to you?

A. All of these are distillations downstream from what I'm assuming was some accounting work. And they were -- yes, they were paid to me, if that's what you're asking. Whether they are accurate in terms of you know, net profitability and -- and that there was proper allocation, I can't say.

Q. Understood. I just want to make sure that you agree with me that although it is marked as a bonus, the $3,292.62 payment is the payment that was made to you for the profit sharing for the second quarter of 2024?

A. Well, presumably, yes.

Q. I realize you say you don't know whether those calculations that were made to determine the profit sharing were correct or incorrect; is that right?

A. Yes.

of were, you know, just right off the top.

Q. Okay. So when you discussed that with them, they said, "We disagree with you, we think this is the appropriate way to account for this in this calculation"?

A. I don't recall their responses.

Q. Okay. Do you remember how many times you discussed that with them?

A. I would say at least three or four times if I had to assert any number.

Q. Do you know if they ever adjusted the calculation based on what you shared?

A. I do not.

Q. Do you have any training in finance?

A. Well, I have an MBA, so I have, you know, several classes on it. It's not anything foreign to me.

Q. Okay. What about training in law?

A. I had legal courses in the course of my MBA, business law. And then, obviously, I was exposed extensively to litigational practices in previous careers. This does not make me an expert in any way. Just lots of exposure. More than average.

Q. In Exhibit 6, the compensation

agreement, paragraph four talks about RPO. Can you tell me what that stands for?

A. Oh, my.

Q. I'm not trying to trick you. Was it recruiting process outsource?

A. Yeah, yeah, yeah.

Q. Okay. My understanding of what RPO was, is that it was the idea that your company was going to help recruit and place talent inside other companies who were your clients?

A. Yes.

Q. Is that right?

A. Yes, and we did.

Q. All right.

A. We had several.

Q. All right. And so what's contemplated here is that beginning January 1st, 2023, you would receive a quarterly percentage share of 10 percent of revenue from that aspect of empact hr's services, correct?

A. Uh-huh. Yes.

Q. And that that was part of the profit-sharing payments that were made to you, right?

A. I don't know, actually. I don't

remember. I don't know.
Q. Okay. How many placements, if you recall, did you make for clients pursuant to the RPO service that you delivered after January 1st, 2023?
A. I can't remember.
Q. Do you remember the names of any of the clients where you made a successful placement?
A. We made some, maybe 15 or so to Javal. I think that was pre-agreement, though.
Q. Okay.
A. I don't remember anyone else thereafter. I know that I had my team deployed on certain projects related to RPO. I don't remember the clients.
Q. In legal recruiting, when we hire talent, we pay a fee like that to the recruiters who help place talent at our law firm, but if it doesn't work out within a period of time, they have to return the money. Is that the same way that the RPO product worked that you worked with?
A. I don't remember the ins and outs of that agreement. I -- ostensibly, RPO is a, you know, if -- if you're going to take it at like a generalized MO, it's going to look something much

more like a -- like the fractional HR services. It's going to look like a service fee paid on a regular basis for a contracted period of time or term. And there may be some incremental increases based on certain numbers of placements.

So say you're, you know, certain levels, you might have varying degrees of extra fees paid for, say, an expert-level placement. I do not remember any more detail than that. Just generally, that's my understanding of that play out.

Q. Are you aware that Justin Farrae kept a spreadsheet that reflected the amount of profit-sharing payments in his calculation of what was to be paid to you each quarter?

A. Can you ask me that again?

Q. Yeah. Are you aware that Justin maintained a spreadsheet to calculate the profit-sharing payments that were owed to you each quarter?

A. Yes.

Q. Did you ever see it?

A. Yes, he showed me on his computer screen a few times.

Q. Did you ever take issue with what he

showed you?

A. Well, yes, that's where I took issue with the allocation toward the sales department. I mean, there were other things maybe, but it was beyond recollection.

Q. All right. Looking back at Exhibit 6, paragraph five mentions that you would get five percent revenue share of empact hr of the trailing twelve months at the given multiple of evaluation in the event of divestiture or recapitalization.

My first question is, was that intended to say, "Divestiture or recapitalization"?

A. Or -- or recapitalization, yeah.

Q. Okay.

A. And I -- by the way, I asked -- on this particular compensation agreement, I asked no fewer than three or four times, "Can we please let an attorney look at this?" I am not an attorney. I mean, I have no idea what I'm writing here. And I wanted my interests protected. And I trusted that they -- and that they had good faith, that they -- all of the myriad conversations we had about how integral I was and how much a part of their strategy and plan Philip Carrillo was. This -- looking back on this, it's very difficult

to look at this as anything short of a setup.

Q. Nothing prevented you from getting an attorney to look at this before you signed it, right?

A. Lot prevented me in -- in terms of good faith, yes.

Q. No one stopped you from doing that?

A. No one stopped me from doing that. And I'm not -- listen, that's not what I'm saying. I'm not trying to abscond with some, you know, responsibility here and that I did write this, and there was back and forth. I did request many times -- actually, I requested that they have an attorney look at it so that it would be copacetic with their practices, with their ownership agreements.

I didn't want this to be anything short of defensible, beneficial to all, motivating for me, fair to me for the amount of investment that I made in terms of my time and my life and my intellectual wherewithal. I was operating in very good faith and it was -- yes, that's it.

Q. There is an asterisk that applies to paragraphs three, four, and five, correct?

A. Uh-huh.

Q. And, essentially, what that asterisk says, all forms of remuneration end upon termination of employment, correct?

A. Yes, and this is what I was asked to put in by Justin.

Q. Okay. So that was a request by the company to include that, and --

A. And this was after we had gotten to the point of finalization, and he said, "Hey, I want you to add one thing to this. I want you to make this final addition change."

Q. Okay. In other words, he wanted to see this language in the agreement before he was willing to sign it?

A. Yes.

Q. And do you understand that this means that the compensation or other consideration that is described in this agreement would not be owed to you if you did not continue to work for the company?

A. No.

MS. DAVIDSON:

Object to form.

BY MS. ROUSSEL:

Q. All right. Is it your understanding

were --

A. My answer is no.

Q. Okay.

A. That did not jive with the conversational preceding and -- and post.

Q. Okay. So let's look at paragraph three. Paragraph three, which has the asterisk, right? You see that?

A. Yes.

Q. All right. Paragraph three says of empact hr's net profits, you are going to receive 10 percent of those every quarter beginning January 1, 2023, right?

A. Uh-huh. Yes.

Q. Do you contend that you were entitled to a 10 percent share of empact hr's net profits in the first quarter of 2026?

A. No.

Q. Because -- do you agree that you were not entitled to a 10 percent share of empact hr's net profits after you lost your job?

A. No, I do not on that point.

Q. Okay. Do you believe you were entitled to a 10 percent share of empact hr's net profits in the third quarter of 2024 when you no longer

worked for Crescent?

A. No.

Q. Why not?

A. Because that was work performed that I did not perform. In this other point here, in this other term here, this five percent revenue share of empact hr in the event of divestiture or recapitalization or any M&A activity, whatever would lead to the valuation of my department and be calculated in a transaction, the five percent revenue share, that would be something that, in my opinion, should have been excluded from that. And certainly my understanding was different, that it was excluded from that, that I had built a product that I would be paid for.

Q. Okay. I want to -- I want to focus still on paragraph three.

A. I just said no.

Q. Okay. So you and I agree that at least as it relates to the asterisk -- let me rephrase this question.

You agree, at least as it relates to paragraph three, that where this agreement says that form of remuneration ends upon termination of your employment, that's true?

A. Yes.

Q. All right. And you agree that the asterisk, when applied to paragraph four, means that you were no longer entitled to a 10 percent share of the gross revenue of RPO after you lost your job, correct?

A. Correct.

Q. But you contend that the meaning of the asterisk in this agreement is different for paragraph five than it is for paragraph three and paragraph four?

A. That is not what I'm contending. I'm saying that there should not be an asterisk there, that it -- that there's a different -- completely different implication for that, for five.

Q. So you're saying although the asterisk appears at paragraph five, you don't think it should be there?

A. Yes.

Q. So is it your contention that you were entitled to a five percent revenue share of empact hr after the termination of your employment in perpetuity?

A. No, I am not contending that. What I said earlier is what I'm attending now, which is

that I had this -- not only in the spirit of this agreement, but in the many, many conversations and many negotiations pursuant to this agreement, my understanding was that I was essentially a partial owner of my department, of my product, and that I would be compensated in the event that there were -- was M&A activity or any kind of transactional activity on the business that would include my department.

Q. Regardless of whether that transaction happened five years after you lost your job?

A. Sure.

Q. Ten years after you lost your job?

A. I don't think it'll last that long, but yeah.

Q. How long would you be entitled?

A. I would say it makes sense to me within a discrete period where my fingerprints are still on the -- on the business and on the product, directly on the employees who are part of the valuation, for training these employees. These were very untrained, crude, crude, uneducated people. That's as far as I, you know, I have lasting impact on empact.

Q. No pun intended.

Five.

A. Number five.

Q. My question is, isn't it true that you received payments from Crescent in addition to your base salary after November 17, 2022?

A. Yes.

Q. So the answer is incorrect?

A. I think so, yes.

Q. Request for Admission Number 6 asks you to admit that you received complaints from subordinates about your responsiveness before you were placed on the Performance Improvement Plan. Did you receive any such complaints?

A. Not about responsiveness.

Q. Okay. All right. I'm going to show you a document we'll mark as 18, which is the lawsuit we filed. Did you read the lawsuit?

(Exhibit No. 18 marked.)

A. Yes, I think.

Q. All right. You understand it's important to have a factual basis for things you allege in lawsuits?

A. Yes.

Q. All right. I'd like you to turn your attention to Paragraph 60. Paragraph 60 says,

"Defendant did not pay Plaintiff any of the profit-sharing payments listed above subsections three through five of the addendum." That is not true, is it?

A. Where is the three through five? I'm sorry.

Q. Subsections three through five of the addendum, which is Exhibit 6. You're welcome to read the lawsuit --

A. Yeah.

Q. -- and take a look at the allegations, and then I want you to tell me whether the allegation in Paragraph 60 is true.

A. I missed that. No, it's not true.

Q. Okay. Look at Paragraph 64. It reads, "As a result of Defendant's failure to perform under the contract, Plaintiff was actually damaged and did not receive any of the monies owed under the contract for which he is owed and relied upon receiving to his detriment."

It is not true that you did not receive any of the money owed to you under Exhibit 6 of the compensation agreement, is it?

A. I think pursuant to term five, that's not true, I would say. In terms of two through

four, it's -- it's -- I mean, it is true in terms of number five, but it is not true in terms of two through four.

Q. Which makes it an untrue statement because it said you got -- you didn't receive any of those payments, right?

A. Yeah. I mean, I clearly have mistaken my language in that spot.

Q. All right. Let's look at Paragraph 70. Paragraph 70 says, "Though Plaintiff performed all of his duties under the contract, all conditions precedent were met. Defendants failed to pay any of the bonuses or profits owed to Plaintiff under the contract."

That's not true, is it?

A. I would say it's nuanced.

Q. Okay. Well, it is not true that Crescent failed to pay you the bonus that you were owed, correct?

A. I would say that I don't have a full understanding of everything that was owed based on the fact that I did not have direct access nor insight into the P&L.

Q. Is it your testimony that Crescent failed to pay you the bonus that was owed under

the compensation agreement?
A. They paid the $5,000.
Q. Okay. So we can agree that Paragraph 70 is false to the extent it says that Crescent failed to pay you any bonus that was owed under that agreement, can't we?
A. Yes.
Q. It is also false to say that they failed to pay you any of the profits owed, correct?
A. Yes, "any" being the contention there. Yeah.
Q. Okay. Same with paragraph 71. It is a false statement to say Defendants failed to pay any of the profit-sharing payments listed in the addendum, isn't it?
A. Yes.
Q. You broke up with your partner on October 8th, 2023?
A. Yes.
Q. And you told Sanders and Justin about that shortly afterwards?
A. Yes.
Q. Were you and Brad owning the home in New Orleans that you lived in or renting?
A. Owning.

Q. Did you sell it at that point?
A. We listed to sell sometime in January, I think.
Q. At what point did you tell Sanders and Justin that you wanted to move out of state after this breakup?
A. Immediately. I told them I wanted to move to Florida. That was my -- my goal. And --
Q. Go ahead. I'm just going to get some water.
A. -- that's it.
Q. Did you discuss that with both Sanders and Justin?
A. Yes. I probably over shared.
Q. Why did you ultimately move to Houston?
A. I was pushed to move to Houston by Sanders. I am from Houston, born and raised there. Houston seemed to Sanders to be a better opportunity. At one point, he offered me a different job within the company as a salesperson in Houston. We had hired multiple salespeople there, although they were consistently turned over, severed.
And he said his reasoning for why I should not consider, and why, in fact, he could

not support me moving to Tampa or anywhere in Florida -- I don't remember there being explicit to an exact place -- was that one of his -- one of the partner bureaus, one of the associated bureaus had a salesperson there or something.

So there was, you know, some sense that there would be a breach of his gentleman's agreement with all of these other -- other -- whatever you call it.

I decided ultimately to move back to Houston because I was going through so much change, and I just said, well, might as well just keep the job and move to -- I did offer to leave when I asserted that I had planned to move away. I was not going to stay in New Orleans. That was the gist of it.

Q. And you had family in Houston, right?

A. Yes.

Q. Did you have family in Florida, too?

A. No.

Q. Sanders was talking to you about changing your position and doing a sales job if you moved away, right?

A. He offered that because, in his words and in the words of Grayson Reno, who was the

director of sales, and all others who had ever seen me in a sales meeting, I was so good at it. And so he offered that, saying that could be a great opportunity for me.

I have never felt called in the direction of a sales career, and so I did not want to do it. Plus, this is my baby. I mean, I had built this from scratch, and I was quite proud of it. And I didn't want to relinquish my post.

Q. Let me show you a document that we'll mark as --

MS. DAVIDSON:

Can we take a quick break?

MS. ROUSSEL:

Of course, yes, yes, yes, of course.

(Break taken.)

BY MS. ROUSSEL:

Q. Okay. I was going to hand you -- yeah -- Exhibit 19. Exhibit 19 is a couple of emails from December 6th, 2023. Take a moment to read them and let me know when you've done so.

(Exhibit No. 19 marked.)

A. Okay.

Q. Okay. In the email on the first page,

Sanders says he has some great ideas to discuss with you and talks about where he thinks you can best fit into the organization.

At this point, you had already talked to him about the fact that you were leaving New Orleans, right?

A. Yes.

Q. Had you determined yet whether you were going to Texas or Florida?

A. I expressed to Justin and Sanders that I would most certainly be leaving New Orleans. I don't remember if I said that I was open to Florida or Houston. I'm sure that was pretty quickly on or early on discussed, because I had an intention anyway of buying a beach house or something in Florida at some point anyway, so I -- and there was a fair amount of travel to Florida. I would say once every two months for about two years anyway.

Q. When did you actually move away from New Orleans?

A. I moved in April, I think, of 2024.

Q. Okay. So here in December of 2023, Sanders is requesting a meeting with you to discuss ideas about how he thinks you can fit in

I don't remember the job details and so on. So, I mean, this is quite difficult to connect to right now.

Q. Okay. Do you remember Sanders ever showing you projections about what he thought you might be able to earn if you joined the sales team?

A. Yes. I remember one time he wrote some numbers on a whiteboard in a meeting.

Q. All right. Ultimately, though, whatever he talked to you about in terms of doing sales and what he thought you could earn if you went into that section of the business, you said no thank you?

A. Well, knowing what I knew about the Houston market and the management of the sales team, no thank you.

Q. All right. I'm going to hand you a document I will mark as 22. Exhibit 22 is dated May 23rd, 2024. You see that?

(Exhibit No. 22 marked.)

A. Yes.

Q. You had moved back to Houston by then?

A. Yes.

Q. And this is a document that Crescent

sent to EquiMax Mortgage.
Q. Were you in the process of purchasing a home in Houston?
A. Yes. I relied on the assurances from Sanders and that he wanted to keep me as an employee, and I purchased a home in Houston.
Q. Okay. And did you see this document that Crescent supplied to the mortgage holder?
A. Yes, I believe I may have asked rather specifically for this language to be provided.
Q. Did you draft the language?
A. Maybe. I don't remember.
Q. Okay. In any event, this is making representations to the mortgage about the amount of incentive compensation you had been paid while working for Crescent, right?
A. Yes.
Q. Okay. And it reflects that in 2022 you received bonuses of $5,324.85, right?
A. Yes, that's what it says.
Q. Okay. I'm going to show you a document we'll mark it Exhibit 23. Exhibit 23 is a paystub from December of 2022, and it reflects, as stated in Exhibit 22, the letter to the mortgage holder, that your bonuses in 2022 totaled $5,324.85,

right?

(Exhibit No. 23 marked.)

A. Yes.

Q. So the information represented to the mortgage holder was correct?

A. Yes.

Q. All right. And for 2023, Exhibit 22 reflects that you received a profit share of $11,210.43, correct?

A. Yes.

Q. All right. I'll show you a document we'll mark as 24. Exhibit 24 confirms that you indeed did receive profit share of $11,210 for the year 2023, right?

(Exhibit No. 24 marked.)

A. Yes.

Q. Okay. And I'm going to refer you back to Exhibit 15. I can show you mine.

A. Yeah.

Q. Here. I can show you mine.

Exhibit 15 reflects that in 2024 you received profit-sharing payments of $12,501.91, correct?

A. That's what it shows in the paystub, yes.

Q. Which means that the information that you -- you reported to the mortgage holder here is correct, right?
A. Yes.
Q. Do you have any reason to dispute that what Crescent reported to the mortgage holder on May 23rd, 2024, was incorrect -- I'm sorry -- that -- do you have any reason to believe what Crescent reported to EquiMax Mortgage in May of 2024 was incorrect?
A. No.
Q. I believe you told me at the beginning of this deposition that you no longer own or do not own your home in Houston. Did you sell the home that you purchased in 2024?
A. I did, yes.
Q. Did you sell it at a profit?
A. I don't lose money on real estate.
Q. So that's a yes.
A. Yes.
Q. Do you recall how much profit you made?
A. No.
Q. After you declined to work in sales, tell me about the conversations you had that resulted in you moving to Houston and working on a

remote anyway. It just -- it was not a -- it's not a thing.

Q. After you moved to Houston, Connor Boleware and Alex Vial -- is that how you pronounce his last name?

A. Vial, yeah.

Q. -- complained to Jessica Johnson about your unavailability and lack of attention to work. Are you aware of that?

A. They came to me and said that they felt as though I was very distracted. This -- I don't remember what the time frame was, but we're talking very shortly after I had been on a work trip in San Diego after I had been -- had moved all of my property, which was practically an 18-wheeler, from my Houston home -- or my New Orleans home, rather, to my Houston storage.

I had been living with my ex for almost six months and was in the process of renovating the home that I ultimately financed in June or May, whenever it was.

And I said, "Look guys, I mean, I'm downcast, to say the least. I apologize, and I'll try to be better. I'll try to be more attentive and more" -- you know, they had been so accustomed

to a tremendous amount of hand-holding. I mean, they would barely send an email without asking for help. And this is the truth. I mean, there's a lot of -- I can say incredulity.

And the truth of the matter is these guys were not consultant ready. I mean, one of them had one year of experience in HR. They were in their 20s, young, young kids. I mean, I think Connor was 25, 26. Their communication style was subpar, to say the least, to advise leaders of businesses on what can be very complex issues and matters.

So they were very accustomed to lots and lots of handholding. I mean, I would stay late all day long for these guys. I loved helping them become better consultants. When I said they were crude earlier, that was the truth. They were very crude. In fact, that was the complaint. In fact, when I interviewed both of them --

THE WITNESS:

I'm sorry. Are you taking a picture?

MR. SMITH:

No. I'm sorry.

THE WITNESS:

achieve better equanimity in my life.

Q. Are you aware that Connor and Alex later complained to Jessica again after that phone call with you that they felt you were unavailable and disengaged?

A. Yes.

Q. Do you dispute that?

A. Yes, I do.

Q. All right. I'm going to show you Exhibit 23. Exhibit 23 --

MS. ROUSSEL:

I'm sorry, is it 25? I'm sorry.

Sorry. Sorry. Thank you.

BY MS. ROUSSEL:

Q. Exhibit 25 is an Employee Warning Notice that was delivered to you by Jessica and Sanders, correct?

(Exhibit No. 25 marked.)

A. Yes.

Q. They met with you on June 13th, 2024 in person to deliver this to you?

A. Not in person. I was in Houston.

Q. Okay. I'm sorry. That's right.

So they met with you by Teams?

A. Some media. I'm not sure.

Q. Okay. And they told you at the conclusion of this meeting that you were going to be put on a 30-day performance improvement plan, correct?
A. Something like that.
Q. All right. It states here, "Philip Carrillo has not been as engaged or attentive to his staff, clients, or job responsibilities for several months." Do you disagree with that?
A. Yes.
Q. Did you feel that you were equally engaged with your staff, clients, and job responsibilities in the several months before this warning notice, notwithstanding what was going on in your personal life?
A. I would say I was as engaged as they needed me to be.
Q. It says, "On May 8th, one of the staff of empact hr, Philip's department, brought to the company's attention his concerns and evidence of continued disengagement on Philip's behalf. This employee and another full-time member of hr -- empact hr, discussed their concerns with Philip Carrillo within the next two days, just prior to his vacation."

Q. Did you tell them you were committed to improve after you got back from vacation?

A. I don't remember what I told them exactly. I mean, I don't -- I don't remember acknowledging that there was an improvement needed. I had been on phone calls with Sanders that morning. I had been in constant communication with sales. I had never had a vacation where I was not in constant communication with all, including Sanders.

So engagement to me or to them looked like -- in fact, as I was on that vacation, I was responding rather regularly to communications from my team. And Alex, I believe, in an email or text or whatever, after asking me a question to answer, said, "You really need to disconnect, boss. You really need to disconnect," on that vacation.

So there's some real dissonance in my perspective and memory here. This is just, you know, it doesn't make sense.

Q. All right. In any event, Sanders and Jessica told you that after you had spoken to Connor and Alex, they came to Jessica and made a second complaint, right?

A. And Sanders, I believe, told me that in

this meeting, in this PIP meeting.

Q. And this says, "Philip acknowledged his personal life, including, but not limited to his move from Houston -- to Houston, has been a distraction, and committed to improve."

Do you disagree with that?

A. I explained that where there had been a distraction, perhaps, that the circumstances -- I gave context. I mean, sure, I was renovating a house to move into. I was moving across the state, you know, to a new state. I was in the throes of divesting two properties with my ex. I was traveling for Crescent to HR conferences. There were multiples in that month, actually, April, May timeframe.

It's just, you know, my job also had -- had shifted a lot to sales. I mean, I can tell you that I was in constant contact with the sales team. So where -- maybe there was a distraction on the -- on the part of managing the minutiae of my team's goings-on, day-to-day details. There was no lack of engagement with the business and the requirements of my job.

Q. When you met with Sanders and Justin, did you tell them that you disagreed with what

they were saying concerning your lack of engagement?

A. I don't remember.

Q. I'm handing you Exhibit 26. You can look at this one from the back, but essentially I just want to authenticate that you received this, that these were communications that Jessica sent to you after the PIP meeting, recapping what happened and then later attaching the PIP documents.

(Exhibit No. 26 marked.)

A. No, I remember some of this. I mean, I agree this is the communication. Did you ask me a question about it?

Q. Yeah, I just really wanted to authenticate it, that you remember receiving this.

A. Yes, and I did -- I didn't remember some of these details about the dispute she had in terms of the -- my understanding of requirement. There was absolutely no expression of a DAR. I hope they recorded that meeting, a Daily Activity Report. It was a weekly.

And Sanders wouldn't have read that. He's not a detail-obsessed person. That would have been silly.

Q. Yeah. And if you look at the second page, Jessica says, "You're correct in your understanding. You're required to submit a weekly activity report," and she makes a change. Do you remember that happening?

A. I didn't remember that happening, but thank you for bringing it to my attention.

Q. And so after that meeting, it was your understanding that you were on a 30-day performance improvement plan with an obligation to make weekly reports --

A. Yes.

Q. -- about your activity?

A. Yes, which I did. Uh-huh.

Q. And before the end of that 30-day period, you were notified that the company had changed its mind; it was going to terminate your employment, right?

A. That's right, yes.

Q. Who told you that?

A. Sanders called me.

Q. Tell me what you remember to the best of your recollection about that call.

A. He called me. I was on my way home from the gym. I had -- I had a habit of going to

classes at my lunchtime, and said that he had decided to go in a different direction with the department and they wanted their leaders in the GNO area. That was it.

And I said to him on that conversation, in response, "I'm so gravely disappointed in this. I relied on my employment at Crescent Payroll Solutions. I would not have moved to Houston." I expressed all the things that he knew already, that I would not have moved to Houston had I known. I would certainly not have gotten in the middle of a full home renovation, an addition, and all the things had I known that my time there would be so curtailed.

I said -- they all knew that I had been involved in AA. This was a topic of constant conversation with folks in the office, and that I had, you know, experienced extreme emotional distress over the course of my divorce, separation, from my ex, and all the top things that can happen to a person in their life, stressful things that can happen to a person in life-- happened in short order for me.

I had to sell a home. That's top 10 stressors. Buy a new home; top 10 stressors.

is not a caring organization that's there for their employees when they need it."

Q. Did you ask if he would reconsider the decision?

A. No, I did not. I didn't -- that was not an option. I don't know how many separation phone calls you've been on, but that's typically not an option to ask for that.

Q. I'm going to hand you Exhibit 27.

Was Sanders the only person on that call?

(Exhibit No. 27 marked.)

A. As far as I know, yes.

Q. All right. Exhibit 27 is an email from Jessica Johnson dated July 20 -- excuse me, July 1st, 2024, that begins, "Further to your conversation with Sanders offer at 1 p.m. on Monday, June 24th, 2024, Crescent Payroll Solutions has decided to terminate your employment effective June 24th, 2024," right? You see that?

A. Yes.

Q. June 24th, 2024, was the effective date of your termination from the company?

A. As far as this says, yes, that's correct. And, sure, I remember that.

sordid and the return on the time investment is so little, I didn't care to.

Q. What was the time investment required that --

A. I mean, you have to call in on Sunday nights. You have to go online and fill out forms. You have to do -- it just was an immense amount of silliness for something that was hardly sustainable.

Q. Okay. So you elected -- you just elected not to go through the process?

A. I elected not to go through the process. There's a reason they pay unemployment in Louisiana, and it's because it's -- anyway.

Q. The email that Jessica sent you with the confirmation of the termination noted that iSolved benefits would be communicating with you about the COBRA eligibility. Did you understand that iSolved was the benefits administrator for Crescent?

A. Yes, I did. Well, maybe I didn't. I don't know. I don't remember.

Q. Do you know when Crescent first had discussions with iSolved about a potential transaction between companies?

A. No, I do not.
Q. You produced some text messages in your discovery responses in this case, I think -- yeah -- with Sanders and with Justin. Both of them thanked them at one point for a $200 payment. Do you know what that was for?
A. I thanked them for a $200 payment?
Q. You did. Yeah.
A. Maybe it was a Christmas cash payout, probably.
Q. In your lawsuit, you've asserted a claim for abuse of rights. What right do you contend that Crescent had the right to exercise that it abused?
A. I don't have an answer for that right now.
Q. What damages do you contend that Crescent caused you to suffer?
A. Tremendous. Professional. There were, out of the mouths of former colleagues, myriad and ongoing derision from Justin and from Sanders, directed about me, maligning my -- directed to me and about me, and maligning my professionalism, maligning my competency, maligning -- referring to me as the, "Oh, now that the gray hair is not here

received?

A. I didn't receive any job offers after that, after I was laid off. When I say "job offer," what I mean is overtures, and I revised that earlier, from companies, recruiters, via LinkedIn, wherever, whatever else -- platforms I was on. I don't know. I don't have any social media anymore, and I don't keep any of these job sites anymore here.

Q. Let me just make sure that we're -- we're communicating, because I want to ask you both about overtures that were made while you worked for Crescent and job search efforts that you made after.

A. Uh-huh.

Q. So let's talk about while you still worked for Crescent. You said that you eschewed overtures that were made. I think you're telling me now that those were communications over social media, LinkedIn, and the like; is that right?

A. Yes.

Q. Did you receive any job offers from anyone while you worked for Crescent?

A. No, I never pursued any overture to the extent of even an interview.

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "*Agreement*") dated as of **August 4, 2020** (the "*Effective Date*") is entered into between ***Philip Carrillo***, a resident of Orleans Parish, Louisiana (the "*Employee*"), and Crescent Payroll Solutions, a Louisiana corporation, with its principal place of business in Jefferson Parish, Louisiana (the "*Company*").

WHEREAS, Company desires to obtain the services of Employee and Employee desires to be employed by Company, upon the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants and obligations contained herein, and intended to be legally bound, the parties hereto agree as follows:

1. Employment: Company agrees to and does hereby employ Employee, and Employee agrees to and does hereby accept employment by Company, as herein set forth. As of the Effective Date of **August 17, 2020**, the Employee's title shall be Human Resource Advisor (the "***Position***"), and the Employee's status shall be Salary, Exempt, based on a standard 40-hour work week.

2. Employee Duties. Employee shall perform and have the duties, responsibilities and authority that are typical for the Position, and such other duties, responsibilities and authority as may be assigned from time to time by Company. Employee shall devote substantially all his/her productive time, ability and attention to the performance of the duties required. Employee shall perform such duties and responsibilities for the Company's business operations in Louisiana, subject to necessary business travel, or such other locations as the Chief Executive Officer or President may provide from time to time.

3. Other Business Activities. Employee will not engage, directly or indirectly, for himself or in conjunction with any other person or entity, in any other business activities or pursuits which constitute competition to the Company. Competition, for purposes of this Agreement, shall mean any person or entity which engages in or plans to engage in the business of providing payroll services, human resource services, and/or time and attendance solutions. However, the foregoing limitations shall not be construed as prohibiting Employee from making personal investments in a form and manner which will not detract from Employee's obligations to Company to perform the duties of his Position or have an adverse effect on the Company.

4. Compensation. Company shall pay Employee, and Employee hereby agrees to accept, as compensation for all services to be rendered to Company and for Employee's covenants as provided in this Agreement, the compensation set forth in this Section 4.

4.1 Rate. For the first 180 days of employment, Company shall pay Employee a base salary at the annual rate of Sixty Thousand Dollars (**$60,000.00**), pro-rated for partial periods actually worked (as the same may hereafter be adjusted, the "***Salary***"). After 6 consecutive months of employment, Company shall increase Salary to Seventy-five Thousand Dollars (**$75,000.00**). Upon successful attainment of agreed upon goals in the following 6-month period, Company shall increase Employee base



EXHIBIT
2
Serpas Court Reporting
1.800.526.8720

Cresecent 0014

salary to Ninety Thousand Dollars ($90,000.00). The Salary shall be inclusive of all applicable income, social security and other taxes and charges that are required by law to be withheld by Company and shall be paid and withheld in accordance with Company's normal payroll practice for its employees from time to time in effect. Incremental rate increases may be awarded as Employee attains targeted advanced levels of performance.

4.2 Benefits. Employee will receive 7 paid holidays and will begin accruing paid time off (PTO) upon first day of employment. Employee is eligible for all Voluntary Medical, Dental, Life, AFLAC, FSA, and 401K benefits on the first day of the month following employee's date of hire.

5. Confidential Information and Fiduciary Obligations.

5.1 Confidential Information. The Parties recognize and acknowledge that, during this Agreement, in order for Employee to perform the duties required under this Agreement, Company is obligated to provide some, but not all, of certain confidential information of Company, including, but not limited to, (i) software, processes, compilations of information, records, and specifications, that are owned by Company and that are used in the operation of the business of Company, (ii) customer lists, financial, accounting, statistical, and personnel information concerning Company or customers of Company and (iii) lists of and the relationships that Company has with entities (all of the foregoing are collectively referred to hereinafter as the "***Company Confidential Information***".) Employee acknowledges and agrees that Company Confidential Information constitutes valuable, special and unique property of Company. Employee further acknowledges that protection of such Company Confidential Information and trade secrets against unauthorized disclosure and use is of critical importance to Company in maintaining its competitive position. Employee hereby agrees that Employee will not, at any time during or after Employee's employment by Company, make any unauthorized disclosure of any Company Confidential Information or trade secrets of Company, or make any use thereof, except in the carrying out of Employee's employment responsibilities hereunder. As a result of Employee's employment by Company, Employee may also from time to time have access to, or knowledge of, confidential business information or trade secrets of third parties, such as customers, suppliers, partners, joint venturers, and the like, of Company. Employee also agrees to preserve and protect the confidentiality of such third-party confidential business information and trade secrets to the same extent, and on the same basis, as Company's Confidential Information and trade secrets. Employee acknowledges that money damages would not be a sufficient remedy for any breach of this Section 5 by Employee, and Company shall be entitled to enforce the provisions of this Section 5 by terminating any payments then owing to Employee under this Agreement or any other agreement between Employee and the Company and/or to specific performance and injunctive relief as remedies for such breach or any threatened breach. Such remedies shall not be deemed the exclusive remedies for a breach of this Section 5, but shall be in addition to all remedies available at law or in equity to Company, including the recovery of damages from Employee and Employee's agents involved in such breach. In connection with any such equitable action, Employee agrees that Company shall not be required to post a bond greater than One

Thousand Dollars ($1,000).

5.2 Confidentiality of this Agreement. Employee understands and acknowledges that the terms and conditions of this Agreement constitute confidential information. Employee shall keep confidential the terms of this Agreement and shall not disclose this confidential information to anyone other than Employee's attorneys, tax advisors, spouse or as required by law. Employee acknowledges and understands that disclosure of the terms of this Agreement constitutes a material breach of this Agreement and could subject Employee to disciplinary action, including without limitation, termination of employment.

5.3 Fiduciary Duty. Employee acknowledges and agrees that, at all times during employment with Company, Employee owes fiduciary duties to Company, including, but not limited to, the fiduciary duties of the highest loyalty, fidelity and allegiance to act at all times in the best interests of the Company, to make full disclosure to Company of all information that pertains to Company's business and interests, to do no act which would injure Company's business, its interests, or its reputation, and to refrain from using for Employee's own benefit or for the benefit of others any information or opportunities pertaining to Company's business or interests that are entrusted to Employee or that Employee learned while employed by Company. Employee acknowledges and agrees that upon termination of said employment with Company, Employee shall continue to refrain from using for Employee's own benefit or the benefit of others any information or opportunities pertaining to Company's business or interests that were entrusted to Employee during the employment relationship or that Employee learned while employed by Company.

5.4 Return of Confidential Information. All written materials, records, and other documents made by, or coming into the possession of, Employee during the period of Employee's employment by Company which contain or disclose confidential business information or trade secrets of Company shall be and remain the property of Company, as the case may be. Upon termination of Employee's employment by Company, for any reason, Employee promptly shall deliver the same and all copies thereof, to Company.

6. Covenant Not to Compete.

6.1 The Company is engaged in the business of providing payroll services (the "***Business***").

6.2 For purposes of this Agreement, (a) the term "***Territory***" shall mean the State of Louisiana, including the Parishes of Louisiana in its entirety, and (b) the term "***Restricted Period***" shall mean the longer of (a) two (2) years following the termination.

6.3 Employee shall not, during the applicable Restricted Period, do any of the following, directly or indirectly, without the prior written consent of Company, in its sole and absolute discretion:

(a) Engage or participate, directly or indirectly, in any business activity in the Territory competitive with the Business;

(b) have a relationship with, interest in, or act for (whether as a principal, agent, shareholder, investor, partner, member, joint venture, manager, director, officer, employee, or consultant) any person, firm, corporation, association or other entity that provides or renders products and/or services competitive with the Business anywhere in the Territory; *provided, however*, that the foregoing shall not preclude Employee from owning not more than an aggregate of two percent (2%) of the equity of a publicly traded company;

(c) solicit, call on or transact, or engage in any direct or indirect business activity, or provide assistance in such acts, for a purpose competitive with the Business, with any (i) customer with whom the Company shall have dealt at any time preceding the termination of Employee's employment hereunder, or (ii) independent contractor or supplier with whom Company shall have dealt at any time preceding the termination of Employee's employment hereunder;

(d) influence or attempt to influence any then current or prospective customer or independent contractor of Company to terminate or modify any written or oral agreement with Company; or

(e) influence or attempt to influence any person, directly or indirectly, for a purpose competitive with the Business either (i) to terminate or modify an employment, consulting, agency, distributorship or other arrangement with Company, or (ii) to employ or retain, or arrange to have any other person or entity employ or retain, any person who has been employed or retained by Company as an employee, consultant, agent, supplier, or distributor at any time during the three (3) year period immediately preceding the termination of Employee's termination hereunder.

6.3 Employee acknowledges that he/she has carefully read and considered the provisions of this Section and understands that the foregoing restrictions may limit Employee's ability to engage in certain businesses anywhere in the Restricted Area during the period provided for above, but acknowledges that Employee will receive sufficiently high remuneration, confidential information and other benefits to justify such restriction. Employee acknowledges that money damages would not be a sufficient remedy for any breach of this Section 6 by Employee, and Company shall be entitled to enforce the provisions of this Section 6 by terminating any payments then owing to Employee under this Agreement or any other agreement between Employee and Company and/or to specific performance and injunctive relief as remedies for such breach or any threatened breach. Such remedies shall not be deemed the exclusive remedies for a breach of this Section 6, but shall be in addition to all remedies available at law or in equity to Company, including, without limitation, the recovery of damages from Employee and Employee's agents involved

in such breach. In connection with any such equitable action, Company shall not be required to post a bond greater than One Thousand Dollars ($1,000).

6.4 It is expressly understood and agreed that Company and Employee consider the restrictions contained in this Section 6 to be reasonable and necessary to protect the proprietary information and legitimate business interests of Company. Nevertheless, if any of the aforesaid restrictions are found by a court having jurisdiction to be unreasonable, or overly broad as to geographic area or time, or otherwise unenforceable, the parties intend for the restrictions herein set forth to be modified by such courts so as to be reasonable and enforceable and, as so modified by the court, to be fully enforced.

7. <u>Termination</u>. Employee's employment hereunder may be terminated as provided in this Section 7. Upon termination, Employee shall be entitled only to such compensation and benefits as are described below.

7.1 <u>Termination upon Disability or Death</u>.

(a) If Employee, due to physical or mental disability or incapacity (a "***Disability***"), is unable to perform his duties hereunder or devote the same amount of time, energy and skill that Employee normally performed prior to such Disability for a period of sixty (60) or more consecutive days, or for a total period of ninety (90) days in any six (6) consecutive month period, as determined by Company, Company shall have the right to terminate this Agreement and Employee's employment hereunder upon fifteen (15) days' prior written notice. Employee (or his personal representatives) shall fully cooperate with, provide all records pertinent to and submit to any medical examinations requested by Company to make a Disability determination. Failure of Employee (or his/her personal representatives) to comply with the previous sentence shall be deemed an admission that Employee is Disabled.

(b) If Employee dies during the Term, this Agreement shall automatically terminate.

(c) In the event of termination of Employee's employment under this Section 7.1, Employee (or his/her estate, as applicable) shall be entitled to receive all accrued but unpaid (as of the effective date of such termination) Salary, Benefits, and Employment Bonus. All Salary and unpaid expenses under sections 4.3 and 4.4 shall cease at the time of such termination. Except as specifically set forth in this Section 7.1, the Company shall have no liability or obligation hereunder by reason of or subsequent to such termination. Termination under this Section 7.1 shall not be deemed to be termination for Cause.

7.2 <u>Termination by Company for Cause</u>.

(a) Notwithstanding anything in this Agreement to the contrary, Company may terminate Employee's employment for Cause upon written notice to Employee. "***Cause***" shall be defined as Employee's: (i) gross negligence in the performance of, or

intentional nonperformance of, any of Employee's material duties and responsibilities hereunder; (ii) willful failure or refusal to comply in a material manner with generally applicable Company policies; (iii) willful dishonesty, fraud or material misconduct with respect to the material business affairs of the Company; (iv) failure or inability to follow a lawful order of the Chief Executive Officer or Board of Directors or Managers after receiving written notice that termination will result, (v) theft, embezzlement or other similar misappropriation of Company's funds or property in a material amount; (vi) formally convicted of, or pleading guilty to, any felony; (vii) violation of any federal, state or local law or regulation in the performance of his duties for the Company, but only to the extent that such performance is for his own personal material benefit; or (viii) failure to perform any of his material obligations under this Agreement and the failure to cure such breach within ten (10) days after written notice thereof to Employee from Company with a specific explanation of the alleged breach and the required corrective action.

(b) In the event of a termination of Employee's employment under this Section 7.2, Employee shall be entitled to receive all Salary, Bonus and Commission earned as of the effective date of such termination; *provided*, that the Employee has complied with all of his/her obligations under this Agreement and continues to comply with all of his/her surviving obligations set forth in this Agreement. In the event of a termination of Employee's employment under this Section 7.2, all Salary and unpaid expenses under sections 4.3 and 4.4 shall cease at the time of such termination.

7.3 Resignation by Employee. Employee shall have the right to terminate this Agreement on fourteen (14) days' prior written notice to Company. If Employee terminates this Agreement, Employee shall be entitled to receive all Salary, Bonus and Commission earned as of the effective date of such termination; *provided*, that the Employee has complied with all of his/her obligations under this Agreement and continues to comply with all of his/her surviving obligations set forth in this Agreement. All Salary, Commission, Bonus, and Benefits shall cease at the time of such termination. Company shall have no liability or obligation hereunder by reason of or subsequent to such termination. If Employee does not materially comply with the notice requirements provided for in this Section 7.4, Employee shall be deemed terminated for Cause pursuant and subject to Section 7.2 hereof.

7.4 Termination by Employee for Good Reason. Employee may terminate this Agreement at any time for Good Reason. For purposes of this Agreement, "**Good Reason**" means (i) the Company's failure to timely pay any amount due to Employee under this Agreement, (ii) the Company's dissolution, insolvency, or bankruptcy, or (iii) the assignment by the Board of Managers to Employee of any duties or responsibilities that are inconsistent with his/her status, title and position.

8. Survival of Provisions. The provisions of this Agreement set forth in Sections 4 through 15 hereof shall survive the termination of Employee's employment hereunder.

9. Successors and Assigns. This Agreement shall inure to the benefit of and be binding upon Company and Employee and their respective successors, executors, administrators, heirs and/or assigns; *provided*, that Employee shall not make any assignment of this Agreement or any interest herein, by operation of law or otherwise. Company may assign its rights under this Agreement.

10. Notice. Any notice hereunder by either party shall be given by personal delivery or by sending such notice by certified mail, return-receipt requested, or sent by any national overnight delivery service, addressed, as the case may be, to the other party at its address set forth below or at such other address designated by notice in the manner provided in this Section. Such notice shall be deemed to have been received upon the date of actual delivery if personally delivered or, in the case of mailing, two (2) days after deposit with the U.S. mail, or one business day if sent by national overnight delivery service.

(a) if to Company, to:

Crescent Payroll Solutions
ATTN.: Sanders Offner
2225 North Hullen Street
Metairie, LA 70001

(b) if to Employee, to:

Philip Carrillo
New Orleans, LA

11. Entire Agreement; Amendments. This Agreement contains the entire agreement and understanding of the parties hereto relating to Employee's employment by or other relationship with, Company, past and present, and merges and supersedes all prior and contemporaneous discussions, agreements and understandings of every nature between the parties hereto relating to the employment or other dealings and agreements of Employee with Company. This Agreement may not be changed or modified, except by an express agreement in writing signed by each of the parties hereto.

12. Waiver. The waiver of the breach of any term or provision of this Agreement shall not operate as or be construed to be a waiver of any other or subsequent breach of this Agreement.

13. Governing Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Louisiana, without regard to the principles of conflicts of laws of any jurisdiction; *provided*, that the provisions of Section 6 shall be construed and enforced in accordance with the laws of the applicable state.

14. Invalidity. If any provision of this Agreement shall be determined to be void, invalid, unenforceable or illegal for any reason, then the validity and enforceability of all of the remaining provisions hereof shall not be affected thereby. If any particular provision of this Agreement shall be adjudicated to be invalid or unenforceable, then such provision shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable, such amendment to apply only to the operation of such provision in the particular jurisdiction in which such adjudication is made; *provided*, that, if any provision contained in this Agreement shall be adjudicated to be invalid or unenforceable because such provision is held to be excessively broad as to duration, geographic scope, activity or subject, then such provision shall be deemed amended by limiting and

reducing it so as to be valid and enforceable to the maximum extent compatible with the applicable laws of such jurisdiction, such amendment only to apply with respect to the operation of such provision in the applicable jurisdiction in which the adjudication is made.

15. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall be deemed to be one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Employment Agreement as of the date first above written.

**EMPLOYER:**

Crescent Payroll Solutions

By: ______________________

Sanders Officer, President

**EMPLOYEE:**

Philip R. Carrillo

Philip Carrillo

Crescent payroll SOLUTIONS

ACKNOWLEDGEMENT

I acknowledge receipt of the Company's employee handbook. I agree to read the handbook and to follow the guidelines and policies set forth in the handbook and any amendments to the handbook along with the other policies and procedures of the Company.

I understand that I am not being hired for any definite period of time even though my wages are paid regularly. I further understand that I am an at-will employee and my employment can be terminated at any time, with or without cause and with or without prior notice either by the Company or myself. No promises or representations have been made to me that I can be disciplined or discharged from my employment with the Company only under certain circumstances or after certain events.

I am aware that the contents of the employee handbook are presented as a matter of information and that except for the at-will provisions, the handbook can be amended at any time. I realize that nothing in this handbook is intended to infringe upon my rights under Section Seven (7) of the National Labor Relations Act (NLRA).

I understand and agreed that the handbook is for informational purposes only and is not intended to create a contract, nor is it a contract of employment or continuing employment between myself and the Company. I also understand that neither the handbook nor any policy of the Company is a guarantee or promise of employment or continuing employment. I am aware that Company policy requires employees to be hired at-will and this policy cannot be changed by any oral modifications. My at-will employment status with the Company has been fully explained and I have been given an opportunity to ask questions regarding Company policies and my at-will employment status.

August 18, 2020
Dated

[signature]
Signature

Philip R. Carrillo
Print Name

EXHIBIT
3
Serpas Court Reporting
1.800.526.8720

# COMPENSATION AGREEMENT

This agreement made November 17, 2022, by and between Philip Carrillo, Sanders Offner, Justin Farrae, and Crescent and empact hr (a division of Crescent).

It is the desire of all parties to enter into this agreement, whereby Philip Carrillo's remuneration for services rendered is increased and Philip Carrillo is given certain other incentives.

It is agreed as follows:

1. Base wage increase to $100,000 per annum, effective November 16, December 5 check date, 2022.*
2. One-time bonus of $5000 will be paid to Philip Carrillo in December, 2022.
3. Of empact hr's net profits, starting January 1, 2023, Philip Carrillo will be paid a quarterly percentage share of 10%. Paid the 2nd check date of the following quarter.*
4. Of RPO's gross revenues, starting January 1, 2023, Philip Carrillo will be paid a quarterly percentage share of 10%. Paid the 2nd check date of the following quarter.*
5. 5% revenue share of empact hr (of the trailing 12 months at the given multiple of valuation), in the event of divestiture of recapitalization.*
6. Title change to Director of HR, effective October 17, 2022.

*All forms of remuneration end upon termination of employment. No claim on either extends past the final date of employment, and final payments for services rendered up to the date of termination.

In witness of, the parties have executed this agreement.

| | | |
|---|---|---|
| [signature] | Philip Carrillo | [signature] |
| Signature | Signature | Signature |
| Justin Farrae | Philip Carrillo | Sanders Offner |
| Printed Name | Printed Name | Printed Name |
| 11/30/22 | 11/30/22 | 11/30/22 |
| Date | Date | Date |

EXHIBIT
6
Serpas Court Reporting
1.800.526.8720

| Statement of Earnings For: | **Philip Carrillo** | | | **Crescent Payroll Solutions Inc**<br>2450 Severn Ave<br>Suite 300<br>Metairie, LA 70001 | |
|---|---|---|---|---|---|
| Period Begin 11/16/2022<br>Period End 11/30/2022<br>Check Date 12/5/2022 | Company Id 3433<br>Department 3000<br>Company 1 | Employee Number 43<br>Pay Group Semi-Monthly | | | |
| Federal Filing Single<br>Fed Exempts 0<br>Fed Additional | Res State TX<br>Work State TX<br>Local Filing | | | TX Exemptions<br>Local Exemptions | TX Additional<br>Local Additional |

| Voucher Id | Check Amount | Gross Pay | Net Pay | Check Message |
|---|---|---|---|---|
| V3075854 | $0.00 | $5,000.00 | $3,614.06 | |

**EARNINGS** *Not included in Totals ^Hrs/Units = Units (Units not included in Totals)

| Description | Rate | Hrs/Units | Dollars | YTD Hrs/Units | YTD Dollars |
|---|---|---|---|---|---|
| Bonus | | | 5,000.00 | | 5,000.00 |
| Salary | | | 0.00 | 1,733.74 | 77,438.49 |
| Holiday | | | 0.00 | 48.00 | 2,128.77 |
| *(M) Life | | | 0.00 | | 77.00 |
| *(M) Vision Pre | | | 0.00 | | 112.86 |
| *(M) EAP | | | 0.00 | | 65.56 |
| *(M) Life\|AD&D | | | 0.00 | | 35.86 |
| PTO | | | 0.00 | 101.00 | 4,519.29 |
| Bereavement | | | 0.00 | 24.00 | 1,038.42 |
| *401K ER Match | | | 0.00 | | 3,405.00 |
| *Expense Reimbur | | | 0.00 | | 640.02 |
| *Travel Expense | | | 0.00 | | 2,621.61 |
| **Total:** | | 0.00 | 5,000.00 | 1,906.74 | 90,124.97 |

**TAXES**

| Description | Current | YTD |
|---|---|---|
| SOC SEC EE | 310.00 | 5,328.14 |
| MED EE | 72.50 | 1,246.10 |
| FEDERAL WH | 600.00 | 12,235.04 |
| LOUISIANA WH | 153.44 | 2,860.56 |
| **Total:** | 1,135.94 | 21,669.84 |

**DEDUCTIONS**

| Description | Current | YTD |
|---|---|---|
| Medical PreTax | 0.00 | 3,496.90 |
| Dental PreTax | 0.00 | 347.16 |
| 401K | 250.00 | 6,051.29 |
| Acc PreTax | 0.00 | 343.20 |
| STD AfterTax | 0.00 | 686.40 |
| CPS Merch | 0.00 | 338.46 |
| **Total:** | 250.00 | 11,263.41 |

**CURRENT PERIOD LEAVE ACCRUAL**

| | | | | |
|---|---|---|---|---|
| PTO | Accrued: 5.0000 | Taken: 32.00 | Balance | 14.89 |
| Birthday | Accrued: 0.0000 | Taken: 0.00 | Balance | 8.00 |
| Floating Holiday | Accrued: 0.0000 | Taken: 0.00 | Balance | 0.00 |

**DISTRIBUTION OF NET PAY**

| | | | |
|---|---|---|---|
| Checking | Account: ####7631 | Deposit Amount: | 722.81 |
| Checking | Account: ####0217 | Deposit Amount: | 1,807.03 |
| Checking | Account: ####2249 | Deposit Amount: | 1,084.22 |

crescent

2450 Severn Ave
Suite 300
Metairie, LA 70001

| CHECK DATE | VOUCHER ID |
|---|---|
| 12/5/2022 | V3075854 |

| TOTAL NET PAY |
|---|
| ******$3,614.06 |

**Philip Carrillo**
9805 Warwana Road
Houston, TX 77080

**NOT NEGOTIABLE**

Crescent Payroll Solutions Inc
2450 Severn Ave Suite 300
Metairie, LA 70001

**Philip Carrillo**
9805 Warwana Road
Houston, TX 77080

EXHIBIT
7
Serpas Court Reporting
1.800.526.8720

IMPORTANT DOCUMENT ENCLOSED:

3433-Semi[illegible]V3075854

| Statement of Earnings For: | Philip Carrillo | | | | | Crescent Payroll Solutions Inc |
|---|---|---|---|---|---|---|
| Period Begin | 4/1/2023 | Company Id | 3433 | Employee Number | 43 | 2450 Severn Ave |
| Period End | 4/15/2023 | Department | 3000 | Pay Group | Semi-Monthly | Suite 300 |
| Check Date | 4/20/2023 | Company | 1 | | | Metairie, LA 70001 |
| Federal Filing | Single | Res State TX | | TX Exemptions | | TX Additional |
| Fed Exempts | 0 | Work State TX | | | | |
| Fed Additional | | Local Filing | | Local Exemptions | | Local Additional |

| Voucher Id | Check Amount | Gross Pay | Net Pay | Check Message |
|---|---|---|---|---|
| V3318941 | $0.00 | $3,282.59 | $2,472.00 | |

**EARNINGS** *Not Included in Totals ^Hrs/Units = Units (Units not included in Totals)

| Description | Rate | Hrs/Units | Dollars | YTD Hrs/Units | YTD Dollars |
|---|---|---|---|---|---|
| Commission | | | 3,282.59 | | 3,282.59 |
| *401K ER Match | | | 131.30 | | 1,305.99 |
| Salary | | | 0.00 | 566.69 | 27,243.69 |
| Holiday | | | 0.00 | 24.00 | 1,153.80 |
| *(M) Life | | | 0.00 | | 24.50 |
| *(M) Vision Pre | | | 0.00 | | 35.91 |
| *(M) EAP | | | 0.00 | | 20.86 |
| *(M) Medical P 1 | | | 0.00 | | 1,106.84 |
| *(M) Life\|AD&D | | | 0.00 | | 11.41 |
| PTO | | | 0.00 | 16.00 | 769.20 |
| *Car Allowance | | | 0.00 | | 100.00 |
| Clnt Ref Bonus | | | 0.00 | | 200.00 |
| *Expense Reimbur | | | 0.00 | | 41.20 |
| **Total:** | | 0.00 | 3,282.59 | 606.69 | 32,649.28 |

**TAXES**

| Description | Current | YTD |
|---|---|---|
| SOC SEC EE | 203.52 | 1,926.33 |
| MED EE | 47.60 | 450.51 |
| FEDERAL WH | 303.38 | 4,388.03 |
| LOUISIANA WH | 91.96 | 1,040.98 |
| **Total:** | 646.46 | 7,805.85 |

**DEDUCTIONS**

| Description | Current | YTD |
|---|---|---|
| Medical PreTax | 0.00 | 907.69 |
| Dental PreTax | 0.00 | 118.86 |
| FSA Medical | 0.00 | 350.00 |
| 401K | 164.13 | 1,632.44 |
| Acc PreTax | 0.00 | 91.56 |
| Illness PreTax | 0.00 | 30.87 |
| STD AfterTax | 0.00 | 312.55 |
| CPS Merch | 0.00 | 305.67 |
| Hospital Indemn | 0.00 | 80.50 |
| APL Term Life | 0.00 | 294.00 |
| **Total:** | 164.13 | 4,124.14 |

**CURRENT PERIOD LEAVE ACCRUAL**

| | | | | | | |
|---|---|---|---|---|---|---|
| PTO | Accrued: | 5.0000 | Taken: | 0.00 | Balance | 43.89 |
| Birthday | Accrued: | 0.0000 | Taken: | 0.00 | Balance | 8.00 |
| Floating Holiday | Accrued: | 0.0000 | Taken: | 0.00 | Balance | 8.00 |

**DISTRIBUTION OF NET PAY**

| | | | |
|---|---|---|---|
| Checking | Account: ####7631 | Deposit Amount: | 494.40 |
| Checking | Account: ####0217 | Deposit Amount: | 865.20 |
| Checking | Account: ####2249 | Deposit Amount: | 1,112.40 |

crescent

2450 Severn Ave
Suite 300
Metairie, LA 70001

| CHECK DATE | VOUCHER ID |
|---|---|
| 4/20/2023 | V3318941 |

**TOTAL NET PAY**
******$2,472.00

**Philip Carrillo**
9805 Warwana Road
Houston, TX 77080

**NOT NEGOTIABLE**

Crescent Payroll Solutions Inc
2450 Severn Ave Suite 300
Metairie, LA 70001

**Philip Carrillo**
9805 Warwana Road
Houston, TX 77080

EXHIBIT
10
Serpas Court Reporting
1.800.526.8720

IMPORTANT DOCUMENT ENCLOSED:

3433-Semi...18941

Statement of Earnings For: **Philip Carrillo**

**Crescent Payroll Solutions Inc**
2450 Severn Ave
Suite 300
Metairie, LA 70001

| | | | | | |
|---|---|---|---|---|---|
| Period Begin | 7/1/2023 | Company Id | 3433 | Employee Number | 43 |
| Period End | 7/15/2023 | Department | 3000 | Pay Group | Semi-Monthly |
| Check Date | 7/20/2023 | Company | 1 | | |

| | | | | | |
|---|---|---|---|---|---|
| Federal Filing | Single | Res State TX | | TX Exemptions | TX Additional |
| Fed Exempts | 0 | Work State TX | | | |
| Fed Additional | | Local Filing | | Local Exemptions | Local Additional |

| Voucher Id | Check Amount | Gross Pay | Net Pay | Check Message |
|---|---|---|---|---|
| V3464081 | $0.00 | $3,672.55 | $2,559.99 | |

**EARNINGS** *Not included in Totals ^Hrs/Units = Units (Units not included in Totals)

| Description | Rate | Hrs/Units | Dollars | YTD Hrs/Units | YTD Dollars |
|---|---|---|---|---|---|
| Commission | | | 3,672.55 | | 6,955.14 |
| *401K ER Match | | | 146.90 | | 2,452.91 |
| Salary | | | 0.00 | 1,050.71 | 50,513.01 |
| Holiday | | | 0.00 | 32.00 | 1,538.40 |
| *(M) Life | | | 0.00 | | 45.50 |
| *(M) Vision Pre | | | 0.00 | | 66.69 |
| *(M) EAP | | | 0.00 | | 38.74 |
| *(M) Medical P 1 | | | 0.00 | | 2,055.56 |
| *(M) Life\|AD&D | | | 0.00 | | 21.19 |
| PTO | | | 0.00 | 36.00 | 1,730.70 |
| *Car Allowance | | | 0.00 | | 400.00 |
| Birthday | | | 0.00 | 8.00 | 384.60 |
| Clnt Ref Bonus | | | 0.00 | | 200.00 |
| *Expense Reimbur | | | 0.00 | | 186.80 |
| *Travel Expense | | | 0.00 | | 156.30 |
| *Meals | | | 0.00 | | 25.00 |
| **Total:** | | 0.00 | 3,672.55 | 1,126.71 | 61,321.85 |

**TAXES**

| Description | Current | YTD |
|---|---|---|
| SOC SEC EE | 227.70 | 3,620.09 |
| MED EE | 53.25 | 846.63 |
| FEDERAL WH | 523.92 | 8,377.25 |
| LOUISIANA WH | 124.06 | 1,971.56 |
| **Total:** | 928.93 | 14,815.53 |

**DEDUCTIONS**

| Description | Current | YTD |
|---|---|---|
| Medical PreTax | 0.00 | 1,685.71 |
| Dental PreTax | 0.00 | 220.74 |
| FSA Medical | 0.00 | 650.00 |
| 401K | 183.63 | 3,066.05 |
| Acc PreTax | 0.00 | 170.04 |
| Illness PreTax | 0.00 | 57.33 |
| STD AfterTax | 0.00 | 580.45 |
| CPS Merch | 0.00 | 305.67 |
| Hospital Indemn | 0.00 | 149.50 |
| APL Term Life | 0.00 | 546.00 |
| **Total:** | 183.63 | 7,431.49 |

**CURRENT PERIOD LEAVE ACCRUAL**

| | | | | |
|---|---|---|---|---|
| PTO | Accrued: 5.0000 | Taken: 24.00 | Balance | 29.89 |
| Birthday | Accrued: 0.0000 | Taken: 0.00 | Balance | 0.00 |
| Floating Holiday | Accrued: 0.0000 | Taken: 0.00 | Balance | 8.00 |

**DISTRIBUTION OF NET PAY**

| | | | |
|---|---|---|---|
| Checking | Account: ####7631 | Deposit Amount: | 512.00 |
| Checking | Account: ####0217 | Deposit Amount: | 896.00 |
| Checking | Account: ####2249 | Deposit Amount: | 1,151.99 |

crescent

2450 Severn Ave
Suite 300
Metairie, LA 70001

| CHECK DATE | VOUCHER ID |
|---|---|
| 7/20/2023 | V3464081 |

| TOTAL NET PAY |
|---|
| ******$2,559.99 |

**Philip Carrillo**
9805 Warwana Road
Houston, TX 77080

**NOT NEGOTIABLE**

Crescent Payroll Solutions Inc
2450 Severn Ave Suite 300
Metairie, LA 70001

**Philip Carrillo**
9805 Warwana Road
Houston, TX 77080

**EXHIBIT**
11
Serpas Court Reporting
1.800.526.8720

IMPORTANT DOCUMENT ENCLOSED:

3433-Semi... V3464081

Statement of Earnings For: **Philip Carrillo**

**Crescent Payroll Solutions Inc**
2450 Severn Ave
Suite 300
Metairie, LA 70001

| | | | | | |
|---|---|---|---|---|---|
| Period Begin | 10/1/2023 | Company Id | 3433 | Employee Number | 43 |
| Period End | 10/15/2023 | Department | 3000 | Pay Group | Semi-Monthly |
| Check Date | 10/20/2023 | Company | 1 | | |

| | | | | |
|---|---|---|---|---|
| Federal Filing | Single | Res State TX | TX Exemptions | TX Additional |
| Fed Exempts | 0 | Work State TX | | |
| Fed Additional | | Local Filing | Local Exemptions | Local Additional |

| Voucher Id | Check Amount | Gross Pay | Net Pay | Check Message |
|---|---|---|---|---|
| V3618299 | $0.00 | $4,255.29 | $2,923.69 | |

**EARNINGS** *Not Included in Totals ^Hrs/Units = Units (Units not Included in Totals)

| Description | Rate | Hrs/Units | Dollars | YTD Hrs/Units | YTD Dollars |
|---|---|---|---|---|---|
| Commission | | | 4,255.29 | | 11,210.43 |
| *401K ER Match | | | 170.21 | | 3,623.14 |
| Salary | | | 0.00 | 1,518.73 | 73,013.13 |
| Holiday | | | 0.00 | 48.00 | 2,307.60 |
| *(M) Life | | | 0.00 | | 66.50 |
| *(M) Vision Pre | | | 0.00 | | 97.47 |
| *(M) EAP | | | 0.00 | | 56.62 |
| *(M) Medical P 1 | | | 0.00 | | 3,004.28 |
| *(M) Life\|AD&D | | | 0.00 | | 30.97 |
| PTO | | | 0.00 | 72.00 | 3,461.40 |
| *Car Allowance | | | 0.00 | | 700.00 |
| Birthday | | | 0.00 | 8.00 | 384.60 |
| Clnt Ref Bonus | | | 0.00 | | 200.00 |
| *Expense Reimbur | | | 0.00 | | 933.18 |
| *Travel Expense | | | 0.00 | | 823.30 |
| *Meals | | | 0.00 | | 93.11 |
| **Total:** | | 0.00 | 4,255.29 | 1,646.73 | 90,577.16 |

**TAXES**

| Description | Current | YTD |
|---|---|---|
| SOC SEC EE | 263.83 | 5,349.98 |
| MED EE | 61.71 | 1,251.21 |
| FEDERAL WH | 645.71 | 12,488.26 |
| LOUISIANA WH | 147.59 | 2,925.67 |
| **Total:** | 1,118.84 | 22,015.12 |

**DEDUCTIONS**

| Description | Current | YTD |
|---|---|---|
| Medical PreTax | 0.00 | 2,463.73 |
| Dental PreTax | 0.00 | 322.62 |
| FSA Medical | 0.00 | 950.00 |
| 401K | 212.76 | 4,528.79 |
| Acc PreTax | 0.00 | 248.52 |
| Illness PreTax | 0.00 | 83.79 |
| STD AfterTax | 0.00 | 848.35 |
| CPS Merch | 0.00 | 305.67 |
| Hospital Indemn | 0.00 | 218.50 |
| APL Term Life | 0.00 | 798.00 |
| **Total:** | 212.76 | 10,767.97 |

**CURRENT PERIOD LEAVE ACCRUAL**

| | | | | |
|---|---|---|---|---|
| PTO | Accrued: 5.0000 | Taken: 0.00 | Balance | 47.89 |
| Birthday | Accrued: 0.0000 | Taken: 0.00 | Balance | 0.00 |
| Floating Holiday | Accrued: 0.0000 | Taken: 0.00 | Balance | 8.00 |

**DISTRIBUTION OF NET PAY**

| | | | |
|---|---|---|---|
| Checking | Account: ####7631 | Deposit Amount: | 1,461.85 |
| Checking | Account: ####0217 | Deposit Amount: | 1,461.84 |

crescent

2450 Severn Ave
Suite 300
Metairie, LA 70001

| CHECK DATE | VOUCHER ID |
|---|---|
| 10/20/2023 | V3618299 |

| TOTAL NET PAY |
|---|
| ******$2,923.69 |

**Philip Carrillo**
9805 Warwana Road
Houston, TX 77080

**NOT NEGOTIABLE**

Crescent Payroll Solutions Inc
2450 Severn Ave Suite 300
Metairie, LA 70001

**Philip Carrillo**
9805 Warwana Road
Houston, TX 77080

EXHIBIT
12
Serpas Court Reporting
1.800.526.8720

IMPORTANT DOCUMENT ENCLOSED:

| Statement of Earnings For: | **Philip Carrillo** | | Crescent Payroll Solutions Inc<br>2450 Severn Ave<br>Suite 300<br>Metairie, LA 70001 |
|---|---|---|---|
| Period Begin 1/19/2024<br>Period End 1/19/2024<br>Check Date 1/19/2024 | Company Id 3433<br>Department 3000<br>Company 1 | Employee Number 43<br>Pay Group Semi-Monthly | |
| Federal Filing Single<br>Fed Exempts 0<br>Fed Additional | Res State TX<br>Work State TX<br>Local Filing | TX Exemptions<br>Local Exemptions | TX Additional<br>Local Additional |

| Voucher Id | Check Amount | Gross Pay | Net Pay | Check Message |
|---|---|---|---|---|
| V3786209 | $0.00 | $6,436.31 | $4,963.93 | |

**EARNINGS** *Not included in Totals ^Hrs/Units = Units (Units not included in Totals)

| Description | Rate | Hrs/Units | Dollars | YTD Hrs/Units | YTD Dollars |
|---|---|---|---|---|---|
| Commission | | | 6,436.31 | | 6,436.31 |
| Salary | | | 0.00 | 125.34 | 6,025.74 |
| Holiday | | | 0.00 | 16.00 | 769.20 |
| *(M) Life | | | 0.00 | | 7.00 |
| *(M) Vision Pre | | | 0.00 | | 10.26 |
| *(M) EAP | | | 0.00 | | 5.96 |
| *(M) Medical P 1 | | | 0.00 | | 333.86 |
| *(M) Life\|AD&D | | | 0.00 | | 3.26 |
| PTO | | | 0.00 | 16.00 | 769.20 |
| *Car Allowance | | | 0.00 | | 100.00 |
| Birthday | | | 0.00 | 8.00 | 384.60 |
| Floating Holida | | | 0.00 | 8.00 | 384.60 |
| *401K ER Match | | | 0.00 | | 333.34 |
| **Total:** | | 0.00 | 6,436.31 | 173.34 | 14,769.65 |

**TAXES**

| Description | Current | YTD |
|---|---|---|
| SOC SEC EE | 399.05 | 889.83 |
| MED EE | 93.33 | 208.11 |
| FEDERAL WH | 495.74 | 1,623.30 |
| LOUISIANA WH | 162.44 | 432.72 |
| **Total:** | 1,150.56 | 3,153.96 |

**DEDUCTIONS**

| Description | Current | YTD |
|---|---|---|
| Medical PreTax | 0.00 | 281.78 |
| Dental PreTax | 0.00 | 35.80 |
| FSA Medical | 0.00 | 100.00 |
| 401K | 321.82 | 738.48 |
| Misc Deduction | 0.00 | 40.00 |
| APL Term Life | 0.00 | 84.00 |
| **Total:** | 321.82 | 1,280.06 |

**CURRENT PERIOD LEAVE ACCRUAL**

| | | | | |
|---|---|---|---|---|
| PTO | Accrued: 0.0000 | Taken: 0.00 | Balance | 37.89 |
| Birthday | Accrued: 0.0000 | Taken: 0.00 | Balance | 8.00 |
| Floating Holiday | Accrued: 0.0000 | Taken: 0.00 | Balance | 8.00 |

**DISTRIBUTION OF NET PAY**

| | | | |
|---|---|---|---|
| Checking | Account: ####7631 | Deposit Amount: | 2,481.97 |
| Checking | Account: ####0217 | Deposit Amount: | 1,985.57 |
| Checking | Account: ####2249 | Deposit Amount: | 496.39 |

crescent

2450 Severn Ave
Suite 300
Metairie, LA 70001

| CHECK DATE | VOUCHER ID |
|---|---|
| 1/19/2024 | V3786209 |

| TOTAL NET PAY |
|---|
| ******$4,963.93 |

**Philip Carrillo**
9805 Warwana Road
Houston, TX 77080

**NOT NEGOTIABLE**

Crescent Payroll Solutions Inc
2450 Severn Ave Suite 300
Metairie, LA 70001

**Philip Carrillo**
9805 Warwana Road
Houston, TX 77080

EXHIBIT
13
Serpas Court Reporting
1.800.526.8720

IMPORTANT DOCUMENT ENCLOSED:

3433-Semi-Monthly-3000-1-V3786209

| Statement of Earnings For: | **Philip Carrillo** | | | **Crescent Payroll Solutions Inc** |
|---|---|---|---|---|
| Period Begin 4/1/2024 | Company Id 3433 | Employee Number 43 | | 2450 Severn Ave |
| Period End 4/15/2024 | Department 3000 | Pay Group Semi-Monthly | | Suite 300 |
| Check Date 4/19/2024 | Company 1 | | | Metairie, LA 70001 |

| | | | |
|---|---|---|---|
| Federal Filing Single | Res State TX | TX Exemptions | TX Additional |
| Fed Exempts 0 | Work State TX | | |
| Fed Additional | Local Filing | Local Exemptions | Local Additional |

| Voucher Id | Check Amount | Gross Pay | Net Pay | Check Message |
|---|---|---|---|---|
| V3952752 | $0.00 | $5,133.47 | $4,136.87 | |

**EARNINGS** *Not included in Totals ^Hrs/Units = Units (Units not included in Totals)

| Description | Rate | Hrs/Units | Dollars | YTD Hrs/Units | YTD Dollars |
|---|---|---|---|---|---|
| Commission | | | 5,133.47 | | 12,501.91 |
| *401K ER Match | | | 205.34 | | 1,409.31 |
| Salary | | | 0.00 | 534.69 | 25,705.29 |
| Holiday | | | 0.00 | 24.00 | 1,153.80 |
| *(M) Life | | | 0.00 | | 24.50 |
| *(M) Vision Pre | | | 0.00 | | 35.91 |
| *(M) EAP | | | 0.00 | | 20.86 |
| *(M) Medical P 1 | | | 0.00 | | 1,168.51 |
| *(M) Life\|AD&D | | | 0.00 | | 11.41 |
| PTO | | | 0.00 | 24.00 | 1,153.80 |
| *Car Allowance | | | 0.00 | | 400.00 |
| Birthday | | | 0.00 | 8.00 | 384.60 |
| Floating Holida | | | 0.00 | 16.00 | 769.20 |
| *Expense Reimbur | | | 0.00 | | 202.69 |
| *Travel Expense | | | 0.00 | | 624.28 |
| **Total:** | | 0.00 | 5,133.47 | 606.69 | 41,668.60 |

**TAXES**

| Description | Current | YTD |
|---|---|---|
| SOC SEC EE | 318.28 | 2,492.84 |
| MED EE | 74.43 | 583.00 |
| FEDERAL WH | 347.22 | 4,988.16 |
| LOUISIANA WH | 0.00 | 1,146.05 |
| **Total:** | 739.93 | 9,210.05 |

**DEDUCTIONS**

| Description | Current | YTD |
|---|---|---|
| Medical PreTax | 0.00 | 986.23 |
| Dental PreTax | 0.00 | 125.30 |
| FSA Medical | 0.00 | 350.00 |
| 401K | 256.67 | 2,083.41 |
| Misc Deduction | 0.00 | 40.00 |
| APL Term Life | 0.00 | 294.00 |
| **Total:** | 256.67 | 3,878.94 |

**CURRENT PERIOD LEAVE ACCRUAL**

| | | | | |
|---|---|---|---|---|
| PTO | Accrued: 5.0000 | Taken: 0.00 | Balance | 59.89 |
| Birthday | Accrued: 0.0000 | Taken: 0.00 | Balance | 8.00 |
| Floating Holiday | Accrued: 0.0000 | Taken: 0.00 | Balance | 0.00 |

**DISTRIBUTION OF NET PAY**

| | | | |
|---|---|---|---|
| Checking | Account: ####7631 | Deposit Amount: | 1,034.22 |
| Checking | Account: ####0217 | Deposit Amount: | 3,102.65 |

crescent

2450 Severn Ave
Suite 300
Metairie, LA 70001

| CHECK DATE | VOUCHER ID |
|---|---|
| 4/19/2024 | V3952752 |

| TOTAL NET PAY |
|---|
| ******$4,136.87 |

**Philip Carrillo**
9805 Warwana Road
Houston, TX 77080

**NOT NEGOTIABLE**

Crescent Payroll Solutions Inc
2450 Severn Ave Suite 300
Metairie, LA 70001

**Philip Carrillo**
9805 Warwana Road
Houston, TX 77080

**EXHIBIT**
14
Serpas Court Reporting
1.800.526.8720

IMPORTANT DOCUMENT ENCLOSED:

| Statement of Earnings For: | **Philip Carrillo** | | | **Crescent Payroll Solutions Inc** |
|---|---|---|---|---|
| Period Begin 7/1/2024<br>Period End 7/15/2024<br>Check Date 7/19/2024 | Company Id 3433<br>Department 3000<br>Company 1 | Employee Number 43<br>Pay Group Semi-Monthly | | 2450 Severn Ave<br>Suite 300<br>Metairie, LA 70001 |
| Federal Filing Single<br>Fed Exempts 0<br>Fed Additional | Res State TX<br>Work State TX<br>Local Filing | | TX Exemptions<br>Local Exemptions | TX Additional<br>Local Additional |

| Voucher Id | Check Amount | Gross Pay | Net Pay | Check Message |
|---|---|---|---|---|
| V4203222 | $0.00 | $3,292.62 | $2,577.48 | |

**EARNINGS** *Not included in Totals ^Hrs/Units = Units (Units not included in Totals)

| Description | Rate | Hrs/Units | Dollars | YTD Hrs/Units | YTD Dollars |
|---|---|---|---|---|---|
| Bonus | | | 3,292.62 | | 3,292.62 |
| Salary | | | 0.00 | 920.04 | 46,538.65 |
| Holiday | | | 0.00 | 32.00 | 1,538.40 |
| *(M) Life | | | 0.00 | | 45.50 |
| *(M) Vision Pre | | | 0.00 | | 66.69 |
| *(M) EAP | | | 0.00 | | 38.74 |
| *(M) Medical P 1 | | | 0.00 | | 2,170.09 |
| Commission | | | 0.00 | | 12,501.91 |
| *(M) Life\|AD&D | | | 0.00 | | 21.19 |
| PTO | | | 0.00 | 56.00 | 2,692.20 |
| *Car Allowance | | | 0.00 | | 600.00 |
| VIP Bonus | | | 0.00 | | 1,500.00 |
| Birthday | | | 0.00 | 16.00 | 769.20 |
| Floating Holida | | | 0.00 | 16.00 | 769.20 |
| *401K ER Match | | | 0.00 | | 2,394.96 |
| PTO Payout | | | 0.00 | 68.89 | 3,311.89 |
| *Expense Reimbur | | | 0.00 | | 202.69 |
| *Travel Expense | | | 0.00 | 581.36 | 1,230.64 |
| *Meals | | | 0.00 | | 45.00 |
| **Total:** | | 0.00 | 3,292.62 | 1,108.93 | 72,914.07 |

**TAXES**

| Description | Current | YTD |
|---|---|---|
| SOC SEC EE | 204.14 | 4,352.39 |
| MED EE | 47.75 | 1,017.90 |
| FEDERAL WH | 463.25 | 9,519.51 |
| LOUISIANA WH | 0.00 | 1,146.05 |
| **Total:** | 715.14 | 16,035.85 |

**DEDUCTIONS**

| Description | Current | YTD |
|---|---|---|
| Medical PreTax | 0.00 | 1,831.57 |
| Dental PreTax | 0.00 | 232.70 |
| FSA Medical | 0.00 | 650.00 |
| 401K | 0.00 | 3,315.44 |
| Misc Deduction | 0.00 | 150.00 |
| APL Term Life | 0.00 | 546.00 |
| **Total:** | 0.00 | 6,725.71 |

**CURRENT PERIOD LEAVE ACCRUAL**

| | | | | | | |
|---|---|---|---|---|---|---|
| PTO | Accrued: | 0.0000 | Taken: | 0.00 | Balance | 0.00 |
| Birthday | Accrued: | 0.0000 | Taken: | 0.00 | Balance | 0.00 |
| Floating Holiday | Accrued: | 0.0000 | Taken: | 0.00 | Balance | 0.00 |

**DISTRIBUTION OF NET PAY**

| | | | |
|---|---|---|---|
| Checking | Account: ####7631 | Deposit Amount: | 644.37 |
| Checking | Account: ####0217 | Deposit Amount: | 1,933.11 |

crescent

2450 Severn Ave
Suite 300
Metairie, LA 70001

| CHECK DATE | VOUCHER ID |
|---|---|
| 7/19/2024 | V4203222 |

**TOTAL NET PAY**
******$2,577.48

**Philip Carrillo**
9805 Warwana Road
Houston, TX 77080

**NOT NEGOTIABLE**

Crescent Payroll Solutions Inc
2450 Severn Ave Suite 300
Metairie, LA 70001

**Philip Carrillo**
9805 Warwana Road
Houston, TX 77080

EXHIBIT
15
Serpas Court Reporting
1.800.526.8720

IMPORTANT DOCUMENT ENCLOSED:

3433-Semi[illegible]V4203222

**Jessica Johnson**

---

| | |
|---|---|
| **From:** | Sanders Offner |
| **Sent:** | Wednesday, December 6, 2023 6:08 PM |
| **To:** | Philip Carrillo |
| **Subject:** | RE: Thank You |

Thank you Philip. I have some great ideas to discuss with you and give you some insight on where I feel your strengths can best fit the organization. With the intent to allow your creative side to flourish and give you the ability to make more money through commissions. But we have to talk through that first to make sure we are on the same page.

Are you available on the 18th at 2pm to meet?

*Thanks in advance,*


**Sanders Offner**
President & Visionary , Crescent

crescent
empowering people

2450 Severn Ave Suite 300 Metairie, LA 70001
504-301-3318 Ext. 1180
Sanders@crescent-hr.com
http://www.crescent-hr.com/

empact hr



The technology you want
The support you need

SSAE 16 CERTIFIED SOC 1 TYPE II
CityBusiness 21 Best Places to Work
Inc. 5000

Join our team **Are you ready for the challenge?**


**From:** Philip Carrillo <philip@crescent-hr.com>
**Sent:** Wednesday, December 6, 2023 4:31 PM

EXHIBIT 19
Serpas Court Reporting
1.800.526.8720

**To:** Sanders Offner <sanders@crescent-hr.com>
**Subject:** Thank You

I wanted to let you know I appreciate everything this business—you and Justin—have done and continue to do for me. You give your time consideration to thinking about my best role for the business and where I can push myself. I am very open to evolving as needs change and the business expands. All of it has been an adventure so far.

Thanks for the fun planning session, dinner, and darts, too.

**Philip Carrillo, MBA, SHRM-SCP**
Director, HR Consulting | **empact hr**

2450 Severn Ave., Suite 300; Metairie, LA 70001
504-301-3318, ext.1378
philip@crescent-hr.com
http://www.crescent-hr.com

Click to schedule a meeting

The technology you want
The support you need

empact hr, a subsidiary of Crescent, is committed to its customers' business success. empact hr does not engage in the practice of law and the contents of this email should not be construed as legal advice and does not create an attorney-client relationship. Legal questions should be directed to a licensed attorney. empact hr and Crescent cannot be held legally accountable for actions related to its receipt.

crescent

May 23, 2024

Equimax Mortgage
2401 Fountain View Drive,
Suite 464,
Houston, TX 77057

Attn: Tim Tran –

Philp Carrillo, Director of HR Consulting for Empact HR, is a full time, exempt employee of Crescent Payroll Solutions. He has been employed since 08/17/2020. Philip is a remote employee working from his home at 9805 Warwana Road, Houston, Texas, 77080.

As Director of HR Consulting, Philip is eligible for a 10% profit share of the gross profit generated by the HR Services Department. During the year of 2021 the department was just being developed and did not generate enough gross revenue for Philip to receive a profit share. In 2022 the department continued to grow slowly and added an employee. This limited the profit overall to $53,248.50 giving Philip a bonus of $5324.85 in total. In 2023 the gross revenue total grew dramatically. The department grew by an additional employee bringing the profit of the department for the first three quarters of 2023 to $112,104.25 thereby giving Philip a profit share of $11,210.43 paid by the end of 2023. The last quarter of 2023 and the first quarter of 2024 showed a gross profit of $122,710.30 giving Philip $12,501.91 paid to date in 2024.

The profit share agreement with Philip Carrillo continues and will throughout his employment with Crescent Payroll Solutions.

We appreciate the opportunity to provide this information to you and are available to answer further questions as required.

Best Regards,

Jessica Johnson
Director of Administration
504-301-3318 x 1010

2450 Severn Ave. Suite 300, Metairie, LA 70001
Tel (504) 301-3318

www.support@crescent-hr.com

EXHIBIT
22
Serpas Court Reporting
1.800.526.8720

crescent

# Employee Warning Notice

## Employee Information

| | | | |
|---|---|---|---|
| **Employee Name:** | Philip Carrillo | **Date:** | 06/13/2024 |
| **Employee ID:** | | **Job Title:** | Director, HR Consulting |
| **Manager:** | Sanders Offner | **Department:** | Empact HR |

## Type of Warning

☒ First Warning ☐ Second Warning ☐ Final Warning

## Type of Offenses

| | | |
|---|---|---|
| ☐ Tardiness/Absenteeism | ☐ Conduct | ☐ Violation of Company Policies |
| ☒ Substandard Work | ☐ Violation of Safety Rules | ☐ Insubordination |
| ☐ Other: ______ | | |

## Details

Description of Infraction: Philip has not been as engaged or attentive to his staff, clients, or job responsibilities for several months. On May 8th, one of the staff of Empact HR, Philip's Department, brought to the company's attention his concerns and evidence of continued disengagement on Philip's behalf. This employee and another full-time member of Empact HR discussed their concerns with Philip within the next two days, just prior to his vacation. Philip acknowledged their observations and committed to improve upon his return.

It was then brought to the company's attention again by his staff on June 7th stipulating things had not improved. Further, they stated that Philip advised them he would be disconnected and disengaged for the foreseeable future due to matters in his personal life. Sanders Offner and Jessica Johnson addressed all concerns with Philip on June 13th after individually interviewing the staff of EmpactHR. Philip acknowledged his personal life, including but not limited to his move to Houston, has been a distraction and committed to improve.

Plan for Improvement: Sanders Offner placed Philip on a 30-day Improvement Plan. During this time Philip is to conduct a weekly check in with Sanders; to include a report detailing the activities he completes during the workdays of the week under review. Sanders will then assess Philip's performance, including his engagement and weekly activities, at the end of the 30-day period.

Consequences of Further Infractions: If further infractions are uncovered or improvement is not made, Philip is subject to further disciplinary actions including termination of employment.

EXHIBIT
25
Serpas Court Reporting
1.800.526.8720

crescent

## Acknowledgment of Receipt of Warnings

By signing this form, you confirm that you understand the information in this warning. You also confirm that you and your manager have discussed the warning and a plan for improvement. Signing this form does not necessarily indicate that you agree with this warning.

Employee Signature | Date

6/19/24

Manager Signature | Date

Witness Signature (if employee understands warning but refuses to sign) | Date

**Jessica Johnson**

**From:** Philip Carrillo
**Sent:** Thursday, June 20, 2024 8:23 AM
**To:** Jessica Johnson
**Cc:** Sanders Offner; Justin Farrae
**Subject:** RE: 30 Day Improvement Notification - Plan.

I appreciate the opportunity to continue contributing excellence to the organization. I have contributed greatly and want to continue.

I do not have a printer and the adobe license I use has too many users for me to use the electronic form creation / signature. Can you send me a paper copy to sign and mail back?


crescent
empowering people
empact hr

**Philip Carrillo, MBA, SHRM-SCP**
Director, HR Consulting | empact hr

2450 Severn Ave., Suite 300; Metairie, LA 70001
504-301-3318, ext.1378
philip@crescent-hr.com
http://www.crescent-hr.com


Click to schedule a meeting


The technology you want
The support you need
SSAE 16 CERTIFIED
CityBusiness 2021 Best Places to Work
Inc. 5000
LSU ONE HUNDRED

empact hr, a subsidiary of Crescent, is committed to its customers' business success. empact hr does not engage in the practice of law and the contents of this email should not be construed as legal advice and does not create an attorney-client relationship. Legal questions should be directed to a licensed attorney. empact hr and Crescent cannot be held legally accountable for actions related to its receipt.


**From:** Jessica Johnson <jjohnson@crescent-hr.com>
**Sent:** Wednesday, June 19, 2024 5:16 PM
**To:** Philip Carrillo <philip@crescent-hr.com>

**EXHIBIT**
26
Serpas Court Reporting
1.800.526.8720

**Cc:** Sanders Offner <sanders@crescent-hr.com>; Justin Farrae <justin@crescent-hr.com>; Jessica Johnson <jjohnson@crescent-hr.com>
**Subject:** RE: 30 Day Improvement Notification - Plan.

Hello Philip –
Thank you for your email and your call regarding my emails sent on June 13, 2024, detailing your 30 day Improvement requirements, and the subsequent email sent today with the formal write-up. I understand your request to clarify the matter regarding the DAR requirements. As I understand it, your understanding was that you were required to only submit a weekly activity report detailing all activities completed during the workdays of the week in question. You did not agree that you had to complete a DAR daily.

I submitted your inquiry to Sanders Offner this afternoon to clarify.

You were correct in your understanding. You are required to submit a weekly activity report detailing all activity completed during the days of the week in review. You do not have to complete or submit a DAR form daily.

I apologize for the error in the document sent this morning and have amended it accordingly. Please find attached the revised form explaining that you are in fact required to complete a weekly activity report detailing your activities for the week in review.

I appreciate your bringing this to my attention and am available if you have any further questions or concerns.

Have a good evening.

crescent
empowering people
empact hr
powered by crescent

Jessica Johnson
*Director of Administration - Crescent*
2450 Severn Ave. Suite 300, Metairie, LA 70001
Office 504.301.3318 ext 1010| Fax 504.434.4748
www.crescent-hr.com

**From:** Jessica Johnson <jjohnson@crescent-hr.com>
**Sent:** Wednesday, June 19, 2024 1:13 PM
**To:** Philip Carrillo <philip@crescent-hr.com>
**Cc:** Sanders Offner <sanders@crescent-hr.com>; Justin Farrae <justin@crescent-hr.com>; Jessica Johnson <jjohnson@crescent-hr.com>
**Subject:** RE: 30 Day Improvement Notification - Plan.

Hello Philip –
I hope you are doing well today.

Please find attached the completed write-up form that was omitted from my email sent on June 13, 2024. We apologize for the oversight in not attaching this to our email below.

Please review the form in its entirety. You can see it states the same as the email sent. Once you have taken the time to review the form, please sign and return it to me.

Please let us know if you have any questions or concerns regarding this request.

Best Regards,

crescent
empowering people
empact hr
powered by crescent

Jessica Johnson
*Director of Administration - Crescent*
2450 Severn Ave. Suite 300, Metairie, LA 70001
Office 504.301.3318 ext 1010| Fax 504.434.4748
www.crescent-hr.com

**From:** Philip Carrillo <philip@crescent-hr.com>
**Sent:** Thursday, June 13, 2024 2:04 PM
**To:** Jessica Johnson <jjohnson@crescent-hr.com>
**Cc:** Sanders Offner <sanders@crescent-hr.com>
**Subject:** RE: 30 Day Improvement Notification - Plan.

I understood I agreed to provide Sanders a report of relevant activities with respect to my team oversight. How detailed is this weekly email expected to be?

I am committed to being a strong manager, no matter what. And I am confident the team will be unable to report anything less than that at the end of 30 days. I am concerned about the sentimental aspect of this PIP as well as the brief time period.

Changes will need to be made to their responsibilities. Part of why they're feeling disconnected from me has to do with the broad ranging latitude I have given them to self-direct and to steer through various initiatives of their own making. We are getting on a call Monday to limit the scope of work to their job descriptions, which is client support and related activities, so there isn't an insupportable range of tasks to track and to focus on with quality assurance.

Thanks for the expression of support for me as I have gone through these life changes.

Philip Carrillo, MBA, SHRM-SCP
Director, HR Consulting | empact hr

crescent
empowering people
empact hr
powered by crescent

2450 Severn Ave., Suite 300; Metairie, LA 70001
504-301-3318, ext.1378
philip@crescent-hr.com
http://www.crescent-hr.com

Click to schedule a meeting

empact hr, a subsidiary of Crescent, is committed to its customers' business success. empact hr does not engage in the practice of law and the contents of this email should not be construed as legal advice and does not create an attorney-client relationship. Legal questions should be directed to a licensed attorney. empact hr and Crescent cannot be held legally accountable for actions related to its receipt.

**From:** Jessica Johnson <jjohnson@crescent-hr.com>
**Sent:** Thursday, June 13, 2024 1:59 PM
**To:** Philip Carrillo <philip@crescent-hr.com>
**Cc:** Sanders Offner <sanders@crescent-hr.com>; Jessica Johnson <jjohnson@crescent-hr.com>
**Subject:** 30 Day Improvement Notification - Plan.

Hello Philip –
Thank you for taking the time to meet with Sanders and me this morning. As you know, our meeting was a direct result of concerns voiced by your staff regarding your dis-engagement and dis-connectedness with them, as well as with your clients. We appreciate you providing your feedback to the concerns and the assertions given. We value hearing from all parties involved.

We do accept your acknowledgement that your personal experiences in the last few months have had a direct impact on your work performance. Crescent Payroll Solutions knows that our employees have lives outside of work and that personal matters happen. We do our utmost to support our team in this regard. That support does have limits when the actions taken, or in this case not taken, start to affect the performance of the employee and have a direct impact on the department and the company overall. We feel yours have.

As a result, we confirm that you are being placed on a 30-day Improvement Plan starting today. Every Friday you will provide Sanders Offner with a report of the activities conducted throughout that week. We have attached a Daily Activity Report to help you keep your records.

At the end of the 30 days, we will evaluate your performance and hope to see a marked improvement in your engagement with your co-workers in the Empact department, your clients, and with management. We will meet with you at the end of the 30 days to review our findings and get your feedback.

Philip, please know that you are a valued member of our team. We do not take these actions lightly. It is our goal to help you improve and grow within your role here. We see you as a member of our work family for a long time to come. Please help us make that a reality.

Feel free to reach out to me or to Sanders with any questions or concerns you might have regarding this notice.

Take Care,

**Jessica Johnson**

| | |
|---|---|
| **From:** | Jessica Johnson |
| **Sent:** | Monday, July 1, 2024 10:42 AM |
| **To:** | P C |
| **Cc:** | Jessica Johnson |
| **Subject:** | Termination of Employment - Offboarding |

Good morning Philip –
Further to your conversation with Sanders Offner at 1pm on Monday, June 24, 2024, Crescent Payroll Solutions has decided to terminate your employment effective June 24, 2024.

We have processed your last paycheck to be remitted to you on the next available paycheck date of July 5, 2024. Included in this paycheck is the payout of your remaining accrued PTO hours; 68.89 in total. Your salary was pro-rated and paid through June 24, 2024. You were also reimbursed for your travel expenses incurred in April for your company trip to San Diego.

As you were a participant in our medical plans, you are eligible for COBRA. We have notified iSolved Benefits accordingly. You should receive a notice from them explaining the next steps should you choose to enroll in the COBRA plan. Further, as you participated in the additional life insurance plan through APL, they will be reaching out to confirm if you would like to continue that plan directly with them. If you do not hear from iSolved Benefits or APL, please reach out and let us know so we can ensure they provide you with the required information. Please note that all company provided plans have been terminated effective June 30, 2024.

We have gathered all your personal belongings from your office here in Metairie. We will be sending those to you this week via Federal Express. They will be sent to the home address in Houston that we have on file.

Included in the boxes sent will be an empty PC box and an empty Monitor box in which we will need you to return the company owned laptop and monitor you have in Houston. Please be sure to also include your restroom key and office key fob in the box with the monitor. The postage for the return of these items is paid by Crescent and will be included in the boxes themselves. Please affix the labels to the boxes when taking them to Federal Express to ship.

Please feel free to reach out to us if you have any questions or concerns regarding the information contained herein.

Wishing you all the best for the future.
Best Regards,

crescent
empowering people
empact hr
powered by crescent

Jessica Johnson
*Director of Administration - Crescent*
**2450 Severn Ave. Suite 300, Metairie, LA 70001**
**Office 504.301.3318 ext 1010| Fax 504.434.4748**
www.crescent-hr.com

EXHIBIT
21
Serpas Court Reporting
1.800.526.8720