UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

PHILIP CARRILLO

Plaintiffs,

VERSUS C.A. NO. 2:25-cv-01787

CRESCENT PAYROLL SOLUTIONS,

INC., ET AL

Defendant.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Deposition of JUSTIN FARRAE, taken at Adams and Reese, LLP, Hancock Whitney Center, 701 Poydras Street, Suite 4500, New Orleans, Louisiana 70139, on Thursday, June 4th, 2026, at 10:05 a.m.

By: Ashlee B. Ancalade

Registered Professional Reporter

EXHIBIT

B

"Philip" or "Mr. Carrillo." I may interchange those things. Do you understand I'm talking about Philip Carrillo, the plaintiff in this lawsuit?
A Yes.
Q Okay. And similarly, I may say "the defendant" or just shorten it to "Crescent." We're talking about -- I believe it's Crescent Payroll Solutions, Inc.
A Correct. Yes.
Q Does that make sense?
A Yep.
Q Okay. Reviewing the discovery, there was an LLC, but we're talking about Inc. today --
A Okay.
Q -- right?
Okay. Are you under any sort of confidentiality or nondisclosure agreement that will prevent you from talking about Philip or the facts of this case or your work with Crescent Payroll Services, Inc.?
A No.
Q Okay. Do you still work at Crescent?
A No.
Q Okay. Why not?
A I sold my shares.

70005.

Q How long have you lived there?

A Eight years.

Q Do you rent or own?

A Own.

Q Okay. Did you graduate from high school?

A I did.

Q Did you attend college?

A I did.

Q Where did you go?

A LSU.

Q And what was your major?

A Psychology.

Q Okay. Did you have a minor?

A No.

Q Okay. What was your last-held position at Crescent, or title?

A Vice president.

Q Okay. And I saw some -- I saw that mentioned in your discovery responses, and I saw kind of a brief summary, but if you would just kind of give me more detail about what you did as the VP.

A Sure. I was kind of the general manager, so I definitely oversaw operations, finance, but still kind of had a grip on sales a little bit in the respect

of making sure they were accountable to their numbers, doing things they needed to do.

Q Okay.

A With a concentration on finance, I'd say.

Q Okay. Yeah, because I think yesterday we heard you being referred to as the CFO, but you're not a CFO?

A Never held that title, no.

Q Okay. But you did have some hand in the finances; is that what you're telling me?

A Yes.

Q Okay. So kind of describe the finance aspect of your role as a VP.

A Sure. I did all the forecasting, so year to year what we expected to grow by if we were able to attain certain sales, limited churn. So, with that, we would determine when we would hire additional employees.

Created capacity reports to see how much the service staff could handle, just so that way we knew when we had to hire and bring in new staff.

I did the commission reports since 2019 for the sales team before I turned that over not too long before I sold my shares.

That's the lot of it. I mean, if something

needed a spreadsheet or something like that, it was not complicated things, but just basic formulas, I'd create those.

Q I'm going to have some questions about that later, but . . .

So commission reports seem pretty straightforward to me, right, that -- is it, like, you get the sales and then there's a -- like a set percentage or a set metric that the salesman has to make, and then you calculate their commission off of that?

A For the most part.

Q Okay. The other things I don't know how to do, like forecasting, I think you said, and then you said something else.

A Capacity reports.

Q Capacity reports.

A Sure.

Q Where did you learn how to do that stuff?

A I just got to figure it out.

Q Are you a CPA?

A No.

Q Okay. What did you do before you worked at Crescent?

A I worked in sales for Paychex.

like, classes like the Goldman Sachs one?
A No. Some of the forecasting and modeling and budgets-to-actuals, we were part of group called the "Honey Badgers." The Honey Badgers consist of nine isolved peer reviewers, so we all shared data.
So we would share profit and losses and other documents that had been formed from one another. So I'd say a lot of my financial -- some of my financial background came from looking at their P&Ls and how they did their things.
Q So I think if I recall correctly in your discovery responses, you said not only were you VP but you were an owner of Crescent?
A Correct.
Q Okay. How did you become an owner?
A Initially, I was an employee back in November of 2013, and the plan was to earn in. So, as I sold revenue, I would get shares of the company.
Q How old was the company, if you know or remember, when you started as an employee?
A Two-plus years old. It opened in June 2011.
Q So did someone offer you part ownership?
A Yes.
Q Who was that?
A Sanders Offner.

A Reduced to writing? It was in the operating agreement.
Q Okay. You didn't have a separate agreement outside of the operating --
A It as --
Q -- about your pay and your distribution percentage?
A We were $7 million. I don't think we had anything along those lines yet, no.
Q Okay. Throughout your tenure, did you have anything other than the operating agreement that showed how you were paid as an owner?
A No. How we were paid was kind of flexible, so Sanders and I would kind of discuss what distribution we wanted to take and how much cash we wanted to leave in the business in the operating account.
So we'd typically set that for the beginning of the year with what we expected financially, and then if there were ups or downs, then we would adjust accordingly.
Q When you came on as an owner, was Sanders the only owner?
A No.
Q Okay. Who was the other owner?

A Shawn Nolan.
Q Okay. And then I think we -- you maybe heard yesterday there was like a CPA --
A Uh-huh.
Q -- that we thought maybe was an owner. Is that who that is?
A No.
Q Okay.
A Steven Johnson --
Q Okay.
A -- CPA, was a 5 percent owner?
Shawn Nolan at the time I joined -- I don't know for sure. Him and Sanders were 50/50 at some point, but they had a -- some sort of eat-what-you-kill relationship. So based on whatever they brought in, they were being paid off of that.
The summer before I joined Sanders, we were in negotiations on me joining him, at some point he had given five shares to Steven Johnson. Did they come from Sanders or Shawn, I don't know.
Q Got it. Okay.
And then so when you became an owner, there were three owners of the company; is that right?
A Four.
Q Four, okay.

Q Like what?
A Like letting Philip go.
Q We will -- I have a whole section of questions on that. We will -- we will get to that in a minute. So let's -- but let's switch gears and talk about Mr. Carrillo's employment there. Okay?
A Okay.
Q I believe I saw from your discovery responses you had a part in hiring him; is that right?
A Yes.
Q What all was your involvement in that?
A I think Sanders phone-interviewed him. And then I remember meeting him in the office in our conference room.
Q Okay. So it sounds like Sanders did the initial phone interview and then you were involved in the first in-person interview; --
A Yes.
Q -- is that right?
A Yes.
Q Okay. How many interviews were there after that?
A I don't recall for sure. There weren't a ton. There might have been a second interview and then an offer.

A I would think they'd be in the HR employee folders.
Q Are those physical folders or are they electronic or both?
A Both.
Q Okay. And is that where resumé's are kept as well?
A I believe so.
Q Okay. Do you recall the general terms of the offer to Mr. Carrillo when he first started?
A Yes.
Q And what were those?
A As discussed yesterday, I believe those to be accurate. I think it was an entry-level start of 60, to change within a year-or-so's time to 72.
Q And it was a full-time position as an HR advisor; is that right?
A That's correct.
(Exhibit 2 is marked.)
BY MS. DAVIDSON:
Q Okay. I'm going to hand you Exhibit 2.
A (Views document.)
Q So this is kind of, I think, what you were alluding to. The more extensive terms outside of any offer letter that was sent would have been in this

A This could have come from him.
Q Okay.
A It could have.
Q Sure.
Okay. All right. Let's see.
And then did you have any involvement in these raises, I guess for lack of a better term, these staggering compensation raises, in paragraph 4?
A I would have been part of the discussion, yes.
Q Okay. So how did it work when you have an agreement like this at Crescent? Who in upper management or an owner triggers: Hey, this -- per this agreement, we've got to raise him up to 75 or 90 or something like that?
A Typically, HR.
Q Okay. A specific person in the 2020 time period?
A At that time, it would have been Rema Gray.
Q Okay. All right. And did you have any conversations with Mr. Carrillo about him not getting bumped to either 75,000 or 90,000 in a timely manner?
A I do recollect the phone call that we had around Hurricane Ida.
Q Okay. It was around that time, you mean?

A I believe so.
Q Okay. And not -- the subject matter was not Hurricane Ida?
A No. I believe the call was in respect to his change of pay.
Q Okay. And then what do you recall about that conversation?
A Not a ton except for the fact he said, "Hey, I think I'm supposed to get paid more." And I said something along the lines of, "I'll look into it."
Q Did you?
A Yes.
Q And was that issue resolved?
A I believe so.
Q Okay. So he did get paid the 90,000 at some point and possibly retroactively?
A I believe it was retroactive. I believe we were wrong and there was not a trigger to give him the raise that he was supposed to have; and so when he brought it to our attention, we said we did it wrong and paid him the difference.
Q Did anyone get in trouble for that, like Ms. Gray?
A No.
Q Okay. No write-ups or anything?

Q Okay. And what -- how would you classify it, other than the obvious title?
A It was the -- the new agreement for Philip's pay.
Q Okay. Do you recall if the intention was in the conversations you had with, you know, with Mr. Carrillo, Mr. Offner, maybe somebody else, that this was like an addendum to the employment agreement or this was to override everything?
A I'd say addendum.
Q Just to the compensation part; is that fair?
A Yes.
Q Okay.
All right. So the date here, it says the -- "This agreement made on November 17, 2022."
Do you see that?
A Yes.
Q Okay. Leading up to mid to late November, because it looks like this was executed by all three of you on the 30th, what do you recall about your conversations about this?
A I recall that he wanted to have a raise at the time, and I think his ask was $120,000. I don't recall if that was to myself and Sanders, but I do remember talking to Sanders about building an incentive

plan that was more around growth as opposed to a flat salary.

Q Uh-huh. Okay. So this was something brought up by Mr. Carrillo?

A I believe so.

Q Okay. And then, at some point, you maybe talked one-on-one about it to Sanders, it sounds like?

A I don't remember Philip asking me and Sanders for the raise or just talked to Sanders about it at the time. Philip at that time reported directly to Sanders.

Q Okay. So it sounds like Philip may have asked Sanders, Sanders talked to you about it one-on-one as a co-owner. And then was there a time after that where all three of you spoke about it?

A Yes.

Q Okay. Was that in person or on the phone?

A I believe that was in the conference room in person.

Q So when you talked to Sanders one-on-one, what was the consensus that you two came to about the -- the base increase to 120,000?

A The thought behind it was we wanted him to be committed to the growth of the company and not just settling for a base, and so having the incentive plan

RPO's, gross revenues, a quarterly percentage share of 10 percent; and then five, 5 percent revenue share of empact hr. I'm just kind of talking generally about these percentages. Who was tasked with calculating these specifically related to this agreement?

A Three was me and 4 was me.

Q Do you know who 5 was?

A Five never happened.

Q Okay. So what documents do you use to calculate the 10 percent for number 3?

A I don't remember specifically the name of the report, but it was a billing report that I'd run for quarterly basis by check date. So, from there, it had a series of boxes where you could include or exclude what items you wanted to see from a billing standpoint.

So I would include all of the empact billing items. So it might say "empact hr." It might say "empact Training." It might say "empact Concierge." There were a variety of billing items from that division. So I would run that, see all the billings, and that's how I'd get my gross number.

Q Okay. And this -- let's just back up a little bit.

So this sounds like some sort of, like, maybe QuickBooks or something similar.

A We ran it on isolved.
Q Okay. So it sounds like there was already data in the system and you just ran a report; is that right?
A Correct.
Q Okay. So what was the underlying data? Were these contracts, paid invoices, receipts?
A Paid invoices.
Q Okay. And these are input do you know by who?
A It's automated. So as we process the payroll, if your check date was on the 31st, we would debit you on the 31st for those fees.
Q Okay.
A So it all kind of worked in conjunction in automation.
Q Who all had access to either the information to build the report or the ability to build the report itself?
A Most of management.
Q Was Mr. Carrillo involved in that?
A I don't think so.
Q Okay.
A I don't think he had that level of access.
Q Would you print out or -- a saved PDF or save

some -- maintain in some other way this report that you were pulling to calculate this 10 percent?
A I don't believe I did.
Q Why not?
A Yeah. I probably should have kept some sort of workbook that showed the individual billings, but I don't believe I did that.
Q What would be a reason why you would uncheck certain items for billing?
A Because they didn't pertain to empact.
Q Okay. So was there a way to specifically just do empact hr billing or you had to go through its -- designate who --
A So there were probably close to a hundred different billing items for all the HCM items that we did. It could be weekly payroll, biweekly, could be PEPM. Just a variety of services.
And for one-times billings, it would be individual lines, so if those happened, and there was a note one-times billings for extra reports, there would be a line item for that. So I would just have to uncheck all and find all the empact ones to make sure those were checked before I ran the report.
Q How long did it take you to do this report every month -- or, sorry -- every quarter?

had employees beneath them, were you typically "in the know" or looped in when someone got a PIP?

A Yes.

Q Okay. Was that kind of a standard company practice or that was just with the people that you were supervising?

A We -- we didn't have a lot of discipline issues, so, when there was one, there was -- so we met as a leadership team on a weekly basis, and if there was something of that magnitude that there was someone was getting written up, or a PIP, it was discussed in that meeting to where everyone was aware of what was going on.

Q What was your knowledge of the -- the PIP being issued to Mr. Carrillo before it was issued?

A I was not aware that one was going to be issued.

Q Okay. Who would I ask about that if -- if you have any knowledge about that?

A Jessica and Sanders discussed it prior to discussing it with Philip.

Q Okay. And then looking at your --

A To my knowledge.

Q Sure.

And it looked at -- it looked from your

discovery responses, you were told about it at some point after the issuance; is that right?

A After it occurred.

Q Okay. And then who told you about it?

A Sanders.

Q And what did he say to you?

A I asked Sanders how it went, that being the termination call, and he said, "I put him on a PIP." At that point, I was quite angry because we had decided prior to that, that Philip was going to be let go on that call.

Q Okay. And so when was the first time it was brought up that Mr. Carrillo would be terminated?

A The third time that his direct report said that he was not readily available or disengaged from the company is when we had a discussion regarding Philip's future with the company.

Q Okay.

A His termination.

Q How long was that call?

A It was a discussion in one of the Monday-morning meetings.

Q How long are those?

A They ran an hour and a half.

Q Okay.

A Philip's employment had been discussed previously as well.

Q I was going to bring this up later, but let's -- we'll -- we'll do it now.

MS. DAVIDSON:

And we labeled this already. I labeled mine. I forgot to label this.

(Exhibit 5 is marked.)

BY MS. DAVIDSON:

Q Okay. I'm going to give you Exhibit 5.

A (Views document.)

Q Okay. So, again, we've got some more documents from Crescent according to the Bates labels at the bottom. And then the top of the first page says "Management Level 10 Meeting Agenda, May 13, 2024."

Do you see that?

A Yes.

Q Okay. So there's a lot of redactions in these documents, but the most important things are the only thing not redacted.

So, on the second page, there's a little arrow and it says, "Staffing Decisions/Planning."

Do you see that?

A Yes.

Q All right. And it says, "Review of Philip

Carrillo status in Houston." Underneath that, "Fear of job loss, Detachment, Implementation Specialist, One or 2."

Do you see all that?

A Yes.

Q So are these the -- the management meetings you were talking about?

A These are the minutes from the meeting, yes.

Q Okay. So it says "Agenda," but these are the minutes, this --

A These are the minutes.

Q Okay. So these documents were created kind of during the conversation?

A Yes.

Q All right. And then they were distributed to the people who attended the -- the meeting afterwards?

A Minutes were stored; they weren't distributed.

Q Okay. Where were they stored?

A One of the SharePoint folders.

Q Okay. So does this little blurb of words and phrases bring to mind what happened at the management meeting on May 13th, 2024, with regards to conversations about Philip Carrillo?

A I don't remember if this was prior to his

direct report saying he was stepping away from the business or not.

Q Well, the only word I can see that would be related to that would be "Detachment"; right?

A Sure. But he had detached prior to on separate occasions. So, again, I don't know if this was specifically about that conversation or -- or prior to.

Q Okay. So you can't remember -- just looking at this little block of -- of words and phrases, you can't remember anything specific that was discussed on this meeting?

A Not that meeting. Philip's employment was discussed on a regular basis around that time.

Q And define "detached" for me. You're using that word "detached."

A The words that he used when he was talking to his direct reports was that he was going to either detach or step away from the company for a period of time to work on personal items, something in that realm.

His detachment -- and this would have been Jessica's notes, or her words -- would have been his lack of involvement. That could be lack of involvement with clients as he didn't have regular client contact

at that point in time. Detachment from the rest of his team, detachment from the rest of the company. I don't know in particular what -- what was discussed. All those things had been discussed at some point in time.

Q So, outside discussions, though, what personal knowledge do you have of his detachment from the company or clients or anything else?

A A number of things. We had engagement reports for the HR team and seeing who was involved with what client and how many hours were spent. So you would see Philip's name show up less and less on those reports to see who was doing what work with what clients.

We had -- again, those capacity reports, we had a staff of three at the time, two full time, one part time. None of them was even close to their full capacity. They were working at maybe 50 percent of what they were capable of doing.

So it was -- it was confusing as far as what Philip's role was because it wasn't so much in supporting clients at all for -- that was part of his job responsibility. So growing the division was, yes, important in the way of sales, but it was also important in the way of retaining clients.

One of the big issues we had was the

consistent loss of clients. We were gaining clients, but we were losing them just as fast. So for a, I want to say, almost a nine-to-12-month span, we were flatlined from a revenue standpoint. We were not growing.

Q But was Philip Carrillo considered a salesperson?

A No.

Q So who would you be blaming on the losing clients?

A Losing clients would have been his responsibility.

Q How?

A Clients were brought into the division and they needed to be engaged on a regular basis to ensure they would stick around with the service.

Q And that was only his responsibility, nobody else's?

A That and his staff's. But it ultimately tiered up to him, yes.

Q Why were there no reprimands given or training offered or anything brought up before a PIP?

A He reported to Sanders.

Q All right. Let's look at the next meeting. It looks like it occurred on May 20th, 2024. Looks

that meeting?
A The final meeting we had regarding Philip's employment was shortly thereafter the comment was made about him being disengaged and stepping away from the company. At that meeting, the five of us all agreed that he was going to be terminated as of the "X" date, which was shortly after the meeting. Dates in particular, I don't recall.
Q So nobody said, "Maybe we shouldn't fire him, maybe we should just give him a PIP," in that meeting?
A No. The agreement there between all five of us that agreed to it was that he was going to be terminated, and the reason for that is because we didn't think that he could regain the faith of his employees that have publicly now said that he was detached from the company.
Q Is it common at Crescent for you to fire a supervisor over a couple of disgruntled underlings?
MS. ROUSSEL:
Objection to the form of the question.
BY MS. DAVIDSON:
Q You can answer.
A Okay. No. We didn't -- we hadn't fired any other supervisors in quite a few years prior to that.
Q So why was this situation different?

A Situation different. His lack of performance and the performance of the division, as well as his lack of engagement with the clients, was enough grounds to release him.
Q What documents do you have that kind of support what you're saying?
A You could see the revenue stagnation through a variety of QuickBooks reports. You could see his activity levels through his e-mail. You could see his lack of calendar activity. There was a large variety of items that showed that he was not working 40 hours a week or anything close to it.
Q I do have some questions for you on that later, but I just want to get through this exhibit really quick.
A Okay.
Q On Point D, it says, "Greyson leading HR sales efforts in place of PC."
Do you see that?
A Yes.
Q "PC," do you -- do you know that to mean Philip Carrillo's initials?
A I do.
Q Okay. So is it true that this -- this kind of implies that Philip was running HR sales?

replacement.
Q Anything else?
A Probably to see if there were any open issues that really needed to be resolved. You know, if they had any outstanding things that they wanted, what kind of support they wanted from me. As you take over a team, it's a longer conversation with how they want to be managed or not. Or there's a lot that I didn't know was going on within the division.
Q Did you, in fact, have that conversation --
A Yes.
Q -- as planned?
Okay. How did it go?
A It went fine.
Q So we briefly touched on complaints, I think, by Alex and Connor --
A Uh-huh.
Q -- about Philip; right?
A Uh-huh.
Q Okay. Did either of them or both of them ever personally come to you and complain about him?
A Yes.
Q Okay. And was it one of them? both of them?
A Alex.
Q Okay. And when was that?

A It's whenever we were doing the NOLA Detox investigation.
Q And what did he say to you?
A He said he couldn't get Philip to support him.
Q And what was your response to that?
A Well, we went through the details of what was going on in so much as he was supposed to interview these people and was reaching out to them and they wouldn't respond. So he went to Philip and said, "Hey, Philip, what do we do in this scenario," because the NOLA Detox owner at the time didn't want to get involved and force his managers to do anything about it.
So, at that point, Alex went to Philip, I presume, is what he told me, and said, "What do I do about this?" And Philip's response was something along the lines of, "You need to figure it out."
Q Do you have any personal knowledge about how much time Philip spent training Alex before Alex complained to you?
A I can't say that, no.
Q Okay. What was your impression of his complaint? Did you think it had merit?
A Yes.

Q Why?
A Philip was very distracted at that point in time. There were other conversations Alex had had with me that they would be in the middle of a meeting and someone would be discussing something, and Philip would zone out and not pay attention to what it was and have to be brought back into the conversation after the fact.
Q Were you involved in Alex being hired?
A Yes.
Q Did you want to hire him?
A Yeah.
Q You did?
I think there was some testimony to the contrary yesterday.
Do you recall that?
MS. ROUSSEL:
Objection to the form. That mischaracterizes the testimony yesterday.
You can answer.
A I do remember, and, yes, Alex is a little goofy.
BY MS. DAVIDSON:
Q Do you remember having a conversation with Philip about his goofiness?

Q Okay. Perfect.
All right. So, as you can see, there's kind of a question. Every now and then, there's an objection. And then your answer is below.
Do you see that?
A Yes.
Q Okay. So I do want to talk about -- and I'm going to jump around a little bit.
So looking at Number 10. I think it's on the fourth page.
A Okay.
Q Describe your role in placing plaintiff on a PIP is, essentially, the summary of that question, and then the answer is you did not have a role in placing him on a PIP.
Do you see that?
A Yes.
Q Okay. And that's true; right?
A Yes.
Q Okay. And then on the next page, I think it's actually Question 14, but your answer goes into page 5.
A Okay.
Q Kind of halfway through that paragraph on page 5, it says: "Later, Mr. Farrae learned that they

put plaintiff on a PIP instead. When he found out they did that, he was furious and let them know he did not agree with the decision and believed the company should terminate plaintiff's employment."

Do you see that?

A Yes.

Q Okay. So why the fury?

A Because we had agreed as a team that we were going to do something and then that decision was totally undermined.

Q So you were mad at your teammates?

A Absolutely.

Q Okay. And when you expressed this anger to your teammates, who were you expressing it to specifically?

A Sanders Offner.

Q And what was his responses?

A He didn't -- he wasn't aggressive about it. He knew he did something that was not agreed upon by his business partner. Our discussion prior to was he was at the point of no return with the respect of his two direct reports and those were the grounds by which he was going to get let go. So regardless of his actions over a 30-day period, there's nothing that could have reversed that at that point in time.

Q How do you know that nothing could have been done to reverse that?
A This was the, at least, third or fourth time that his team had reported that he wasn't available or wasn't doing proper support to them.
Q Directly to you or you just heard about that?
A Alex came to me two or three times, I believe three times, one of which is when he said he could handle it directly with Philip.
Because my discussion with Alex was that, "If you get us involved, Philip is going to know that you reported him to us. It's, like, I think that's going to do some harm in y'all's relationship." He agreed with that.
And so when he did report, and we got involved, he agreed that it would do irreparable harm to his and Philip's relationship.
Q Okay. So you -- you testified earlier about the one -- the first time that Alex complains. Let's talk about those other two or three times that you mentioned.
A Yeah. It was the meeting when he was disengaged and he had to report everything. It was the, "Hey, you go figure it out yourself."
And the other time is when he had moved to

Houston. He said, "Hey, Philip is really disengaged." And my response back to him was: "Can you and Connor handle that or do y'all need us to get involved?"

The fourth complaint was made to Jessica about him saying he was stepping away from the company.

Q Got it. So just -- we can just focus on the ones you heard directly --

A Sure.

Q -- right, because you have the best knowledge about those.

A Okay.

Q Were these phone calls?

A No.

Q What were they?

A They were in person in my office.

Q Okay. Did you write this down at all?

A No.

Q Notes?

Okay. And then who did you talk about Alex's complaints to?

A We would typically address them in the leadership meetings.

Q Okay. Did anybody else complain to you directly?

A No.

Q So just Alex two to three times; is that right?
A Yes.
Q Okay. And then from conversations with Jessica and/or Sanders or possibly others, you know that there may have been other complaints?
A There could have been, yes.
Q Okay.
A Or there was at least one that I'm made aware of.
Q Okay. When you learned that he was on a PIP, did -- were you apprised of the length of time of the PIP?
A I believe it was 30 days.
Q Okay. And it was your desire at that time to terminate him in the middle of the PIP?
A Immediately, yes.
Q Looking back, do you think that was a good decision?
A Yes.
Q Why?
A Because he had been terminated at the end of the 30 days had he stayed on the PIP. I wouldn't have let go of that. I was adamant.
Q So the next sentence in this quest- -- or in

point; right?
A He was still supposed to work with the higher, bigger clients.
Q And he was still supposed to do the productivity report entries?
A Yes.
Q Okay.
A That's to my knowledge. I don't know what Sanders and him discussed.
Q Sure. And that's okay.
So -- so at this time when he was getting a PIP, he was not your direct report; is that right?
A Correct.
Q Okay. So wasn't it Sanders' ultimate decision as Philip's supervisor whether or not he wanted to put him on a PIP or fire him?
A Yes.
Q But you got involved in that?
A Yes.
Q Okay. And how much time did you spend looking through plaintiff's e-mails and his calendar activity and his productivity reports?
A I -- I can't tell you exactly how much time. The productivity reports are something I had looked at previously as we were going through this process. I

didn't agree with keeping him in his current role when he moved to Houston, so I agreed to the sales role. And Sanders had reversed his course of action and allowed him to keep his same role in Houston as well.

So, again, when Sanders didn't follow through on what he said he was going to do, this was the second case in which Philip was allowed to do something that we didn't agree upon.

Q So kind of going back to -- to really kind of like my line of questioning is, is your investigation. I want to know more about that. Okay?

A Sure. Maybe an hour to go through his inbox and outbox to see how much activity he had.

Q And you automatically had direct access to his e-mails like that or you had to get IT involved?

A No. I had direct access.

Q Okay. Did you have direct access to all --

A I did.

Q -- the Crescent employees?

A (Nods head.)

Q And from what you know of his duties, like, what percentage of his duties required e-mailing?

A Communication with clients could be verbal, yes. I would expect some e-mails to go back and forth. It was down to maybe two or three a day. A normal

course of business, if you're working, you're sending more than two or three e-mails a day.
Q How far back did you go when you were tracking this?
A Probably close to January. Just to get a feel for how long it was occurring.
Q You didn't go back farther than January 2024?
A I think I -- I don't recall.
Q Okay. And what about calendars, how far back in the calendars did you look?
A I can't say. I mean, I -- I'd look at them monthly and I'd kind of go back. I think I went as far back as when he was in the office to see how many more meetings and things like that he was attending that were on his calendar to compare with the Houston time versus the New Orleans time.
Q Okay. And then productivity reports, how far back did you go on there? Did you open each one up, things like that?
A Those were on different quarterly tabs, so it's pretty easy to flip back through those. That happened relatively quickly.
Q Did you ever look at the PIP and read it?
A I don't believe I did.
Q Okay. So what would you say were the reasons

plaintiff was terminated?

A Consistent reports from his direct reports that he wasn't supporting them properly. That would be the primary reason.

The next reasons would be the lack of growth of the division.

Q Anything else?

A Being in Houston, I don't know how many sales calls he could effectively go on. I believe they were bringing laptops and bringing them on a Zoom basis, but I don't know that for sure.

Q And since you didn't read the PIP, you don't know one way or another what the reasons for the PIP were; is that fair?

A You can say that.

Q Sure. Okay.

So and then kind of related to what you just said about him being in Houston, under -- under 16, you wrote: "Mr. Farrae did not encourage or approve the decision to allow plaintiff to work remotely after he decided to move to Houston."

Do you see that?

A Yes.

Q So what was your biggest problem with that?

A I didn't think he could effectively manage

his team and continue to grow the division from Houston.

Q And what do you mean by "grow the division"?

A The main goal in his compensation were tied to revenue and profit growth. It had stalled. And I think exiting the area that you're in, not being in direct correlation with your staff and the sales team wouldn't better things.

Q But as a supervisor of folks in that division, would you say that his -- his main duty was more managing versus sales?

A No. I'd say it was growth of the division, which is going to be sales and retention.

Q So he was mostly a salesperson who just happened to manage people?

A No. He was supposed to support his clients, and his team were supporting the clients, as well as the sales team to grow additional clients.

Q And what part of his responsibilities were managing his team, like what percentage or fraction?

A I -- I don't know.

Q And this company was around during COVID; right?

A Yes.

Q How did it fare working remotely then?

A It did fine.
Q So you work for a company that did just fine with remote work, but you had a problem with Mr. Carrillo working remotely?
A I had a problem with his results, yes.
Q Okay. And then -- let's see.
So, to recap, you looked at his e-mails: inbox, outbox. You looked at his calendar activity. You looked at his productivity report. And you went to about January 2024; is that right? From what you remember?
A Roughly.
MS. ROUSSEL:
I'm just going to make an objection that I think that's not consistent with the prior testimony.
That's okay.
BY MS. DAVIDSON:
Q Before January, did you think he was a good employee?
A Moving to that last year's employment, my attitude did change. He was constantly changing the different products, constantly changing the different scopes of work, and we were losing clients as fast as we were gaining them.

accrue additional expenses, there would be more profit at the end. I mean, I don't specifically remember reviewing these things with him, but I'm sure I did at some point in time.

Q Well, you weren't asking him to sign a paper that didn't mean anything; right?

A No. I wanted him to be engaged in the division and continue its growth.

Q And if he grow -- if he grew per the agreement, he would get a piece; is that right?

MS. ROUSSEL:

Objection to form.

A Not a piece, no.

BY MS. DAVIDSON:

Q Well, a percentage of the revenue specific to the agreement.

MS. ROUSSEL:

Objection to the form.

A Percentage of profits.

BY MS. DAVIDSON:

Q Percentage of profits, right, a piece of the profits; right?

MS. ROUSSEL:

Objection to the form.

A A piece of the profits of the revenue

what -- how would you define a profit-sharing or revenue-sharing agreement?
A There are spreadsheets that I believe you provided that show gross revenue minus expenses equal the profit. We agreed to pay a percentage of that bottom-line profit on a quarterly basis.
Q If he does what?
A If he grew the division profitability.
Q Did you expect him to continue working under that new compensation agreement?
A Yes.
Q Were you aware at any point in time that you worked with Mr. Carrillo that he had gotten overtures to work for other companies?
A I was not.
Q Did that surprise you?
A I think Philip was a pretty dynamic guy with an impressive resumé. I mean, I got hit up on LinkedIn and still do on a regular basis.
Q So it didn't surprise you; is that right?
A No.
Q Did you ever admit that you were underpaying him, especially in the beginning, for that 60k?
A No.
Q You thought 60k was -- was fine for someone

with a MBA?

A For a division with zero revenue, yes. With the upside that we were providing to him, absolutely.

Q Well, do you agree that someone's worth with regards to pay doesn't really have anything to do with what the company makes?

A It doesn't help with what the company makes, but with their future earnings, it does. I started the same base salary with Sanders and it worked out.

Q Whenever you were talking to Mr. Carrillo about the new compensation arrangement, did you ever classify it as an investment?

A No, not to my knowledge.

Q Did you think of it as an investment in his future with the company?

A I thought of it as higher earning potentials.

Q So it's a "no," you did not think of it as an investment in the company?

A It could have been an investment of his time and efforts. There was no financial investment that was ever asked of him, no.

Q Sure.

And it doesn't have to be financial. Any sort of investment -- emotional, sweat equity, anything like that?

A Sweat equity, no. There was never a conversation about equity.

Q Did you ever promise something along the lines of, if he puts in the work now, he would get a future financial gain from that?

A Through the profit sharing, yes.

Q So would you agree that that type of arrangement kind of depends on the employee trusting the employer to do what they say they're going to do?

A That type of an arrangement?

Q Yeah, that compensation arrangement where, if you do this now, you're going to get paid later, that involves some sort of trust?

A Sure.

Q Do you disagree that plaintiff relied on the terms of that compensation agreement?

MS. ROUSSEL:

Objection to the form. That calls for speculation.

A I can't say what he relied on or not. I didn't know his financial background. I knew he owned -- flipped a couple of houses, but, beyond that, I didn't know if he was sitting on a stack of cash or broke.

BY MS. DAVIDSON:

something that you created?
A Yes.
Q Okay. And is this the Excel spreadsheets that you talked about earlier, the billing report that was uploaded to SharePoint?
A No. This is a forecast.
Q Okay. The -- so just --
A Well --
Q If you'll look at --
A -- these aren't -- these aren't the billing reports. This is the consolidated report after the fact.
Q Okay.
A This is the mini P&L to determine profitability.
Q And this is one report. So, actually, just -- just --
A It's hard with the pages.
Q Yeah. So if you'll just go through and look at the data, and just from what you can see, if you can tell me is this possibly one spreadsheet, two spreadsheets, or this is maybe -- and -- and that may just be cleared up by getting the -- the native format.
A So some of this is one tab. Some of this is more than -- more than -- some of these are on one tab.

Q Okay. Perfect.
But you -- you created this?
A Yes.
Q Okay. And I forgot -- I forgot -- oh, you -- isolved was the -- the database that you used?
A Yes.
Q Okay. So you got the -- so did that go directly to Excel or did you physically put the data from the database into Excel?
A Grab and -- drag and drop.
Q Okay. All right. Got it.
Okay. Actually, there is a couple things I just wanted to ask you about because I told you I was going to, so I want to do it.
A Okay.
Q You talked earlier about formulas.
A Uh-huh.
Q And I think you mention it in your -- in your interrogatories too. We can go back and look.
But how did you -- how did you come up with these formulas for these -- I'm assuming it was for forecasting and for, you know, maybe these calculations.
MS. ROUSSEL:
Object to form.

You can answer.

A How did I? Take out an Excel sheet and do this times this equals this percentage. Not really complicated.

BY MS. DAVIDSON:

Q Okay. So it wasn't -- did you, like, Google specific formulas that you can use specifically on Excel, because they have all those functions, that you would use for your work?

A I didn't use complex formulas, so those weren't necessary.

Q Okay. If you had the data in front of you, like at trial, could you recreate those formulas again?

A Yeah.

Q Okay. Perfect.

Did you share those formulas with anybody, like, here's how I'm calculating this, whether it was a subordinate or maybe Sanders?

A I would typically go through my reports with someone else to make sure I'm not missing something, yes.

Can I say in particular I did with this one? This one was really simple. I mean, it's this equals this, minus this, minus this, minus this, equals profit. I'm quite confident my 12-year-old can do it.

agreement?
A Yes.
Q Tell us about that.
A We went through the sheet just so that we -- he understood how does -- he was going to get paid.
Q Okay. Did he object to the way in which you were allocating expenses?
A Not to me.
Q Did Philip make -- ever make a financial investment in Crescent Payroll Solutions?
A No, not to my knowledge.
Q Was there ever any discussion that you're aware of about Philip acquiring an equity ownership interest in Crescent?
A There was never a discussion with me about that, no.
Q Okay. To your knowledge, did Philip ever acquire an equity ownership in Crescent?
A He did not.
Q Did Philip ever get shares in the company distributed to him?
A He did not.
Q Did you understand that the compensation agreement gave Philip an ownership interest in Crescent?

A It did not.
Q Okay. Did you ever consider Philip to be an owner of the business?
A I did not.
Q Did you ever treat him like an owner of the business?
A I did not.
Q Did you ever pay him distributions of -- from the company as you would, as you discussed, pay yourself and Sanders?
A No.
Q Was he ever entitled to be paid distributions from the company?
A No.
Q Is there a difference between the distributions you were talking about paying yourself as an owner and the incident of compensation that Philip was entitled to under the compensation agreement?
A Yes.
Q Did Philip ever tell you that he thought he was entitled to distributions from the company?
A No.
Q Earlier you were asked about the reasons you did not want Philip to go to Houston.
Do you remember that?

A Yes.
Q And I think you said you were concerned about his ability to manage his team and grow the business; is that right?
A That's correct.
Q Ultimately, in your opinion, was he able to successfully manage his team from Houston?
A No.
Q Was he able to grow the business from Houston?
A No.
Q Earlier you were asked a question about whether Philip was terminated only because, quote, of a couple of disgruntled subordinates.
Is that the only reason Philip was terminated?
A No. He was terminated due to lack of performance.
Q How soon after Philip's breakup did you begin to observe a change in his performance?
A Almost immediately. His demeanor changed as his relationship was falling apart and then ended.
Q How many months did he work for the company before he was let go, after the breakup?
A Seven or so.

Q Okay. Did the company tolerate his disengagement for a period of time?
A Yes.
Q Okay. Was there a point in your view that it became no longer tolerable?
A Yes.
MS. ROUSSEL:
Those are all the questions I have.
MS. DAVIDSON:
I'll reserve for trial.
MS. ROUSSEL:
All right. Thank you.
THE REPORTER:
Do you want a copy?
MS. ROUSSEL:
Yes, ma'am.
THE REPORTER:
And do you want to read and sign?
MS. ROUSSEL:
Yeah, he'll read and sign.
Electronic only.
MS. DAVIDSON:
Oh, yes, for me too.
(The deposition concluded at 1:00 p.m.)