IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

PHILIP CARRILLO, )
PLAINTIFFS, )
)
vs. )CASE NO. 2:25-CV-01787
)
CRESCENT PAYROLL SOLUTIONS, )
INC., ET AL, )
DEFENDANT. )

****************************************************

ORAL AND REMOTE DEPOSITION OF

SANDERS OFFNER

August 3, 2026

********************************************************

ORAL AND REMOTE DEPOSITION OF SANDERS OFFNER, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 3rd day of August, 2026, from 11:30 a.m. to 1:42 p.m., before Cindi L. Bench, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine, wherein all parties were present via Zoom Videoconferencing, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



EXHIBIT
C

**A. I'm paid a salary annually or I get every two weeks or twice a month, and then I take quarterly distributions.**

Q. Are you a part of any sort of -- or a party to any sort of employment agreement with regards to the LLC, your salary there, your distributions, things like that?

**A. No.**

Q. Okay. So I think you said, you know, you and Philip started working together back in 2020.

Did you have a hand in hiring him?

**A. I did.**

Q. Okay. Can you describe your involvement in that hiring process.

**A. I believe I got to know Philip through LinkedIn, and reached out to him with some interest in talking to him about a division that, you know, Justin and I were looking to start and that pretty much started those conversations. He came in for an interview. I think the first interview we had was myself, and Rema Gray, who was an operations manager at the time, and we interviewed Philip. Liked his skill set, he was very dynamic, and chose to pull the trigger and hire him.**

Q. So just to make sure I understand correctly, you saw his profile or something along those lines on

LinkedIn, and then you reached out to him first?
**A. Yes.**
Q. Okay. At that time, had he already filled out some sort of application to work for Crescent or you were the first point of contact?
**A. I don't believe so. I think I was the first point of contact.**
Q. Was there anything specific on his profile that drew you to him with regard to experience or education or, you know, anything really?
**A. It was probably a little bit of his experience. I think he was -- he was involved in recruiting talent for, I think, his job prior to coming to work here, and you know, we needed someone to help us come in and grow a new division, so we liked that.**
Q. Whenever you reached out to him, was there a specific role that you had in mind that you wanted him to fill or was it kind of a more general inquiry, you knew he would be helpful but you kind of figured it out later or something else?
**A. Yeah. I think it was more general in nature. You know, we -- I don't think we were set on a defined role at the moment.**
Q. Okay. So at the time that you contacted him, there was no like specific job description or position

that you were looking at to see whether he qualified and, you know, in comparing his profile to the position; is that right?

**A. Correct.**

Q. Okay. Okay. And then -- sorry, I forgot what you said after that.

So y'all connected and he at some point interviewed for the job; is that right?

**A. We -- yeah, we spoke on the phone and then he came in town -- or no, I think he had just moved here maybe and came in for an interview.**

Q. Okay. And then I guess between the first -- the first contact and the interview, it sounds like you had phone calls.

What was the -- the pitch to him, like as to what he would be doing or what you needed for your company with respect to what he could do for you job-wise?

**A. The pitch was: Hey, we're -- we're interested in -- in potentially growing a new division within the company, around outsourced HR and, you know, we're looking for a person that could -- that could help us, you know, build something like that together; need a certain, you know, skill set to do that.**

Q. And so in the interview, did you discuss like

specific terms, like, maybe a position title or direct reports or pay or anything like that?

**A. I had those initial conversations.**

Q. So specifically in the interview, were those things discussed?

**A. In the interview, I would -- I would -- to the best of my recollection, I assume we did.**

Q. And then you said -- I just didn't write it down.

But you -- so it was you, Philip and I think you said Rema Gray in the interview?

**A. Yes. Justin may have been in the room but I'm not sure he was.**

Q. That's okay. It's been a while.

Okay. So is there anything else that you recall about the -- the general terms of -- well, actually, let me go back. Let me strike that.

After the interview, at what point or maybe during the interview did you offer him a role or a job regardless of title with Crescent?

**A. I believe we offered him the job pretty quickly, you know, we moved quickly on Philip. I'm not sure how quick, you know. It may have been a week, but it didn't take us long to bring him on.**

Q. Okay. And so whenever -- whenever that offer

was made, do you recall any of the details about the offer? And that could have been, you know, maybe you had a title in mind or a -- specific duties in mind or salary or anything like that?

**A. It was basically HR manager, you know, he was -- he was a division of one person, so he was -- he was, you know, doing a little bit of everything but I believe his title was HR manager.**

Q. Back then in 2020, do you recall how many employees the company had?

**A. I would say between 15 and 20 employees.**

Q. Okay. So it was a pretty small outfit?

**A. Yeah. Yeah.**

Q. Okay. So I think I asked some of this off the record, but did you print out any exhibits for today that I sent over?

**A. I haven't printed them, but I have them up on my computer.**

Q. It may be easier -- if you want, I can share my screen but -- and I can zoom in as best you can, but if you want to look at it, you know, in a separate screen, I understand that as well.

The first one, Exhibit 1, is going to be the employment agreement.

(Exhibit 1 marked)

Justin maybe would handle or HR?

**A. If there was issues with his pay?**

Q. Yeah, if he didn't get that 90,000 raise per the agreement, who would have dealt with that?

**A. I mean, that would have probably been brought up in a leadership meeting between Justin, Rema and I, if that were the case.**

Q. You don't remember anything about that?

**A. No.**

Q. Okay. Now if you want to pull it up, it's the compensation agreement, it's going to be Exhibit 2.

(Exhibit 2 marked)

Q (By Ms. Davidson) I've got to label these for you, Cindi. Sorry. One second. I'm trying to make it easy for our court reporter after we're done.

Okay. So you got it on your screen?

**A. Yes.**

MS. DAVIDSON: Liz, are you good?

MS. ROUSSEL: I'm good, yes.

Q (By Ms. Davidson) Okay. Have you seen this document before?

**A. Yes.**

Q. Okay. And what is this?

**A. Compensation agreement.**

Q. So how did this document come about? And it

looks like about a little over two years after Philip was -- started with the company.

**A. Philip wanted a raise, a pay raise, so Justin and I decided to put something like this in front of him. And instead of just giving him a raise, this is what we came up with.**

Q. Okay. I want break that down just a little bit.

**A. Sure.**

Q. It sounds like Philip came to management or leadership, you know, including you and Justin, saying that he wanted a raise.

And then you and Justin had a separate conversation with just the two of you about how that's going to work; is that right?

**A. Yes, correct.**

Q. Okay. Okay. And then when you were talking to Justin, were you throwing numbers around, were you offering other, you know, maybe non-monetary perks or other types of monetary perks, like stocks or anything like that whenever you were considering how and if we're going to give a raise to Philip?

**A. No. We were just trying --**

Q. What was --

**A. -- to get -- on how to incentivize him to**

**continue to help grow the division without just throwing money out there. And just to be clear, we were -- we were, you know, we were in agreement on this.**

Q. Sure. No, I'm just trying to figure out, you know, before everything was reduced to writing what ideas were kind of thrown around as to what the raise should be, what it should look like, and things like that. I'm trying to figure out what happened in that conversation.

**A. I mean, I'm sure we discussed, you know, he's asking for this, you know, what -- you know, can we do something different, you know, different ideas. We were always spit-balling ideas.**

Q. Did Philip ask for a specific number in the request for a raise?

**A. I believe he asked for 120, a salary of 120.**

Q. And was he still at the 90,000 prior to that request?

**A. Yeah, I would assume so. Yeah.**

Q. Okay. So he asked for 120, and you and Justin talked and then ultimately offered him some sort of agreement -- or some sort of raise, I'm trying -- and other -- and other benefits; is that fair to say?

**A. We would have probably verbally going about these six things before we put it in writing.**

that was --

(Overlapping Speakers)

**A. I probably would verbal warning -- it wasn't a warning. He was given feedback on who his employees that shared some not so good feedback to our -- to Jessica at the time.**

Q. So when you say that, you mean two -- two employees complained about Philip?

**A. Yes.**

Q. Okay. And that was towards the end of his employment; is that right?

**A. Yeah, it was probably within the last, maybe six months of his employment. It was towards --**

Q. Got it. Prior to that, did you ever write him up or put him on a PIP or do any sort of disciplinary action against Philip?

**A. No.**

Q. What were the complaints by the two employees?

**A. Not responsive, you know, wasn't around to help them, you know; they were just disgruntled at the time.**

Q. Was there an investigation into those complaints?

**A. Yes, Jessica conducted interviews with both of them to get -- you know, obviously hear from them.**

Q. Did she interview Philip?
**A. Not sure.**
Q. What's that?
**A. I'm not sure if she did or she didn't.**
Q. Okay. And if she didn't, what happened with those complaints in the investigation?
MS. ROUSSEL: Objection to form. Calls for speculation. You can answer if you can.
**A. I'm quite positive he was given the feedback because he, in his own effort, I think went and tried to amend that between the two employees -- those two direct reports.**
Q (By Ms. Davidson) So when you say feedback, who was giving the feedback?
**A. I don't remember if it was me or it came from Jessica.**
Q. Did he contest the truth of those complaints or the merit of them?
**A. I'm not sure. I'm not sure if it had anything to do with, I think, his personal relationship at the time, wasn't going well. I don't know if that's -- that was part of what he told them was his problem.**
Q. But that's -- so you know, to me that would be something else.
I'm asking, like, did he dispute

specifically what those employees complained about; like, I did not do that or that is not accurate, is what I mean.

**A. He never disputed that.**

Q. Are those employees now employed at the LLC of Crescent?

**A. One -- one still is. One just recently left, a couple months ago.**

Q. Which one left?

**A. Alex Vial left.**

Q. I think the other one's name is Conner; is he still there?

**A. Yeah, he's still there.**

Q. Okay. Does -- does Jessica -- her name is Johnson, right, Jessica Johnson?

**A. Yes.**

Q. Okay. I was like that sounds like a super hero name, but I -- maybe I'm thinking of somebody else.

Does she have some sort of, like, investigative license to do investigations?

**A. No, I doubt it.**

Q. Do you recall who all was involved in the conversation with Philip about the -- these two employee complaints?

**A. It was between him and Jessica.**

**A. Yeah, he did. He effectively did all these things.**

Q. Okay. I'm also going to jump back to whenever we talked about -- I think you said earlier how you would and Philip would, at some point, the numbers relating to the compensation agreement and possibly, you know, some -- like maybe a spreadsheet or a screen shot of his spreadsheets.

Do you remember talking about that?

**A. Yes.**

Q. Okay. So this is going to be Exhibit 5. It's the PDF that I labeled Comp spreadsheet and email.

(Exhibit 5 marked)

Q (By Ms. Davidson) Just let me know when you've got that up.

**A. I have it up now.**

Q. So this looks like an email from you to Philip, January 3rd, 2024, subject: Comp Spreadsheet.

Do you see that?

**A. Uh-huh.**

Q. And then I believe that the next page is the next page in the production in order, it's actually the attachment that was referred to in the email.

Do you see that?

**A. Yeah.**

Q. Is that -- is this kind of what you were referring to when you were talking about how you emailed him relating to the -- the underlying documents or the calculations that would ultimately be on his paycheck relating to the compensation agreement?

**A. This is something completely different.**

Q. Okay. So what is this then?

**A. So when Philip said he was moving to Houston, obviously, you know, his role was certainly one that we needed in-house.**

**We gave him -- or we showed him the opportunity of what it would look like if he moved -- when he moved to Houston if he wanted to go and do sales, if he wanted to go sell HR opportunities. We put this together for him so he could get an idea if you sold this many new HR accounts, this is the amount of money you can make and presented that to him. He ultimately decided that he didn't want to do that.**

Q. So you mentioned that you needed him in-house.

Did you tell him that?

**A. I mean, I told him that. Look, preferably, this role needs to be here. So if you're going to move to Houston, here on your options.**

Q. And one of the options was to sell in the Houston market, and what was the other option?

**A. The other option was -- was an opportunity to see how any type of remote work would work, and that's what we ultimately decided on, give him a shot.**

Q. So is it fair to say that, even though you preferred in-person, you did ultimately approve that he work remotely in that role in Houston?

**A. Yes.**

Q. So Exhibit 6 is going to be entitled, the PC Forecast Pay. So maybe you can just help me understand that as well.

(Exhibit 6 marked)

Q (By Ms. Davidson) Well, I mean, first I'm going to ask you a couple questions.

Do you have that?

**A. Yeah, I do.**

Q. Okay. Perfect.

Okay. So to me this looks like -- like someone printed a PDF, a spreadsheet. Have you seen kind of this data before, even though it may have been in an Excel format?

**A. Yeah, I've seen this before.**

Q. Okay. Can you explain to the judge and the jury what this is?

**A. This is just a snapshot of probably over the course of the quarter that he was being, you know,**

**going to be paid that 10 percent profit share.**

Q. Got it. Okay. All right. So I'm done with that one.

The next exhibit is going to be Exhibit 7 entitled, Meeting Minutes, which I misspelled. I will fix that.

(Exhibit 7 marked)

Q (By Ms. Davidson) You got it. Okay.

So here I think I've grouped these together. So I think it's more than one meeting agenda and then on each it's got the date. And so the first page of this one, it says, Management Level 10 Meeting Agenda May 13, 2024.

Do you see that?

**A. Yes.**

Q. Okay. And then there's some redactions, and we're going to go down to Crescent Page 196, and there's a little reference to Philip with some bullet points.

Do you see that?

**A. Yep.**

Q. Okay. Okay. So do you recall attending a meeting in or about May 2024 where it was -- a review of Philip's status in Houston was discussed?

**A. Yeah, that was -- it was in our leadership meeting on that date.**

Q. And who was there in that meeting?
**A. That would have been Justin, myself, Jennifer France, Greyson Reno and Jessica Johnson.**
Q. And do you recall, was this the first meeting where this sort of review for his status on -- status in Houston was done or was there maybe a previous, more informal one?
**A. It was probably a discussion about him wanting to move to Houston, you know, prior to this, you know, minutes log, but this is -- this is where we formally discuss things.**
Q. Okay. And then under that bullet, it says: Fear of job loss detachment.
Do you see that?
**A. Yes.**
Q. Do you recall there being some discussion in this meeting about somebody's fear of a job loss and detachment?
**A. Yeah, this is around the period of time where we started to get the negative feedback on Philip's ability to do his job and be present, and that's, you know, what we started to talk about, was more succession planning, like what's going to happen if we do have to part ways with Philip.**
**I'm assuming that's -- I can't speak 100**

**percent for what those bullet points mean, but that's what -- that's what I remember.**

Q. Sure. Do you recall if Jessica Johnson kind of discussed what had gone on in her investigation, who she talked to, like what the employees were saying, things like that?

**A. Yeah, I don't remember specifically but I would imagine that she would have filled us in on that feedback in that meeting.**

Q. So based on what she was telling you and your knowledge of Philip, what -- what was the story about these employees complaining about Philip and what you thought about those complaints?

**A. I think it was -- as a group, they just didn't -- you know, they didn't sound good. You know, he -- you know, from their feedback, he was -- you know, I think he was disengaging himself from them for personal reasons, is what he told them. I would assume that's just having to do with his breakup with his boyfriend. But, you know, when he started to tell his own direct reports, like, I'm going to -- I may not be around, that was alarming for us.**

Q. So in light of, you know, you saying that he had been performing really well in his role up until these complaints, and that these employees were, by your

label, disgruntled, why did you believe these complaints were valid or had merit?

A. **Well, I think that -- that was just based off our observation of what, you know, those two direct reports had told Jessica. Jessica corroborating that as well, because she interviewed both of them, and then his disconnection when he moved. You know, he wasn't -- he wasn't -- wasn't doing his job that we were requiring him to do as he was before.**

Q. So did these employees complain directly to you about Philip?

A. **Directly to me? No, they went -- they went to Jessica.**

Q. So just so I understand.

So they complained to Jessica, and then Jessica's investigation involved talking to him again, but we don't know if -- or you don't know if she even talked to Philip about it directly; is that right?

A. **She -- she interviewed both of the employees and interview -- and then I believe she talked to them again. I'm not sure 100 percent if she talked to Philip about that or not.**

Q. Did you talk to Philip about it?

A. **I don't remember.**

Q. Did you ever tell Philip, like, in 2023, to

move all his clients to -- to the advisors, that they could kind of work on that, and then he would do the managing aspect of it?

**A. Yeah, but that was part and parcel to the job description for Director of HR services. So as we continued to grow that division, it was impossible for Philip to effectively manage the number of clients we had. But we needed him to really manage probably our -- our higher revenue clients, our bigger HR clients, so we wanted to make sure he maintained some type of client control there as he transitioned off those other clients to the two other advisors.**

Q. And then it sounds like the employees told Jessica, Jessica told you that there was some sort of comment by Philip that he wouldn't always be there.

Is that what I heard?

**A. Yeah, right.**

Q. What did you take that to mean?

**A. I took that to mean that if you're not going to be there for when your employees need you, that's a problem.**

Q. So -- okay. So you took that to mean he wouldn't always be there for his employees generally, not just he wouldn't be able to hold the hands of his employees or that he might be suicidal or any other

explanation of that -- that phrase?
**A. I wouldn't know what you would think of it, but when you tell your employees, Hey, I'm going to disconnect from you all for a period of time, and then I find out about that, that becomes a problem for any business.**
Q. But you heard that statement through Jessica who heard it through the employees who allegedly heard it from Philip; is that right?
**A. Yes.**
Q. And you think that's -- that's a valid -- that's a valid statement then?
**A. Sure.**
Q. Have you ever played the game Telephone?
MS. ROUSSEL: Objection, form. Argumentative. You can answer and tell her if you played the game.
**A. Maybe when I was, like, five years old.**
Q (By Ms. Davidson) When you heard this in this meeting from Jessica, did you initiate a conversation with Philip?
**A. I -- I don't remember.**
Q. And there's another bullet point, it says Implementation Specialist, and it says one or two.
I don't know what that means, so do you

agenda where she wrote before the things that y'all were going to discuss in the meeting?

**A. These -- these were scribed after the meeting as the meeting -- she would take notes and then --**

Q. Got it. The words agenda with meeting minutes threw me off. So that's good to know.

Okay. So in that conversation where it was discussed that Philip would be terminated, do you recall who initiated that conversation or that topic, I should say?

**A. I mean, that was probably a group topic, a group discussion. I'm not sure if one person initiated it.**

Q. Well, sure, but I'm assuming you didn't all in unison say, Let's fire Philip, right?

**A. I mean, look, I think this is where it was coming to a head. His performance, obviously, some realization around the fact that he wasn't working, you know, got us to the point where we knew we had to make a decision on -- on which way we were going to take this.**

**You know, collectively, as a group, I think we all knew we were probably going to have to move on from him, when we were going to do it, there was some disagreement. That was -- that was the reason for that conversation. So we started to -- these other C, D, and**

**E, was more planning for getting ready for that.**

Q. So other than the two employee complaints, if you go back to Exhibit 4, the job description for what he was doing kind of around this time, what part of his job was he not doing, because you mentioned job performance?

**A. He wasn't responding to emails --**

**(Overlapping speakers)**

Q. Was that in the job description?

**A. Was it in the job description --**

Q. Yes.

**A. -- specifically that?**

**No, but I would think that's a responsibility of anyone leading a division.**

**(Overlapping speakers)**

Q. Didn't want to say -- go ahead.

**A. He did a lot of personal stuff during working hours, which was not good either.**

Q. Anything else?

**A. No.**

Q. Okay. So when you say he wasn't responding to emails, he wasn't responding at all or it was a matter of he wasn't responding maybe within a certain period of time, that was maybe an unwritten expectation?

**A. No, there was -- you know, you would think in**

**a day, based on his role, you would have any emails going out or being received, there wasn't either. It's like he wasn't doing anything.**

Q. Was he typically emailing with clients or was he typically calling or doing face-to-face meetings, since he had a car allowance at some point?

**A. He was doing both. The majority of his communication to clients and/or his direct reports was via email.**

Q. So how long -- well, let me ask you this: Were you specifically looking at his email to see if emails were going in and out within a day?

**A. (Inaudible).**

Q. Sorry, I didn't hear you.

**A. I -- I was not doing that, no.**

Q. Do you know who was?

**A. Yeah, when we -- when we knew we were having a problem with his performance, I believe Justin started to monitor those emails.**

Q. Okay. And then do you have any idea how many days he monitored? Did he tell you this has been going on for a week or I've been monitoring for two weeks or I've been monitoring all day, anything like that?

**A. I'm not sure of the specific timeframe, but it was enough for Justin to pay attention to that and make**

**A. That he was not responding to emails within a day? I'm not -- he wasn't responding to email. I'm not sure if it was within a day or more than that.**

Q. Right. Okay. So it came up in this meeting that he wasn't responding to emails, right?

**A. In this meeting? It was probably brought up because it was a point of contention.**

Q. Okay. Well, was it multiple meetings that this was discussed?

**A. If I remember correctly, Justin told me on numerous occasions, not just in this meeting, that there's very little emails traffic from Philip.**

Q. Okay. And he was not at all point in time when he was talking to you about this, Philip's direct supervisor, right?

**A. No, but I don't -- no.**

Q. Were you concerned that Justin was spending a lot of work time going through employee emails and not doing his own work?

**A. No.**

Q. Why not?

**A. Why wouldn't I? Because I knew -- I knew the reasons were valid, that he was investigating Philip's emails.**

Q. Did he investigate Teams, as far as you know?

**A. Team chats?**
Q. Yes.
**A. No, I think -- I don't think he had access to that. I think it was just emails that he was looking at.**
Q. Okay. So he investigated but he either wasn't able to look at all the media Philip was able to contact employees on or he just didn't look?
**A. I'm not sure. I knew of the emails. That's all I know of.**
Q. Did you have access to Teams?
**A. To other people's Teams?**
Q. Yes.
**A. I'm assuming we did, but I never looked at that.**
Q. Did y'all have some sort of phone system or maybe like an app, you know, if people were on the road where you call through like a work line?
**A. Yeah, we did.**
Q. What was the company or the service?
**A. Three -- 3CX.**
Q. Do you know if -- if Philip's call logs were reviewed, in-going and out-going calls, made text messages sent from the work line, anything like that?
**A. There wouldn't -- you couldn't have gone in**

**and accessed his text messages because that was done on his personal device. I mean, I'm not sure if the call -- I'm not sure if any call logs were reviewed. I believe it was just emails.**

Q. Do you know if during this peek at Philip's emails, was there any talk about, like, the substance of that, for example, like this client emailed on this day and Philip did not respond and this was important?

**A. I don't remember.**

Q. Okay. And then at some point after some meetings, after some talks, was there some conclusion that the termination would happen with Philip?

**A. Justin and I disagreed on whether or not we were going to terminate him right away. You know, my -- my stance was, we put him on a PIP, see if he can work through it, and ultimately we -- we disagreed on that as well.**

Q. Okay. And then as far as I know, he wasn't just terminated, there was a PIP issued; is that right?

**A. There was a PIP issued.**

Q. Okay. So it sounds like you kind of won on that disagreement and --

**A. Well --**

**(Overlapping speakers)**

**A. -- to be clear, the decision to put him on a**

**PIP was made by Jessica and I. Justin was not involved in that. Ultimately once we put him on a PIP, Justin was not happy at the time we did that.**

Q (By Ms. Davidson) I do remember some testimony about that.

Did you and Justin have angry words about the PIP, maybe more so on his side than yours?

**A. He wasn't happy with me that we did that. He wanted --**

Q. Did he raise his voice?

**A. I wouldn't say he raised his voice. He was -- he was frustrated and voiced his opinion.**

Q. Did he tell you why he was frustrated?

**A. I think, in his opinion, he thought that Philip needed to be terminated immediately.**

Q. Who was Philip's supervisor at the time the PIP was issued?

**A. It was probably me.**

Q. So at Crescent, wouldn't it be a supervisor's ultimately decision -- a direct supervisor's ultimate decision whether he issues a PIP or terminates or is it always a collaborative effort over there?

**A. It's always a collaborative effort. He and I always --**

**(Overlapping speakers)**

Q. So was there ever a time when he wanted to terminate an employee and he would have to collaborate with you first?

**A. Yeah.**

Q. Was there ever a time that he terminated or maybe placed someone on a PIP and you didn't agree and he did it anyway?

**A. No.**

Q. So do you recall the length of the PIP, how many days, 30 days, 60 days, 90 days, something like that?

**A. It was a 30-day PIP.**

Q. And so what do you believe a PIP is?

**A. A PIP is a process that you go through with an under-performing employee to, you know, let them know that they're underperforming and here's what they need to do within those 30 days to -- to get better and basically prove to us that you are doing all the right things again.**

Q. Would you agree you with me that a PIP is essentially a company saying here's your last chance, fix these within this timeframe or we can't keep you?

**A. Ultimately, that's the definition of a PIP, yes.**

Q. And did Philip work out his PIP, work the full

30 days?
**A. No.**
Q. Why not?
**A. We just decided that it wasn't going to work out, so we terminated him within a week or so of the PIP.**
Q. So why did you offer him this chance and then revoke it by terminating him?
**A. We just changed our minds.**
Q. Do you think that's a good business decision?
MS. ROUSSEL: Object to the form. You can answer.
**A. Yeah, that was the right -- that was the right business decision.**
Q (By Ms. Davidson) Do you recall if there was ever a PIP form that was actually executed by all the proper parties, including Philip?
MS. ROUSSEL: Objection to the form. You can answer.
**A. There was ever a PIP, no.**
Q (By Ms. Davidson) So just like there is a form -- y'all had a form, right?
**A. For the PIP?**
Q. A PIP form.
**A. I don't know if we had a physical form. I**

testified in his deposition that he drafted that agreement, would you have any reason to disagree with that?

**A. If Philip drafted that?**

Q. Right. If Philip testified in his deposition that he is the person who drafted that, would you have any reason to disagree with that?

**A. No.**

Q. You testified earlier, you were asked -- you were shown the job descriptions and you were asked whether Philip performed all of the essential functions of the job, do you remember that?

**A. Yes.**

Q. And you said yes, looking at the list of things you believe that he had, right?

**A. Yes.**

Q. Okay. Later in your testimony, you said you terminated him because he was not doing his job.

At the time you terminated or made the decision to terminate Philip's employment, did you believe that he was performing all of the requirements of his job?

**A. (Inaudible).**

Q. Why not --

MS. ROUSSEL: Wait, did you hear that,

Court Reporter?

THE COURT REPORTER: No.

**A. No.**

Q (By Ms. Roussel) Why not?

**A. Well, I mean, look, if I had to measure what he was doing prior, it was vastly different. He was -- you know, he wasn't communicating well with his two direct reports, he wasn't -- his emails -- nothing was coming in or going out. He was -- he was holding personal engagements in the middle the day. He wasn't working. He was just --**

Q. You were asked questions about his emails, and opposing counsel suggested that the problem was that he wasn't responding to emails timely.

Was that part of the problem?

**A. If I remember correctly, Justin telling me that he just wasn't responding to emails or sending emails at all --**

Q. Right.

**A. -- not just over one day, but multiple days or weeks.**

Q. Okay. And I guess my question is, so it's not just that he wasn't answering emails quick enough, is it also true that part of the problem was just the volume of emails being send and received was indicative of

something else?
**A. Yes.**
Q. Okay. And what was that indicative of to you and Justin?
**A. Disengagement from the business.**
Q. You testified earlier that his subordinates, Alex and Conner, had reported to Jessica that Philip -- I think your work was disconnected.
Do you remember that testimony?
**A. Yes.**
Q. Okay. And you were asked questions about the fact that you heard that from Jessica, who reported hearing that from others.
Do you remember that?
**A. Yes.**
Q. Okay. Did you have any reason to disbelieve Alex and Conner?
**A. Not at all, no.**
Q. Okay. Would it have been your usual practice to take that as true -- if an employee made a complaint, would it have been your usual practice to believe them without doing further investigation?
**A. I would because I would have confirmed that with Jessica.**
Q. Okay. So you typically take people at their

word when they make complaints about their supervisors?
**A. I do.**
Q. In this case, were Alex and Conner complaining about the same things?
**A. Yes.**
Q. Okay. Do you remember -- well, you described Alex and Conner or his -- or the subordinate employees as disgruntled.
Do you remember using that term?
**A. Yeah.**
Q. Did you mean that they were disgruntled employees, in general, with the business or that they were disgruntled with Philip?
**A. Disgruntled with Philip.**
Q. Do you remember -- you talked about believing that Jessica had spoken to Alex and Conner on two occasions.
Do you remember that?
**A. Yes.**
Q. Okay. Do you remember whether on the first occasion Jessica asked them if they wanted to address their concerns with Phil directly or if they wanted her or someone else to address those concerns?
**A. She -- she gave them the ability to approach Philip first and air their thoughts and feelings to him,**

**which they did.**

Q. Okay. So is it fair to say that's the first time they came to her and raised a concern, that was how that worked out?

**A. Yes.**

Q. Okay. And then is it your testimony that the second time they came and raised concerns about Philip was after they had attempted to resolve their concerns with him directly?

**A. Correct, yes.**

Q. Okay. You were asked questions about Justin taking a look at Philip's emails, and I just want to ask you this again since counsel objected to your answer.

Why did you think it was appropriate for Justin to take a look at Philip's emails?

**A. Why?**

Q. Yeah, why did you think that was appropriate?

**A. Well, I think like any owner of a business, you know, is making sure that a particular employee that we felt wasn't doing his job, we needed to make sure all avenues were -- were looked at, including the main median that this employee was being asked to communicate with clients and employees and whatnot, and that was emails.**

MS. ROUSSEL: All right. That's all the

# COMPENSATION AGREEMENT

This agreement made November 17, 2022, by and between Philip Carrillo, Sanders Offner, Justin Farrae, and Crescent and empact hr (a division of Crescent).

It is the desire of all parties to enter into this agreement, whereby Philip Carrillo's remuneration for services rendered is increased and Philip Carrillo is given certain other incentives.

It is agreed as follows:

1. Base wage increase to $100,000 per annum, effective November 16, December 5 check date, 2022.*
2. One-time bonus of $5000 will be paid to Philip Carrillo in December, 2022.
3. Of empact hr's net profits, starting January 1, 2023, Philip Carrillo will be paid a quarterly percentage share of 10%. Paid the 2nd check date of the following quarter.*
4. Of RPO's gross revenues, starting January 1, 2023, Philip Carrillo will be paid a quarterly percentage share of 10%. Paid the 2nd check date of the following quarter.*
5. 5% revenue share of empact hr (of the trailing 12 months at the given multiple of valuation), in the event of divestiture of recapitalization.*
6. Title change to Director of HR, effective October 17, 2022.

*All forms of remuneration end upon termination of employment. No claim on either extends past the final date of employment, and final payments for services rendered up to the date of termination.

In witness of, the parties have executed this agreement.

| | | |
|---|---|---|
| [signature] | Philip Carrillo | [signature] |
| Signature | Signature | Signature |
| Justin Farrae | Philip Carrillo | Saders Offner |
| Printed Name | Printed Name | Printed Name |
| 11/30/22 | 11/30/22 | 11/30/22 |
| Date | Date | Date |

EXHIBIT
2

**Jessica Johnson**

---

**From:** Sanders Offner
**Sent:** Wednesday, January 3, 2024 3:53 PM
**To:** Philip Carrillo
**Subject:** comp spreadsheet
**Attachments:** Copy of Philip sales Comp Projections.xlsx

*Thanks in advance,*


**Sanders Offner**
President & Visionary , Crescent

2450 Severn Ave Suite 300 Metairie, LA 70001
504-301-3318 Ext. 1180
Sanders@crescent-payroll.com
http://www.crescent-hr.com/





Join our team **Are you ready for the challenge?**

EXHIBIT
5

| Annual Sales Quota | Avg annual Revenue | Close Ratio | F2F Presentations per week 4 | Presentations closed | Projected Revenue | amount over/under quota | HCM SPLITS |
|---|---|---|---|---|---|---|---|
| $ 300,000.00 | $ 15,000.00 | 0.15 | 208 | 31.2 | $ 375,000.00 | $ 75,000.00 | |
| | | | | 19 self sourced/12 splits | $285k SS + $90K from splits | | |

| | salary | revenue | com % | comission | total earnings |
|---|---|---|---|---|---|
| year 1 | $ 85,000.00 | $ 285,000.00 | 0.20 | $57,000 | $148,750 |
| $ 375,000.00 | | $ 90,000.00 | 0.075 | $6,750 | |
| | | | | $0 | |
| | | | | $0 | |
| year 2 | $ 80,000.00 | $ 330,000.00 | 0.2 | $66,000 | $153,125 |
| $ 425,000.00 | | $ 95,000.00 | 0.075 | $7,125 | |
| | | | | $0 | |
| | | | | $0 | |
| year 3 | $ 70,000.00 | $ 463,000.00 | 0.2 | $92,600 | $176,625 |
| $ 650,000.00 | | $ 187,000.00 | 0.075 | $14,025 | |
| | | | | $0 | |
| | | | | $0 | |
| year 4 | $ 70,000.00 | $ 496,000.00 | 0.2 | $99,200 | $184,500 |
| $ 700,000.00 | | $ 204,000.00 | 0.075 | $15,300 | |
| | | | | $0 | |
| | | | | $0 | |

crescent
empowering people

# MANAGEMENT LEVEL 10 MEETING AGENDA

May 13, 2024

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

- Staffing Decisions/Planning
  - Review of Philip Carrillo status in Houston
    - Fear of job loss
    - Detachment
  - Implementation Specialist
    - One or two?

[redacted]

[redacted]

crescent
empowering people

MANAGEMENT LEVEL 10 MEETING AGENDA
May 20, 2024

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

•

[redacted] [redacted]

[redacted]

[redacted]

- Car Allowance
  - Terminate Car allowance for Philip
  - Sanders to let him know

- Philip Carrillo
  - Concerns of termination

- Sanders to discuss with him in meeting today.
- Needs re-assurance

[redacted]

[redacted].

- Sanders
  - Meet with Philip
    - Discuss present state of mind
    - Review performance

[redacted]

crescent
empowering people

# MANAGEMENT LEVEL 10 MEETING AGENDA
June 17, 2024

[redacted]

[redacted]

[redacted]

crescent
empowering people

[redacted]

[redacted] [redacted]

[redacted]

4. Philip – Status
    a. 3 current Empact opportunities
    b. Sanders has information on all
    c. Sanders running until replacement found.
    d. Greyson leading HR sales efforts in place of PC
    e. Alex and Connor as follow up on technical questions.

[redacted]

crescent
empowering people

# MANAGEMENT LEVEL 10 MEETING AGENDA

Quarterly Planning

June 26, 2024

[redacted]

crescent
empowering people

[redacted]

crescent
empowering people

[redacted]

- Empact
  - 0-12 mo. commitments
  - Philip
    - Benefits – dynamic/sales
    - Cons – indecisive, no structure, not a support
  - No continuity
  - Need leadership
  - Fluid product is an issue
  - Justin to have conversation with the team
  - Upsell Concierge +
- [redacted]

[redacted]

- [redacted]

➢ Justin –
    - Have conversation with Empact Team

[redacted]