# EXHIBIT 2

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

PHILIP CARRILLO

Plaintiffs,

VERSUS C.A. NO. 2:25-cv-01787

CRESCENT PAYROLL SOLUTIONS, INC., ET AL

Defendant.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Deposition of JUSTIN FARRAE, taken at Adams and Reese, LLP, Hancock Whitney Center, 701 Poydras Street, Suite 4500, New Orleans, Louisiana 70139, on Thursday, June 4th, 2026, at 10:05 a.m.

By: Ashlee B. Ancalade

Registered Professional Reporter

A P P E A R A N C E S

REPRESENTING PLAINTIFF:

SPACE CITY LAW FIRM
BY: BRIDGET DAVIDSON, ESQ.
440 LOUISIANA STREET
SUITE 1110
HOUSTON, TEXAS 77002
713.568.5305
BDAVIDSON@SPACECITYLAW.COM

REPRESENTING DEFENDANTS:

ADAMS AND REESE, LLP
BY: ELIZABETH A. ROUSSEL, ESQ.
HANCOCK WHITNEY CENTER
701 POYDRAS STREET
SUITE 4500
NEW ORLEANS, LOUISIANA 70139
504.581.3234
LIZ.ROUSSEL@ARLAW.COM

ALSO PRESENT: PHILIP CARRILLO

# I N D E X


Page

Caption........................................1

Appearances....................................2

Agreement of Counsel...........................4

Examination By Ms. Davidson: ..................5

Examination By Ms. Roussel: .................160

Reporter's Certificate.......................170

* * * EXHIBITS * * *

Exhibit 1 Bates Cresecent 0037 and 0038 ..........30

Exhibit 2 Bates Cresecent 0014 through 0021 .....35

Exhibit 3 Bates Cresecent 0010 ..................48

Exhibit 4 Paystubs (in globo) ..................74

Exhibit 5 Bates Cresecent 0195 through 0205 .....86

Exhibit 6 Response to Plaintiff's First Set of Interrogatories to Justin Farrae 112

Exhibit 7 Responses to Plaintiff's First Requests for Production ......129

Exhibit 8 Bates Cresecent 0045 and 0046 ........132

Exhibit 9 Bates Cresecent 0206 and 0207 ........145

Exhibit 10 Bates Cresecent 0193 and 0194 ........149

Exhibit 11 Bates Cresecent 0074 and 0075 ........149

Exhibit 12 Bates Cresecent 0212 through 0219 ....156

S T I P U L A T I O N

It is stipulated and agreed by and among Counsel that the deposition of the aforementioned witness is hereby being taken under the Federal Rules of Civil Procedure for all purposes in accordance with the Rules.

That the formalities of reading and signing are hereby not waived. The formalities of sealing and certification and filing are hereby waived. The party responsible for service of the discovery material shall retain the original.

All objections, except those as to the form of the questions and/or the responsiveness of the answers, are reserved until the time of the trial of this cause.

* * * * * * * * * * *

Ashlee B. Ancalade, Certified Registered Professional Reporter, in and for the State of Louisiana, officiated in administering the oath to the witness.

JUSTIN FARRAE,

101 Magnolia Drive, Metairie, Louisiana 70005, jferrae@gmail.com, after first having been duly sworn, was examined and did testify as follows:

EXAMINATION

BY MS. DAVIDSON:

Q Would you please state your name for the record.

A Justin Matthew Farrae.

Q Okay. Have you ever testified in a deposition before?

A No.

Q Okay. This is the first time?

A Yep.

Q So you were here yesterday; correct?

A Yes.

Q Okay. So you may have -- do you want me to go over the ground rules again for depositions or do you want me to just get into the questions?

A Just wait for you to finish talking before I speak; right?

Q Yep. And you can take a break at any time. Verbal answers. She's taking everything down.

A Got it.

Q So if I say, "Is that a yes," or, "Is that a

A As I became an owner, I think my title changed to vice president. I mean, unofficially, I was the integrator of the organization. I don't know if that was ever on my business card or not. I don't think so. But the integrator was a role, like a visionary, to where what we call "traction," entrepreneur operating system, kind of the way we formatted meetings and planning events.

Q Okay. Before you were an owner, that period of time when you were an employee, who did you report to?

A Sanders.

Q And did you -- would you consider yourself reporting to him after you became an owner or would you call it something else?

A No. We -- we were pretty equals. I mean, he was definitely a majority shareholder, but we collaborated a lot. I didn't feel like an employee at that point, no.

Q Do you remember a time where he kind of pulled his weight as the majority shareholder in an argument or a dispute?

A Never came to votes. There were times towards the end where Sanders would do things that we agreed he wouldn't do, or vice versa.

Q Like what?
A Like letting Philip go.
Q We will -- I have a whole section of questions on that. We will -- we will get to that in a minute. So let's -- but let's switch gears and talk about Mr. Carrillo's employment there. Okay?
A Okay.
Q I believe I saw from your discovery responses you had a part in hiring him; is that right?
A Yes.
Q What all was your involvement in that?
A I think Sanders phone-interviewed him. And then I remember meeting him in the office in our conference room.
Q Okay. So it sounds like Sanders did the initial phone interview and then you were involved in the first in-person interview; --
A Yes.
Q -- is that right?
A Yes.
Q Okay. How many interviews were there after that?
A I don't recall for sure. There weren't a ton. There might have been a second interview and then an offer.

Q Okay. Did you present an employment agreement to anybody as the VP of Crescent?
A I don't think so.
Q Okay. So who would have been the person that I need to talk to about where this came from and who presented it to him?
A Probably Rema Gray.
Q Okay. Did she draft this?
A I don't think so.
Q Do you know who drafted this?
A No.
Q Did Crescent have, like, a template employment agreement that they kind of used for everybody maybe in the 2020 or 2021 era and they just kind of filled in the details for each employee, or was it written from scratch or something else?
A It doesn't appear to be written from scratch. It's perhaps something we obtained from LegalZoom or from one of the Honey Badgers that had something similar to that we amended for us.
Q Okay. It sounds like it's possible or probable that this was something that -- was a template obtained from a third party like LegalZoom or the Honey Badgers; and then y'all just tailored it?
A Likely.

Q Who would have been the one to do the tailoring for Mr. Carrillo?
A Rema Gray.
Q Are you aware of her having any sort of a legal training?
A No.
Q Were you comfortable with individuals with nonlegal training or no legal training drafting employment agreements that bound the company?
A At the time, I was.
Q Did that change?
A Sure.
Q When did that change your opinion on that?
A I can't say for certain, but we grew up as a company, as most companies do, and put more controls in place as we saw more threats. We could afford more legal advice.
Q Got it.
Did Crescent have, like, an employment lawyer on retainer in the 2020-2021 era?
A Not on retainer. Albert Nicaud's office was who we went to for operating agreement, transfers of shares, things of that nature, at that point in time.
Q So what about employment agreements, was that run by him?

A This could have come from him.
Q Okay.
A It could have.
Q Sure.
Okay. All right. Let's see.
And then did you have any involvement in these raises, I guess for lack of a better term, these staggering compensation raises, in paragraph 4?
A I would have been part of the discussion, yes.
Q Okay. So how did it work when you have an agreement like this at Crescent? Who in upper management or an owner triggers: Hey, this -- per this agreement, we've got to raise him up to 75 or 90 or something like that?
A Typically, HR.
Q Okay. A specific person in the 2020 time period?
A At that time, it would have been Rema Gray.
Q Okay. All right. And did you have any conversations with Mr. Carrillo about him not getting bumped to either 75,000 or 90,000 in a timely manner?
A I do recollect the phone call that we had around Hurricane Ida.
Q Okay. It was around that time, you mean?

A I believe so.
Q Okay. And not -- the subject matter was not Hurricane Ida?
A No. I believe the call was in respect to his change of pay.
Q Okay. And then what do you recall about that conversation?
A Not a ton except for the fact he said, "Hey, I think I'm supposed to get paid more." And I said something along the lines of, "I'll look into it."
Q Did you?
A Yes.
Q And was that issue resolved?
A I believe so.
Q Okay. So he did get paid the 90,000 at some point and possibly retroactively?
A I believe it was retroactive. I believe we were wrong and there was not a trigger to give him the raise that he was supposed to have; and so when he brought it to our attention, we said we did it wrong and paid him the difference.
Q Did anyone get in trouble for that, like Ms. Gray?
A No.
Q Okay. No write-ups or anything?

Q Okay. And what -- how would you classify it, other than the obvious title?

A It was the -- the new agreement for Philip's pay.

Q Okay. Do you recall if the intention was in the conversations you had with, you know, with Mr. Carrillo, Mr. Offner, maybe somebody else, that this was like an addendum to the employment agreement or this was to override everything?

A I'd say addendum.

Q Just to the compensation part; is that fair?

A Yes.

Q Okay.

All right. So the date here, it says the -- "This agreement made on November 17, 2022."

Do you see that?

A Yes.

Q Okay. Leading up to mid to late November, because it looks like this was executed by all three of you on the 30th, what do you recall about your conversations about this?

A I recall that he wanted to have a raise at the time, and I think his ask was $120,000. I don't recall if that was to myself and Sanders, but I do remember talking to Sanders about building an incentive

plan that was more around growth as opposed to a flat salary.

Q Uh-huh. Okay. So this was something brought up by Mr. Carrillo?

A I believe so.

Q Okay. And then, at some point, you maybe talked one-on-one about it to Sanders, it sounds like?

A I don't remember Philip asking me and Sanders for the raise or just talked to Sanders about it at the time. Philip at that time reported directly to Sanders.

Q Okay. So it sounds like Philip may have asked Sanders, Sanders talked to you about it one-on-one as a co-owner. And then was there a time after that where all three of you spoke about it?

A Yes.

Q Okay. Was that in person or on the phone?

A I believe that was in the conference room in person.

Q So when you talked to Sanders one-on-one, what was the consensus that you two came to about the -- the base increase to 120,000?

A The thought behind it was we wanted him to be committed to the growth of the company and not just settling for a base, and so having the incentive plan

that was based on growth was what we'd prefer.

Q So he asked for kind of a simple raise and y'all upped the stakes and said let's do profit share?

MS. ROUSSEL:

Objection to form.

BY MS. DAVIDSON:

Q Is that a fair assessment?

MS. ROUSSEL:

You can answer.

THE WITNESS:

Sure.

A We gave him the option of which one he wanted. We gave him the one that we prefer. And there was definitely more upside in that as well.

BY MS. DAVIDSON:

Q Okay. So just to be clear, so he approached Sanders, it sounds like, about just a base increase; and then you and Sanders talked and offered him more options than that?

A It's what I recall, yeah.

Q Okay. And then do you recall, were there other options other than the ones here that were discussed or offered?

A I don't think so. I know that his ask for Number 3 -- or Number 5, rather, was something that

kind of came in later in the conversation.

This wasn't a lengthy conversation. For me, at least. I don't know if Sanders and Philip went back and forth several times. But I remember when we were discussing it, that he wanted 5 percent in the event that we sell.

Q Okay. You said Philip wanted that?

A Yes.

Q Okay. So, I mean, was this a situation where it sounds like you all three talked, and then you and Sanders had to have another talk to kind of agree or disagree on terms?

A Yeah.

Q Okay. And then were these all verbal conversations or there are going to be e-mails back and forth between the three of you, you and Sanders, maybe Sanders and Philip?

A I can't say Sanders and Philip or -- or -- I don't have access to my e-mails anymore, so I don't know.

Sanders and I collaborated a lot, so if I built a sheet that showed certain projections that showed forecasting of what he could earn, that could have just been in my office by my monitors or I could have e-mailed it to him for him to review in his

Q Okay. Do you recall as you sit here today -- and you may not. I know it's been four years or so -- questioning why the agreement was made between -- by and between Philip Carrillo, Sanders Offner, and Justin Farrae and Crescent and empact hr, naming you specifically?
A I don't recall, no.
Q And you signed it; correct?
A Yes.
Q That's your signature?
A Yes.
Q Okay.
A I believed to be signing this as an owner of the company.
Q But it doesn't say that anywhere on this document; correct?
A Correct.
Q Do you know if this was ever -- either a draft or the final version was ever sent to -- I already forgot his name, but the -- the lawyer that you mentioned that kind of looks --
A Albert.
Q -- that looks at your agreements sometimes?
A I don't recall.
Q Okay. Would it have been kind of standard or

would that have been rare or would it have been --
A We didn't send him much to review, no.
Q Okay. So the -- kind of going back to this first, and this part is confusing to me, why Crescent and a division of Crescent would be listed separately.
Do you have any explanation for that, Crescent and empact hr, a division of Crescent?
A I do not.
Q Okay. Was there any LLC or other entity, a legal entity, established for empact hr --
A No.
Q -- that you know of?
Okay. So this is a department of the Crescent entity; is that right?
A Correct.
Q Okay. And then I generally remember -- I have slept since then -- but some testimony yesterday about the little asterisks about several of these or on several of these. Do you kind of remember talking about that -- or you didn't talk about it, but hearing about that yesterday?
A Yes.
Q Okay. Do you recall if that would have been something that you would have asked for, this little kind of postscript down here on several of these terms?

A I would have wanted to make sure that was in force for any agreement --
Q So you --
A -- regarding compensation.
Q Sure. Sorry. I didn't mean to interrupt you.
So you don't contest that this maybe have been an addition of yours versus maybe Sanders or Philip's?
A If it wasn't there and it was included after the fact, it would have been me or Rema. I don't think Sanders would have thought of that.
Q Okay. Was Rema in any of these conversations about this?
A In 2022, I don't know if it was her or Jessica was hired at the time.
Q But it's possible that maybe someone else from HR would have been involved other than you, Philip, and Sanders?
A Yes.
Q Okay.
A Sanders and I don't have legal backgrounds, so we would have definitely leaned on someone else to review the document as well to ensure that they agreed with what it said.

Q You just don't know who or if they did for sure; is that right?
A I don't.
Q Okay. All right. So why did you want this language to be added?
MS. ROUSSEL:
For the record, you're talking about the asterisk that says, "All forms of remuneration end upon termination of employment"?
MS. DAVIDSON:
Yes. The -- yes, the one we were just talking about.
A Sure. For some of our sales reps, we had ongoing commissions, that they would get a residual that went onto it, and I remember as we created that document, we wanted to make sure that it wasn't residuals in perpetuity, that it ended at the time of employment; so that way we weren't caught having to pay residuals to an employee who was no longer there, to a former employee.
BY MS. DAVIDSON:
Q Okay. So if I understand you correctly, a similar term was included in other types of agreements?
A That's correct.

Q Okay. And do you remember having a conversation with Mr. Carrillo about this verbally?
A I do not.
Q Okay. So you can't remember if this was something that you maybe typed in yourself or asked him to type in or e-mailed about or anything like that?
A I do not specifically remember, no.
Q Okay. That's all right.
Do you remember explaining the implications of this to him?
A I do not.
Q Do you remember talking to Sanders about it and whether it was a good idea?
A The asterisk in particular?
Q Yes. The -- yeah, the little paragraph at the bottom --
A I don't remember a conversation about it, no.
Q Okay. All right.
A Again, it was a standard practice at that point in time.
Q Sure.
So with regard to these -- we'll say paragraph -- or I guess lines 3, 4, and 5 that talk about net profits and a quarterly percentage share of 10 percent for Number 3, excuse me; for Number 4, of

be able to grab them from that SharePoint box or he would make them available to her for her to send off to other people.

Q Did you ever have an instance where an employee would send you the spreadsheet that you had basically made and said, "Hey, I think there's a problem here"?

A Yes.

Q And what was your process in handling that?

A We'd have to audit it and see what was potentially wrong.

Q And how often would you say this happened in the last -- we'll say from 2020 to 2024?

A 2023-2024, we probably had four sales reps. It depends on the monthly commissions with how many line items there were, how many discounts there, if it started on one day versus another. It was not a simple task, so it was not uncommon on a weekly -- or a monthly basis, rather, to have a discrepancy.

Q Was it -- I think you said there was 40-something employees?

A At the time I left, I believe there was 42.

Q Okay. So, I mean, how many weekly discrepancies are we talking about? More than five? More than ten?

A Monthly discrepancies. Monthly commissions.
Q Oh, I'm sorry. Monthly, yes.
A That's okay.
And, again, it would really depend on the month. Three, maybe four, per month.
Q And then if there was a discrepancy, there would be some sort of audit into it?
A Correct. So first month might have been free. In that case, it doesn't bill. So I -- it wouldn't show up on my billing reports, so I'd provide that to the sales manager at the time. They brought it to the rep. The rep says, "Hey, this isn't on my report. What's going on?"
I could also reflect that against Salesforce, which is what we used. And then later HubSpot, to see why is it on here or it's not on there. Or they were projected to have $10,000 of revenue, but the billing reports only showed 5,000. So those instances, I would highlight whatever the item is to discuss it with the sales rep or the sales manager and say: Hey, this is coming in really high or really low. What's going on?
Q Okay. Was anybody -- anybody else involved in the audit or the -- the fixing of the discrepancies other than you and possibly the salesperson who was bringing it to you?

possibly or potentially, to the employees, what about -- how would it get to payroll for payment?

A It would typically get approved and then it would go to payroll after that.

Q Approved by Sanders?

A Approved by the sales manager and/or Sanders.

Q Okay. Do you remember instances where you would e-mail the number just for Mr. Carrillo and send him an e-mail with what his number was?

A I don't recall.

Q So around this time, late November 2022 through 2023, did -- did Mr. Carrillo interact or was he involved with the sales team?

A Yes.

Q Okay. How were they interacting or how were they interacting with each other?

A I wasn't in charge of sales directly, so I don't know for certain. Did I go on certain sales calls with Philip with prospective clients? Yes, I did a couple.

Q Okay. Do you have any knowledge about either the sales folks that were way under you, right, how they were interacting with -- with Philip or if -- if he was helping them or the sales were helping Philip or anything like that?

A They interacted regularly, yes.
Q Okay. Was there any indication just via the -- the collaboration between Mr. Carrillo and the sales team, they were kind of all on the same team, that Philip was on the sales team?
A The HR team was sometimes included in some sales activities. Philip was invited to a number of sales activities, you know, reward dinners because they hit goals for certain things like that. So, yes, he was.
Q How often did you do the reward dinners? That sounds fun.
A They were quarterly, if we hit goals. Yeah, I'd say more on a quarterly basis.
Q Did you do, like, awards and things like that?
A Sales awards?
Q Yeah.
A There was a President's Club you could qualify for if you sold enough revenue.
Q Okay.
A There would be a trip and there would be an award ceremony then.
MS. DAVIDSON:
Let me know when you want to take a

A Yes.
Q Okay. So if I recall what you said correctly, you were calculating points three and four of Exhibit -- whatever this one was, the compensation agreement; right? The empact hr's net profits and then the RPO's gross revenues; right?
A Yes.
Q Could you tell just by looking at this paystub what portion of this commission is which -- from which paragraph?
A No.
Q Okay. When you ran the report, was it itemized at all?
A I don't recall.
Q Okay. But even if it wasn't itemized, you'd be able to just have the total number that could have combined the two; is that right?
A Yes.
Q Okay. And they were -- you just kind of -- well, did you have any hand in them being designated as commissions on the paystub?
A I might have agreed that's where the earning would go.
Q Okay. So just comparing that, though -- so there's a few more if you wanted to look at them, but,

really, I just wanted to go back to the last -- the last page of this exhibit.

A Okay.

Q It says, "Bonus" versus "Commission." And I think we talked a little about this yesterday. Do you know what -- so if you look at the top of this one, this is around the time that Mr. Carrillo was terminated, June -- no -- July 2024.

Do you see that?

A Yes.

Q Okay. So do you have any knowledge about why this would be considered -- or why this was classified as a bonus versus the commission like it had been before?

A No. It appears to be error.

Q Do you know if bonuses and commissions are taxed differently?

A They can be.

Q Did Mr. Carrillo ever ask for --

MS. DAVIDSON:

Can I borrow that pen so I can label these? Because I didn't give myself a sticker. Okay. This is 4.

MR. CARRILLO:

Is there a pen that I can use over here?

he requested it from Sanders. I doubt it or else we would have some formal process.

MR. CARRILLO:

Can we take a break?

MS. DAVIDSON:

Oh, sure. You want to take a break, yeah.

(A short break is taken.)

BY MS. DAVIDSON:

Q Okay. So we just took a break. You understand you're still under oath?

A Yes.

Q Okay. So, before the break, we were talking about Philip's promotions, but I want to go back to one thing that you said earlier. You said that you went on several sales calls with Philip?

A I was there for at least a couple, yeah.

Q Okay. Was he ever compensated for any sales he made over and above, you know, the agreements that we've looked at today?

A No. Growing empact was his main responsibility.

Q Okay. So he was promoted at least once while he worked at Crescent; is that right?

A Yes.

promotion, that he would now be a supervisor instead of kind of a worker bee?

A I don't know who we had at the time that he would have been -- who would have reported to him. It might have been Whitney in some capacity. It might have been Rema for a period of time. I don't believe at the time of his promotion that there was another full-time HR person.

Q Okay. So it sounds like, in part, he was promoted because he was building up a team and that he would be their supervisor; is that right?

A He was promoted as part of what his overall plan was.

Q Okay.

A But, yes, it had hit that stage for that to occur.

Q Okay. And he was kind of the supervisor of the division that he helped build up; is that right?

A Yes.

Q Okay. Are promotions at Crescent also based on satisfactory performance?

A Yes.

Q I think you touched on it earlier, but, prior to June 2024, are you aware of any written warnings or discipline for Mr. Carrillo?

A Nothing written that I'm aware of.
Q What about verbal warnings that were not reduced to writing?
A Sanders would have been -- would have done that, and I do not believe any of those occurred.
Q Okay. You never verbally reprimanded him; is that right?
A Not formally. I might have disagreed with something, but not a reprimand, I wouldn't say.
Q Okay. And that's -- that's a good distinction because that's kind of what I'm asking. It's one thing to have a dispute, but I'm asking if, you know, per the employee handbook or just kind of your own kind of process as a manager, did you ever discipline or reprimand him?
A I don't believe so.
Q Were reprimands of subordinates something that you and Sanders talked about?
A Yes.
Q Okay. And so just from your recollection of your talks with Sanders, he never mentioned verbally reprimanding Mr. Carrillo?
A No, not to my knowledge.
Q How was the employee handbook distributed to the employees at Crescent?

had employees beneath them, were you typically "in the know" or looped in when someone got a PIP?

A Yes.

Q Okay. Was that kind of a standard company practice or that was just with the people that you were supervising?

A We -- we didn't have a lot of discipline issues, so, when there was one, there was -- so we met as a leadership team on a weekly basis, and if there was something of that magnitude that there was someone was getting written up, or a PIP, it was discussed in that meeting to where everyone was aware of what was going on.

Q What was your knowledge of the -- the PIP being issued to Mr. Carrillo before it was issued?

A I was not aware that one was going to be issued.

Q Okay. Who would I ask about that if -- if you have any knowledge about that?

A Jessica and Sanders discussed it prior to discussing it with Philip.

Q Okay. And then looking at your --

A To my knowledge.

Q Sure.

And it looked at -- it looked from your

discovery responses, you were told about it at some point after the issuance; is that right?
A After it occurred.
Q Okay. And then who told you about it?
A Sanders.
Q And what did he say to you?
A I asked Sanders how it went, that being the termination call, and he said, "I put him on a PIP." At that point, I was quite angry because we had decided prior to that, that Philip was going to be let go on that call.
Q Okay. And so when was the first time it was brought up that Mr. Carrillo would be terminated?
A The third time that his direct report said that he was not readily available or disengaged from the company is when we had a discussion regarding Philip's future with the company.
Q Okay.
A His termination.
Q How long was that call?
A It was a discussion in one of the Monday-morning meetings.
Q How long are those?
A They ran an hour and a half.
Q Okay.

at that point in time. Detachment from the rest of his team, detachment from the rest of the company. I don't know in particular what -- what was discussed. All those things had been discussed at some point in time.

Q So, outside discussions, though, what personal knowledge do you have of his detachment from the company or clients or anything else?

A A number of things. We had engagement reports for the HR team and seeing who was involved with what client and how many hours were spent. So you would see Philip's name show up less and less on those reports to see who was doing what work with what clients.

We had -- again, those capacity reports, we had a staff of three at the time, two full time, one part time. None of them was even close to their full capacity. They were working at maybe 50 percent of what they were capable of doing.

So it was -- it was confusing as far as what Philip's role was because it wasn't so much in supporting clients at all for -- that was part of his job responsibility. So growing the division was, yes, important in the way of sales, but it was also important in the way of retaining clients.

One of the big issues we had was the

consistent loss of clients. We were gaining clients, but we were losing them just as fast. So for a, I want to say, almost a nine-to-12-month span, we were flatlined from a revenue standpoint. We were not growing.

Q But was Philip Carrillo considered a salesperson?

A No.

Q So who would you be blaming on the losing clients?

A Losing clients would have been his responsibility.

Q How?

A Clients were brought into the division and they needed to be engaged on a regular basis to ensure they would stick around with the service.

Q And that was only his responsibility, nobody else's?

A That and his staff's. But it ultimately tiered up to him, yes.

Q Why were there no reprimands given or training offered or anything brought up before a PIP?

A He reported to Sanders.

Q All right. Let's look at the next meeting. It looks like it occurred on May 20th, 2024. Looks

especially the last year or so.

Q Okay. The last year, like --

A Of Philip's employment.

Q Sure. I gotcha.

Okay. And then down -- there's one more little note on this one. It says, "Sanders meet with Philip. Discuss present state of mind. Review performance."

Do you see that?

A Yes.

Q Okay. Just from your recollection, was that -- was that point kind of related to the foregoing point about there was going to be a meeting and there's -- a discussion with Philip?

A Again, I remember the general discussion. I don't remember the individual bullets.

Q Okay. And then "Review performance." Do you know if there was actually a performance review at any point in May of 2024?

A I don't believe there was.

Q Okay. And then it looks like it -- the next -- well, the next meeting I have -- and if you see, like, the Bates labels go from 199 to 200. So these are the next ones in line. The next management meeting is not until June 17th, 2024.

that meeting?

A The final meeting we had regarding Philip's employment was shortly thereafter the comment was made about him being disengaged and stepping away from the company. At that meeting, the five of us all agreed that he was going to be terminated as of the "X" date, which was shortly after the meeting. Dates in particular, I don't recall.

Q So nobody said, "Maybe we shouldn't fire him, maybe we should just give him a PIP," in that meeting?

A No. The agreement there between all five of us that agreed to it was that he was going to be terminated, and the reason for that is because we didn't think that he could regain the faith of his employees that have publicly now said that he was detached from the company.

Q Is it common at Crescent for you to fire a supervisor over a couple of disgruntled underlings?

MS. ROUSSEL:

Objection to the form of the question.

BY MS. DAVIDSON:

Q You can answer.

A Okay. No. We didn't -- we hadn't fired any other supervisors in quite a few years prior to that.

Q So why was this situation different?

A Situation different. His lack of performance and the performance of the division, as well as his lack of engagement with the clients, was enough grounds to release him.
Q What documents do you have that kind of support what you're saying?
A You could see the revenue stagnation through a variety of QuickBooks reports. You could see his activity levels through his e-mail. You could see his lack of calendar activity. There was a large variety of items that showed that he was not working 40 hours a week or anything close to it.
Q I do have some questions for you on that later, but I just want to get through this exhibit really quick.
A Okay.
Q On Point D, it says, "Greyson leading HR sales efforts in place of PC."
Do you see that?
A Yes.
Q "PC," do you -- do you know that to mean Philip Carrillo's initials?
A I do.
Q Okay. So is it true that this -- this kind of implies that Philip was running HR sales?

A Yes.
Q Okay.
A HR sales is empact opportunities.
Q Uh-huh.
A So, for the most part, he was.
There were some reps like Rochelle that would do it independently. For larger, more complex cases, the reps were encouraged to have Philip, and if Philip wasn't available, another HR person on the call to answer any type of technical questions about the service.
Q And you said that he was going on sales calls, a couple with you; is that right?
A I was on a couple with him, yes.
Q Okay. Do you have knowledge of him going on other sales call as well, without you?
A I believe he did, yes.
Q Okay. And then -- but he wasn't making any true commissions; is that right?
A His responsibility was growing the division.
Q Is that a "no"?
A Did he make any commissions off of sales?
Q Correct.
A I don't believe so.
Q Okay.

replacement.

Q Anything else?

A Probably to see if there were any open issues that really needed to be resolved. You know, if they had any outstanding things that they wanted, what kind of support they wanted from me. As you take over a team, it's a longer conversation with how they want to be managed or not. Or there's a lot that I didn't know was going on within the division.

Q Did you, in fact, have that conversation --

A Yes.

Q -- as planned?

Okay. How did it go?

A It went fine.

Q So we briefly touched on complaints, I think, by Alex and Connor --

A Uh-huh.

Q -- about Philip; right?

A Uh-huh.

Q Okay. Did either of them or both of them ever personally come to you and complain about him?

A Yes.

Q Okay. And was it one of them? both of them?

A Alex.

Q Okay. And when was that?

A It's whenever we were doing the NOLA Detox investigation.

Q And what did he say to you?

A He said he couldn't get Philip to support him.

Q And what was your response to that?

A Well, we went through the details of what was going on in so much as he was supposed to interview these people and was reaching out to them and they wouldn't respond. So he went to Philip and said, "Hey, Philip, what do we do in this scenario," because the NOLA Detox owner at the time didn't want to get involved and force his managers to do anything about it.

So, at that point, Alex went to Philip, I presume, is what he told me, and said, "What do I do about this?" And Philip's response was something along the lines of, "You need to figure it out."

Q Do you have any personal knowledge about how much time Philip spent training Alex before Alex complained to you?

A I can't say that, no.

Q Okay. What was your impression of his complaint? Did you think it had merit?

A Yes.

Q From the time that Alex was hired up until he made the complaint directly to you, how much time did you spend with him working alongside him?
A Not much. Not working alongside -- well, we're in close proximity. We interacted a lot. I didn't work with him directly.
Q Did you ever notice, you know, kind of close proximity in the office how often he'd be asking Philip questions?
A I did not.
Q So, during the last two years -- it's kind of going back, and it's kind of a long time period, but during the last two years of Mr. Carrillo's employment, do you have any personal knowledge being in close proximity, working close with him, of what Mr. Philip did for Crescent day in and day out?
A Do I know what he did? Yes.
Q How do you know?
A Observe.
Q So what are you observing?
A I observed him going out on sales calls. He'd be in the sales team's meetings. He'd work with his team and collaborate on a regular basis.
Q Did you --
A At a time, he was client-facing and worked

with different clients.

Q Did you ever pop into his office and peek over his shoulder and make sure he's getting work done?

A No. He wasn't my report. That would have been rude. Have -- would I have stopped by to say hello or ask him a question, that's, yeah, very plausible.

Q Other than the reward dinners that we talked about earlier, were there other, like, HR events that Mr. Carrillo was kind of tasked with attending?

A Uh-huh.

Q What type of events are those?

A The SHRM events, Society of Human Resource Management. I think they met on a monthly basis, of which I -- I think he attended frequently.

Q Do you know if those were in the evenings or were they during the workday?

A They had some lunches, because I attended at least one of them. I -- there were some conferences that went into af- -- late afternoons, evenings, yes.

Q Were there ever, like, weekend conferences that you know of?

A There were weekend conferences.

Did we ask Philip to attend any of those? I can't say that I recall directly.

Was he asked to go on some Honey Badger collaboration meetings in different parts of the country, were there dinners that we'd ask him to attend in those situations? Yes.

MS. DAVIDSON:

Okay. I think what I'm going to do is right here next.

(Exhibit 6 is marked.)

BY MS. DAVIDSON:

Q Okay. I'm going to give you 6.

All right. So you can flip through or you're welcome to read it, every word, and whenever you're finished, just let me know, and I am going to ask you a few questions about these.

A (Views document.)

Sure. I had briefly reviewed this last night, so I'm fairly familiar with it.

Q Okay. Great.

So for the judge and the jury, what is this document?

A "Response to Plaintiff's First Set of Interrogatories to Justin Farrae."

Q So these are your answers to plaintiff's interrogatories, basically; is that right?

A I believe so, yes.

Q Okay. Perfect.
All right. So, as you can see, there's kind of a question. Every now and then, there's an objection. And then your answer is below.
Do you see that?
A Yes.
Q Okay. So I do want to talk about -- and I'm going to jump around a little bit.
So looking at Number 10. I think it's on the fourth page.
A Okay.
Q Describe your role in placing plaintiff on a PIP is, essentially, the summary of that question, and then the answer is you did not have a role in placing him on a PIP.
Do you see that?
A Yes.
Q Okay. And that's true; right?
A Yes.
Q Okay. And then on the next page, I think it's actually Question 14, but your answer goes into page 5.
A Okay.
Q Kind of halfway through that paragraph on page 5, it says: "Later, Mr. Farrae learned that they

put plaintiff on a PIP instead. When he found out they did that, he was furious and let them know he did not agree with the decision and believed the company should terminate plaintiff's employment."

Do you see that?

A Yes.

Q Okay. So why the fury?

A Because we had agreed as a team that we were going to do something and then that decision was totally undermined.

Q So you were mad at your teammates?

A Absolutely.

Q Okay. And when you expressed this anger to your teammates, who were you expressing it to specifically?

A Sanders Offner.

Q And what was his responses?

A He didn't -- he wasn't aggressive about it. He knew he did something that was not agreed upon by his business partner. Our discussion prior to was he was at the point of no return with the respect of his two direct reports and those were the grounds by which he was going to get let go. So regardless of his actions over a 30-day period, there's nothing that could have reversed that at that point in time.

Houston. He said, "Hey, Philip is really disengaged." And my response back to him was: "Can you and Connor handle that or do y'all need us to get involved?"
The fourth complaint was made to Jessica about him saying he was stepping away from the company.
Q Got it. So just -- we can just focus on the ones you heard directly --
A Sure.
Q -- right, because you have the best knowledge about those.
A Okay.
Q Were these phone calls?
A No.
Q What were they?
A They were in person in my office.
Q Okay. Did you write this down at all?
A No.
Q Notes?
Okay. And then who did you talk about Alex's complaints to?
A We would typically address them in the leadership meetings.
Q Okay. Did anybody else complain to you directly?
A No.

Q So just Alex two to three times; is that right?
A Yes.
Q Okay. And then from conversations with Jessica and/or Sanders or possibly others, you know that there may have been other complaints?
A There could have been, yes.
Q Okay.
A Or there was at least one that I'm made aware of.
Q Okay. When you learned that he was on a PIP, did -- were you apprised of the length of time of the PIP?
A I believe it was 30 days.
Q Okay. And it was your desire at that time to terminate him in the middle of the PIP?
A Immediately, yes.
Q Looking back, do you think that was a good decision?
A Yes.
Q Why?
A Because he had been terminated at the end of the 30 days had he stayed on the PIP. I wouldn't have let go of that. I was adamant.
Q So the next sentence in this quest- -- or in

the answer, it says: "Mr. Farrae did some additional investigation by looking at plaintiff's e-mails, which indicated plaintiff was not devoting much, if any, time to his work."

Do you see that?

A Yes.

Q And earlier you said you also were looking at calendar activity and -- you said something else, and I can't remember what it was.

A Productivity reports.

Q Okay. Productivity reports.

Okay. So this says you just looked at some e-mails. So -- so now, you know, looking back, did you also look at his calendar activity and --

A Yes.

Q -- and you said productivity reports?

A Yes.

Q How are productivity reports made?

A They're manual spreadsheets on a share drive, so the way the service worked is you were allocated so many hours of an advisor's time, so as the advisors were doing work, they were logging their hours on it. So that way you could see if they worked up to the amount of hours they were supposed to or not.

Q So -- but he was not an advisor at that

point; right?
A He was still supposed to work with the higher, bigger clients.
Q And he was still supposed to do the productivity report entries?
A Yes.
Q Okay.
A That's to my knowledge. I don't know what Sanders and him discussed.
Q Sure. And that's okay.
So -- so at this time when he was getting a PIP, he was not your direct report; is that right?
A Correct.
Q Okay. So wasn't it Sanders' ultimate decision as Philip's supervisor whether or not he wanted to put him on a PIP or fire him?
A Yes.
Q But you got involved in that?
A Yes.
Q Okay. And how much time did you spend looking through plaintiff's e-mails and his calendar activity and his productivity reports?
A I -- I can't tell you exactly how much time. The productivity reports are something I had looked at previously as we were going through this process. I

didn't agree with keeping him in his current role when he moved to Houston, so I agreed to the sales role. And Sanders had reversed his course of action and allowed him to keep his same role in Houston as well.

So, again, when Sanders didn't follow through on what he said he was going to do, this was the second case in which Philip was allowed to do something that we didn't agree upon.

Q So kind of going back to -- to really kind of like my line of questioning is, is your investigation. I want to know more about that. Okay?

A Sure. Maybe an hour to go through his inbox and outbox to see how much activity he had.

Q And you automatically had direct access to his e-mails like that or you had to get IT involved?

A No. I had direct access.

Q Okay. Did you have direct access to all --

A I did.

Q -- the Crescent employees?

A (Nods head.)

Q And from what you know of his duties, like, what percentage of his duties required e-mailing?

A Communication with clients could be verbal, yes. I would expect some e-mails to go back and forth. It was down to maybe two or three a day. A normal

course of business, if you're working, you're sending more than two or three e-mails a day.

Q How far back did you go when you were tracking this?

A Probably close to January. Just to get a feel for how long it was occurring.

Q You didn't go back farther than January 2024?

A I think I -- I don't recall.

Q Okay. And what about calendars, how far back in the calendars did you look?

A I can't say. I mean, I -- I'd look at them monthly and I'd kind of go back. I think I went as far back as when he was in the office to see how many more meetings and things like that he was attending that were on his calendar to compare with the Houston time versus the New Orleans time.

Q Okay. And then productivity reports, how far back did you go on there? Did you open each one up, things like that?

A Those were on different quarterly tabs, so it's pretty easy to flip back through those. That happened relatively quickly.

Q Did you ever look at the PIP and read it?

A I don't believe I did.

Q Okay. So what would you say were the reasons

plaintiff was terminated?

A Consistent reports from his direct reports that he wasn't supporting them properly. That would be the primary reason.

The next reasons would be the lack of growth of the division.

Q Anything else?

A Being in Houston, I don't know how many sales calls he could effectively go on. I believe they were bringing laptops and bringing them on a Zoom basis, but I don't know that for sure.

Q And since you didn't read the PIP, you don't know one way or another what the reasons for the PIP were; is that fair?

A You can say that.

Q Sure. Okay.

So and then kind of related to what you just said about him being in Houston, under -- under 16, you wrote: "Mr. Farrae did not encourage or approve the decision to allow plaintiff to work remotely after he decided to move to Houston."

Do you see that?

A Yes.

Q So what was your biggest problem with that?

A I didn't think he could effectively manage

his team and continue to grow the division from Houston.

Q And what do you mean by "grow the division"?

A The main goal in his compensation were tied to revenue and profit growth. It had stalled. And I think exiting the area that you're in, not being in direct correlation with your staff and the sales team wouldn't better things.

Q But as a supervisor of folks in that division, would you say that his -- his main duty was more managing versus sales?

A No. I'd say it was growth of the division, which is going to be sales and retention.

Q So he was mostly a salesperson who just happened to manage people?

A No. He was supposed to support his clients, and his team were supporting the clients, as well as the sales team to grow additional clients.

Q And what part of his responsibilities were managing his team, like what percentage or fraction?

A I -- I don't know.

Q And this company was around during COVID; right?

A Yes.

Q How did it fare working remotely then?

before we leave today, just let me know.
A I'd have to review them in more detail to really give you that answer.
Q Sure. And we'll probably take, you know, one more break before we end for the day. I've just got some more exhibits, but you are welcome to do that on the break.
A Okay.
Q Okay. So regardless of what, I guess, they were called -- director. I think he was a director -- but was -- was there any profit-sharing compensation agreement with anyone else at his level, regardless of what they're called, between 2022 and 2024 that you know of?
A Profit sharing, no.
Q Okay. So why was he the only one with this sort of agreement?
A He was the only one that had a division that he was running independently.
Q Do you recall Mr. Carrillo testifying about a dispute, I think between you and Rema Gray, and taking, I think, Connor out to lunch when he was first hired on?
A Yes.
Q Okay. What do you remember about that

2022 before it was implemented; right?
A Yes.
Q And you agreed that he would receive some sort of revenue sharing?
A Profit, yes.
Q Right. Okay. Profit, yeah. I think -- I think it says "revenue," but I think those are the same thing.
And you signed that agreement agreeing to those terms?
A Yes.
Q Okay. Did you intend for him to count on that and rely on it?
A Count and rely on?
Q Yeah. Like -- like rely that these -- this is true and correct, and it would be honored.
MS. ROUSSEL:
Objection to form.
You can answer.
A Did I expect him to think that it would be accurate? Yes.
BY MS. DAVIDSON:
Q Right.
A That he would rely on them? I mean, it was in his boat. He knew if he would grow clients and not

accrue additional expenses, there would be more profit at the end. I mean, I don't specifically remember reviewing these things with him, but I'm sure I did at some point in time.

Q Well, you weren't asking him to sign a paper that didn't mean anything; right?

A No. I wanted him to be engaged in the division and continue its growth.

Q And if he grow -- if he grew per the agreement, he would get a piece; is that right?

MS. ROUSSEL:

Objection to form.

A Not a piece, no.

BY MS. DAVIDSON:

Q Well, a percentage of the revenue specific to the agreement.

MS. ROUSSEL:

Objection to the form.

A Percentage of profits.

BY MS. DAVIDSON:

Q Percentage of profits, right, a piece of the profits; right?

MS. ROUSSEL:

Objection to the form.

A A piece of the profits of the revenue

generated within a period of time.

BY MS. DAVIDSON:

Q Right.

So how is that not a piece; right? The company makes a profit and he gets a piece of that --

MS. ROUSSEL:

Objection to the form.

BY MS. DAVIDSON:

Q -- if he grows; correct?

MS. ROUSSEL:

Objection to the form.

You can answer.

A Say it again.

BY MS. DAVIDSON:

Q So, generally speaking, putting in -- putting it in layman's terms, if he participates and -- and grows the company, right, grows this empact hr, grows the revenues, he gets a piece of that?

MS. ROUSSEL:

Objection to the form.

BY MS. DAVIDSON:

Q No?

A Define "a piece."

Q Why don't you describe the agreement, then. You don't agree with my assessment, so how would you --

what -- how would you define a profit-sharing or revenue-sharing agreement?

A There are spreadsheets that I believe you provided that show gross revenue minus expenses equal the profit. We agreed to pay a percentage of that bottom-line profit on a quarterly basis.

Q If he does what?

A If he grew the division profitability.

Q Did you expect him to continue working under that new compensation agreement?

A Yes.

Q Were you aware at any point in time that you worked with Mr. Carrillo that he had gotten overtures to work for other companies?

A I was not.

Q Did that surprise you?

A I think Philip was a pretty dynamic guy with an impressive resumé. I mean, I got hit up on LinkedIn and still do on a regular basis.

Q So it didn't surprise you; is that right?

A No.

Q Did you ever admit that you were underpaying him, especially in the beginning, for that 60k?

A No.

Q You thought 60k was -- was fine for someone

with a MBA?

A For a division with zero revenue, yes. With the upside that we were providing to him, absolutely.

Q Well, do you agree that someone's worth with regards to pay doesn't really have anything to do with what the company makes?

A It doesn't help with what the company makes, but with their future earnings, it does. I started the same base salary with Sanders and it worked out.

Q Whenever you were talking to Mr. Carrillo about the new compensation arrangement, did you ever classify it as an investment?

A No, not to my knowledge.

Q Did you think of it as an investment in his future with the company?

A I thought of it as higher earning potentials.

Q So it's a "no," you did not think of it as an investment in the company?

A It could have been an investment of his time and efforts. There was no financial investment that was ever asked of him, no.

Q Sure.

And it doesn't have to be financial. Any sort of investment -- emotional, sweat equity, anything like that?

A Sweat equity, no. There was never a conversation about equity.
Q Did you ever promise something along the lines of, if he puts in the work now, he would get a future financial gain from that?
A Through the profit sharing, yes.
Q So would you agree that that type of arrangement kind of depends on the employee trusting the employer to do what they say they're going to do?
A That type of an arrangement?
Q Yeah, that compensation arrangement where, if you do this now, you're going to get paid later, that involves some sort of trust?
A Sure.
Q Do you disagree that plaintiff relied on the terms of that compensation agreement?
MS. ROUSSEL:
Objection to the form. That calls for speculation.
A I can't say what he relied on or not. I didn't know his financial background. I knew he owned -- flipped a couple of houses, but, beyond that, I didn't know if he was sitting on a stack of cash or broke.
BY MS. DAVIDSON:

Q And then after he was promoted from the HR advisor role, even though his title changed periodically, did he, essentially, stay in that same role from his promotion until his termination?
A Yes.
Q So I think we -- we -- we kind of looked briefly earlier at his paystubs and he was getting something based on the compensation agreement --
A Yes.
Q -- separate from his salary; right?
A Right.
Q Okay. So do you agree that Crescent did benefit from his work from the time he signed that compensation agreement up until his termination?
A Did we benefit?
Q Yes.
A Yes.
Q Okay. Because even his last check -- or two checks, because there was a salary check and then there was the -- the bonus check, had money over and above his salary; is that right?
A Yes.
Q Did you have an understanding whenever you talked to Sanders about terminating Mr. Carrillo versus keeping him on a PIP, that the termination would stop

the revenue-sharing part of the agreement?
A We did not discuss that specifically, no.
Q But did you have that understanding?
A Did I have the understanding? I mean, theoretically, it didn't -- he didn't complete the quarter, but we still paid him his revenue share -- his profit share for that quarter.
Q So you would have been involved in the report for that; --
A Yes.
Q -- is that right?
Okay. So when you were pulling that report, what thoughts were going through your mind about paying him that money?
A The same as part of the compensation agreement. We agreed to pay him this money, even though we didn't necessarily have to because he was gone for the vast majority of that quarter. So we determined even though we didn't have to, that we should pay him out those revenues, his profit share.
Q And you -- that was a discussion that you had?
A It was.
Q With?
A Jessica Johnson.

capacity.

Q Okay.

A So she would have done that, and then it would have been HR advisor as her other role. I can't say for a fact, but I don't believe that this would have been offered to Philip.

Q Okay. Well, that's fine. Well, we won't even talk about that one, then.

So let's look at 10, then. So if you just kind of review these -- these bullet points here, it's -- and on the first page is really kind of the only thing I kind of want to talk about. Just let me know when you're done. There's quite a few bullet points, so . . .

A (Views document.)

Okay.

Q Did Mr. Carrillo perform all of these essential functions and responsibilities for the period of time he was in this role?

A At some point in time, he did.

Q So for any point in time where he didn't, is there a specific one you're looking at?

A "The director oversees all client work and expected to be the point of contact for the five largest and most complex accounts."

That's in the top, in the description.
Q Oh, okay. So I'm -- I'm -- I'm actually looking at the one underneath that. "Essential Functions and Responsibilities."
A Okay.
Q Because that's just kind of the general. So these are like the essential functions, right, that are kind of bullet-pointed.
A Okay.
Q So if you just look at those really quick and tell me --
A Sure.
"Intervene -- intervene when needed in client relationships to reinvigorate stale ones or to avert problems that could damage the team." (As read.)
Q Okay. You're saying he did not do that at least one time?
A He did not do that several times.
Q Okay. And then where is that documented that he did not do that?
A Client losses with the Client Engagement Reports. You can see, when zero hours were spent, and those clients were the most likely to leave.
Q When zero hours were spent by whom?
A By an advisor.

Q Okay.
A So if you couldn't get them to answer the phone or if you couldn't provide something of value to them, then they were awarded a zero.
Q And so, as the supervisor, you're saying that was Mr. Carrillo's fault?
A It was his responsibility to intervene when the client relationships -- to reinvigorate the stale ones, the stale ones being the ones that wouldn't communicate with us.
Q Do you know if Mr. Carrillo ever reprimanded anybody for not telling him that people were calling?
A I am unaware.
Q Okay. Because you were not his direct supervisor --
A That's correct.
Q -- so that may not have been your -- your role.
Okay. What else?
A (Reads sotto voce.)
"Develop" -- "Development and management of own relationship with the client and day-to-day client management."
Q Uh-huh. I see it.
A Again, near the end of his tenure, there was

no communication with clients for roughly three months.

Q And that -- you know, since you can't really prove a negative, that would be something captured in e-mails or -- or lack of e-mails, maybe his inbox?

A Yes.

Q Okay. Any other place I should look to substantiate that claim?

A You'd have to talk to the advisors.

Q Okay. Anything else?

A "Self and Team Management." For his team to come to management several times regarding collaborative working environment.

"Delegating effective and fairly." (As read.) I believe they were doing the vast, vast majority of the work. And it wasn't a great working relationship or they wouldn't have reported his activities to us.

Q Was there any sort of complaint form or more formal complaint process other than bringing it to management that Alex or Connor have used?

A No.

Was there a complaint form? I'm unaware if a complaint form existed. I don't think we ever created anything like that.

Q Are you the -- the type of person to e-mail

after a call and kind of recap what was discussed?
A Sometimes.
Q Okay. Do you ever -- did you ever do that with your talks with Alex?
It was Alex, right, I think?
A Uh-huh.
Q Not Connor? Okay.
A Probably not. Those would have been internal conversations, so: Hey, Sanders this is what's going on. Again, we were very close in proximity from each other's offices, so there was a lot of bounce in here, had this quick conversation, make sure we're on the same page.
Q So is there any document you can think of -- e-mail, Teams, text messages maybe between you and Sanders, that could substantiate that those complaints were ever made?
A No. You'd have to talk to Alex.
Q Okay. And then I want to look at this -- this --
A Let me revise. There could be e-mails. I'm unaware.
Q Okay. And -- and I know you don't have access, so -- but they would be on the -- if there were e-mails, would they be on the Crescent server most

REPORTER'S PAGE

I, ASHLEE B. ANCALADE, Certified Court Reporter, in and for the State of Louisiana, The officer before whom this sworn testimony was taken, do hereby state:

That due to the spontaneous discourse of this proceeding, where necessary, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a Court Reporter's transcription of a proceeding, and that dashes (--) do not indicate that words or phrases have been left out of this transcript;

That any words and/or names which could not be verified through reference material have been denoted with the phrase "(phonetically spelled)."

ASHLEE B. ANCALADE, CCR, RPR
CERTIFIED COURT REPORTER

C E R T I F I C A T E

This certification is valid only for a transcript accompanied by my original signature and original required seal or my digital signature on this certificate.

I, Ashlee Ancalade, Certified Court Reporter in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that JUSTIN FARRAE, after having been duly sworn by me upon authority of R.S. 37:2554, did testify on the 4th day of June, 2026, in New Orleans, Louisiana, as hereinbefore set forth in the foregoing 170 pages; that this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, and that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services; that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board, that I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect between a court reporting firm and any party litigant in this matter nor is there any such relationship between myself and a party litigant in this matter. I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

SUBSCRIBED AND SWORN on the 18th day of June, 2026.

______Ashlee B. Ancalade______
ASHLEE ANCALADE, CCR #21019