# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| PHILIP CARRILLO,<br>PLAINTIFFS, | ) |
| vs. | )CASE NO. 2:25-CV-01787 |
| CRESCENT PAYROLL SOLUTIONS, INC., ET AL,<br>DEFENDANT. | ) |

*****************************************************

ORAL AND REMOTE DEPOSITION OF

SANDERS OFFNER

August 3, 2026

********************************************************

ORAL AND REMOTE DEPOSITION OF SANDERS OFFNER, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 3rd day of August, 2026, from 11:30 a.m. to 1:42 p.m., before Cindi L. Bench, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine, wherein all parties were present via Zoom Videoconferencing, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

APPEARANCES

FOR PLAINTIFF:

Ms. Bridget Davidson
Space City Law Firm
440 Louisiana, Suite 1110
Houston, Texas 77002
Telephone: 713.568.5305
E-mail: bdavidson@spacecitylaw.com

FOR DEFENDANTS:

Ms. Elizabeth Roussel
Adams & Rees, LLP
701 Poydras Street, Suite 4500
New Orleans, Louisiana 70139
Telephone: 504.581.3234
E-mail: liz.roussel@arlaw.com

ALSO PRESENT:

Philip Carillo
Justin Farrae

INDEX

PAGE

SANDERS OFFNER

Examination by Ms. Davidson ........................4
Examination by Ms. Roussel ........................82
Signature Page .................................89
Signature Page .................................90
Court Reporter's Certificate .....................91

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
| --- | --- | --- |
| 1 | Employment Agreement | 19 |
| 2 | Compensation Agreement | 30 |
| 3 and 4 | Job Descriptions | 51 |
| 5 | Comp Spreadsheet and Email | 55 |
| 6 | PC Forecast Pay | 57 |
| 7 | Meeting Minutes | 59 |

REPORTER'S NOTE: Please note that I was not physically present for said proceeding in making the stenographic record; therefore, due to sometimes the poor quality of Zoom videoconference, i.e., audio distortions, Internet connections freezing, extremely fast speaking, overlapping speakers, extraneous room noises, et cetera, unintelligibles or inaudibles may have created inaccuracies in the transcription.

THE COURT REPORTER: We are on the record at 11:30 a.m. Central time. Will the parties identify themselves for the record, starting with Ms. Davidson.

MS. DAVIDSON: Bridget Davidson for the Plaintiff.

MS. ROUSSEL: And Liz Roussel for the Defendants.

THE WITNESS: Sanders Offner, present.

SANDERS OFFNER,

having been first duly sworn, testified as follows:

EXAMINATION

BY MS. DAVIDSON:

Q. All right. Good morning. We briefly talked about names off the record, but if you would just state your name for the record one more time.

**A. Sanders Offner.**

name, but -- if -- sorry.
When I say Crescent or company defendant or the defendant, I'm talking about Crescent Payroll Solutions, Inc.
Is that fair?
**A. Fair, yes.**
Q. Are you bound by any sort of confidentiality clause or nondisclosure agreement that would prevent you from talking about Philip Carrillo or the facts of this case in particular?
**A. No.**
Q. Okay. And do you still work at Crescent Payroll Solutions, Inc.?
**A. No.**
Q. Okay. Where do you work now?
**A. Crescent Payroll Solutions, LLC.**
Q. Okay. And when did you stop working for the Inc. corporation?
**A. In May of '25 when we did an F-reorg, and that's when Crescent Payroll Solutions, LLC was started.**
Q. Okay. And then it sounds like you switched as an employee of the corporation to the LLC; is that right?
**A. I wouldn't say employee, but I'm an owner of the LLC.**

Q. Okay. Were you one of the individuals that started the corporation?

**A. Yes.**

Q. Okay. Do you still do anything affiliated with the corporation today, whether or not you do, you know, a majority of work for them or not?

**A. No, that -- that -- that EIN has been dissolved.**

Q. I don't think you did because I don't remember a Zoom attendee, but did you attend virtually the deposition of my client, Philip Carrillo?

**A. No, I was out of town.**

Q. Okay. And you maybe attended virtually. If you attended at all, I could not remember.

Okay. Have you read the transcript for his deposition?

**A. Yes.**

Q. Okay. So far for any of his testimony, generally speaking, because I -- you know, I'm not going to fight the deposition, would it be fair to say that you might remember the testimony as you read the transcript?

**A. To the best of my knowledge, but I'd have to refer back to it to be exact.**

Q. Sure. And today, just to be clear, it's just

**A. No.**

Q. Okay. Whenever the corporation was dissolved and the LLC was created, did a lot of folks come over to the LLC at that time, other than yourself?

**A. The reorg was -- was solely because of a sale that we went through with Isolved, which essentially bought Justin out of the corporation because we were in escrow we had to do an F-reorg. So those employees just became part of the LLC.**

Q. Okay. Got it. What is your current address?

**A. My home address or business?**

Q. Well, both actually.

**A. Okay. Home address is 1322 Cherokee Avenue, Metairie, Louisiana 7005, and the office address, 2450 Severn Avenue, Suite 300, Metairie, Louisiana 70001.**

Q. Okay. And how long have you lived at that home address?

**A. October of 2021, I built the house and moved in.**

Q. Okay. So you own the house?

**A. Yeah.**

Q. Great. Did you graduate from high school?

**A. Yes.**

Q. Did you attend college?

**A. Yes.**

Q. Where did you attend college?
**A. LSU.**
Q. Okay. And what was your major?
**A. It was a bachelor of science with a concentration in microbiology.**
Q. Okay. Let's see. Bachelor of science with biology.
I can't imagine that you took any business time courses, but maybe in your basics did you take any sort of operations or business finance classes, maybe as your math credit or anything like that?
**A. No.**
Q. Management courses?
**A. No.**
Q. Okay. Do you have any higher education?
**A. No.**
Q. Where did you work before you started the Crescent Corporation?
**A. I sold life insurance when I get out of college for maybe eight months, and then I started working for ADP. It's a global payroll company.**
Q. Okay. What did you do for ADP -- sorry, I didn't mean to interrupt you.
**A. I was a -- I started off as sales rep, and then worked my way into management, finished there as a**

**regional sales executive.**
Q. Okay. What does a regional sales executive do over at ADP?
**A. Managing sales teams. Just a title.**
Q. How many teams did you manage there towards that end of your employment?
**A. Just two.**
Q. And then how many people were approximately on those teams?
**A. Maybe 20.**
Q. Whenever you worked with Philip Carrillo, how many people were you directly managing approximately?
**A. Organizationally, I would say maybe 15 to 20 at the time. I can't be --**
Q. Sure. And approximations are fine. I know it's been a minute.
Do you remember about how long you two worked together?
**A. Philip and I?**
Q. Yes.
**A. Let's see, August of 2020 up until June of 2024.**
Q. Okay. All right. We'll talk more about that in a second. I went off script here, so let me get back to prep questions.

**A. I'm paid a salary annually or I get every two weeks or twice a month, and then I take quarterly distributions.**

Q. Are you a part of any sort of -- or a party to any sort of employment agreement with regards to the LLC, your salary there, your distributions, things like that?

**A. No.**

Q. Okay. So I think you said, you know, you and Philip started working together back in 2020.

Did you have a hand in hiring him?

**A. I did.**

Q. Okay. Can you describe your involvement in that hiring process.

**A. I believe I got to know Philip through LinkedIn, and reached out to him with some interest in talking to him about a division that, you know, Justin and I were looking to start and that pretty much started those conversations. He came in for an interview. I think the first interview we had was myself, and Rema Gray, who was an operations manager at the time, and we interviewed Philip. Liked his skill set, he was very dynamic, and chose to pull the trigger and hire him.**

Q. So just to make sure I understand correctly, you saw his profile or something along those lines on

LinkedIn, and then you reached out to him first?

**A. Yes.**

Q. Okay. At that time, had he already filled out some sort of application to work for Crescent or you were the first point of contact?

**A. I don't believe so. I think I was the first point of contact.**

Q. Was there anything specific on his profile that drew you to him with regard to experience or education or, you know, anything really?

**A. It was probably a little bit of his experience. I think he was -- he was involved in recruiting talent for, I think, his job prior to coming to work here, and you know, we needed someone to help us come in and grow a new division, so we liked that.**

Q. Whenever you reached out to him, was there a specific role that you had in mind that you wanted him to fill or was it kind of a more general inquiry, you knew he would be helpful but you kind of figured it out later or something else?

**A. Yeah. I think it was more general in nature. You know, we -- I don't think we were set on a defined role at the moment.**

Q. Okay. So at the time that you contacted him, there was no like specific job description or position

that you were looking at to see whether he qualified and, you know, in comparing his profile to the position; is that right?

**A. Correct.**

Q. Okay. Okay. And then -- sorry, I forgot what you said after that.

So y'all connected and he at some point interviewed for the job; is that right?

**A. We -- yeah, we spoke on the phone and then he came in town -- or no, I think he had just moved here maybe and came in for an interview.**

Q. Okay. And then I guess between the first -- the first contact and the interview, it sounds like you had phone calls.

What was the -- the pitch to him, like as to what he would be doing or what you needed for your company with respect to what he could do for you job-wise?

**A. The pitch was: Hey, we're -- we're interested in -- in potentially growing a new division within the company, around outsourced HR and, you know, we're looking for a person that could -- that could help us, you know, build something like that together; need a certain, you know, skill set to do that.**

Q. And so in the interview, did you discuss like

specific terms, like, maybe a position title or direct reports or pay or anything like that?

**A. I had those initial conversations.**

Q. So specifically in the interview, were those things discussed?

**A. In the interview, I would -- I would -- to the best of my recollection, I assume we did.**

Q. And then you said -- I just didn't write it down.

But you -- so it was you, Philip and I think you said Rema Gray in the interview?

**A. Yes. Justin may have been in the room but I'm not sure he was.**

Q. That's okay. It's been a while.

Okay. So is there anything else that you recall about the -- the general terms of -- well, actually, let me go back. Let me strike that.

After the interview, at what point or maybe during the interview did you offer him a role or a job regardless of title with Crescent?

**A. I believe we offered him the job pretty quickly, you know, we moved quickly on Philip. I'm not sure how quick, you know. It may have been a week, but it didn't take us long to bring him on.**

Q. Okay. And so whenever -- whenever that offer

was made, do you recall any of the details about the offer? And that could have been, you know, maybe you had a title in mind or a -- specific duties in mind or salary or anything like that?

**A. It was basically HR manager, you know, he was -- he was a division of one person, so he was -- he was, you know, doing a little bit of everything but I believe his title was HR manager.**

Q. Back then in 2020, do you recall how many employees the company had?

**A. I would say between 15 and 20 employees.**

Q. Okay. So it was a pretty small outfit?

**A. Yeah. Yeah.**

Q. Okay. So I think I asked some of this off the record, but did you print out any exhibits for today that I sent over?

**A. I haven't printed them, but I have them up on my computer.**

Q. It may be easier -- if you want, I can share my screen but -- and I can zoom in as best you can, but if you want to look at it, you know, in a separate screen, I understand that as well.

The first one, Exhibit 1, is going to be the employment agreement.

(Exhibit 1 marked)

Q (By Ms. Davidson) Do you want me to share my screen for you?
**A. You don't have to --**
MS. ROUSSEL: I can do it either way -- whatever you want, Bridget.
MS. DAVIDSON: I just want everybody to have it but I know sometimes if you control it, like the Zoom and everything, it's easier than sharing a screen.
Q (By Ms. Davidson) I'm just going to ask more general questions, but do you have it up, Mr. Offner?
**A. I do, yeah.**
Q. Okay. So this is Exhibit 1, it's entitled Employment Agreement, and just a couple preliminary things to tell you.
So you probably already know this, but at the bottom of all of these pages, the bottom right you see Crescent and then you see some numbers.
Do you see that?
**A. Yes.**
Q. So those are Bates labels under basically the page numbers, and so I -- you know, if I need to point to a certain page, I'm going to probably be referring to that number, okay?
**A. Yeah.**
Q. Okay. So at the very bottom, so it's Crescent

0021, at the very last page, there are two signatures on this document, and it looks like one is yours and one is Philip's.

Do you see that?

**A. I do.**

Q. Is that your signature?

**A. Yes.**

Q. The top one?

**A. Yeah -- yeah, it is.**

Q. All right. So between his interview and when this agreement became effective, which if you look at the top of Page 14, it says August 4th, 2020. Do you remember any of the conversations about the terms that would ultimately end up in this agreement that you talked about with Philip?

**A. I would assume we verbally talked about some of the pay and whatnot, but obviously, whatever we agreed upon, is in this agreement.**

Q. Okay. And did you draft this agreement?

**A. No. This was drafted by Rema Gray, but I -- we did approve it. Justin and I approved this.**

Q. Is Rema Gray an attorney?

**A. She's not an attorney.**

Q. Okay. Okay. All right. So just really quickly, I just want to make sure I understand the

compensation agreement, which starts, I think, on paragraph 4, towards the bottom of the first page, and there's a 4.1 section that says Rate.

It looks like there's a -- like a tiered raise system where he made one salary for a certain period of time, and then the next period of time he makes more money, and et cetera.

Do you see that?

**A. Yes.**

Q. Okay. Do you remember any conversations with Philip surrounding that sort of staggered raise system?

**A. I don't remember, but I -- I assume this was probably just staggered for a reason of, you know, the company was growing and we want -- you know, we wanted to make sure this was going to work. You know, so -- to be 100 percent sure, I don't know without -- I'm sure there was a reason why we constructed it this way.**

Q. Do you recall at all whether or not Philip took a pay cut from wherever he was working before to work for Crescent?

**A. I'm -- I'm not sure of that.**

Q. And since, you know, it sounds like you looked at his profile, you know, got to know his background a little bit even before you reached out.

Do you think that he was paid adequately,

starting at $60,000, based on his education and experience?
**A. For what we needed, yeah, I do.**
Q. But not for what you needed, right? So it's a different standard, right, because what you want to pay is different than what someone is worth, right?
MS. ROUSSEL: Objection to the form of the question. You can answer.
Q (By Ms. Davidson) Right?
**A. This is what we felt he was worth for the role he was doing.**
Q. Well, he was ultimately worth at least $90,000 because he got those raises per contract; is that right?
**A. Sure. Yes.**
Q. So you don't remember any reason why these were set raises, not merit increases, but contractual raises so that he would make $90,000 relatively quickly after he starts with the company?
**A. I -- I don't know. I -- my assumption is we -- we did that just for cash flow purpose on what we could afford, and obviously get it to a point where it was -- you know, it was doable for Philip for what he could earn.**
Q. For this specific agreement and this specific employee, was the setting of this rate of pay a group

effort or was it your decision or do you know if it was someone else's decision or something else?

**A. This was probably a decision that Justin and I made.**

Q. Do you remember if Rema was involved at all in that decision?

**A. She may have been a party to it, but ultimately it was Justin and I who made the call.**

Q. Do you remember if you and Justin were in complete agreement about this compensation agreement or were there some disagreements about it?

**A. I don't believe there was, no.**

Q. At this point in time, August 4th, 2020, what did Justin do for the company?

**A. Justin was vice president.**

Q. And with regards to power, for lack of a better word, who had the final say? You or Justin or was it exactly 50/50 between you two?

**A. We -- we made decisions on a 50/50 basis, although the ownership was staggered.**

Q. Was there ever a time during Philip's employment where you disagreed about something and then a decision had to be made?

**A. There were multiple times. We always worked through it, though.**

Q. So you ultimately always came to an agreement?

**A. Well, I would say ultimately, we always came to an agreement.**

Q. Okay. Whenever you -- well, let me ask you this: So I think you said Rema drafted this. Do you remember if she ran this by you in like a Word format so that you could make red lines?

**A. No.**

Q. Do you remember making any suggested changes or revisions to the agreement before it was sent out to you and Philip for signature?

**A. That it was looked over, but I don't know if I made any changes for any boundary lines.**

Q. And was the implementation and production of this employment agreement something that you and Justin would both do? And what I mean by that, is like he would also do it -- do a once-over and make sure it's all in compliance or were you the contract person?

**A. So we always looked at things together or individually, we always looked through them.**

Q. Do you remember if he sent over any red lines or revision changes or suggestions with regards to the employment agreement?

**A. I don't recall that.**

Q. Okay. Okay. You don't have to -- I don't

have any more questions about that right now. I may later, but -- so if you don't want to have that up, you don't have to.

**A. Okay.**

Q. Switching gears a little bit, I'm specifically going to focus my next few questions on the time that Philip was working for the Crescent Corporation. So we're going to forget about the LLC for a while. And also I'm not asking about pre-Philip Carrillo time.

So during the 2020 to 2024 period where Philip worked there, were there any standardized or set annual or bi-annual performance reviews at Crescent?

**A. At the time, no.**

Q. Were there sporadic or -- performance reviews that were maybe done at a manager's discretion?

**A. Just specifically for Philip?**

Q. Well, just generally in the company. I'm just trying to figure out how the company worked.

**A. Well, we did -- we didn't do performance reviews at the time. We did monthly one-to-one's or I think what they call them was quarterly four-by-four's. But there was no formal performance review.**

Q. Were the four-by-four's or the other thing that you mentioned, were they reduced to writing or were these like little more informal meetings that were just

verbal?
**A. They were probably a little bit of both. Probably there was some -- some writing.**
Q. And was this a situation where, you know, there's like a little form to fill out for the manager and presents it to the employee or maybe it's a collaborative effort between the employee and the manager or something else?
**A. There wasn't a form at the time, so it was definitely collaborative, especially the four-by-four's.**
Q. And at the end of that process, was -- was that collaborative effort in writing, like, stored in the employee's personnel file or maintained any other way?
**A. I'm assuming it was maintained, I'm not sure where it was, though.**
Q. Was it a supervisor or manager's employee -- or not employee.
A supervisor's or a manager's responsibility to maintain those sorts of records for the employees that they were giving these to?
**A. It was probably more the responsibility of the department -- the department head, the manager, maybe not their direct supervisor.**
Q. Okay. So now let's talk about Philip.

Who was his supervisor or supervisors during the time that he worked for Crescent?

**A. It was me the majority of the time.**

Q. And did you have these sorts of meetings with him, the four-by-four meetings, that we were just talking about?

**A. No.**

Q. Why not?

**A. Why not?**

Q. Yes.

**A. Just never felt the need to because we communicated a lot. You know, I knew what was going on, so I just never felt the need to do that.**

Q. What about coaching or write-ups or progressive discipline, how did that work at Crescent during those -- that time period?

**A. You mean specific to the operational side, from what I know, and keep in mind, my role here was more development related, not so much in the operation end.**

**I believe if there was an incident with an employee, there was a write-up process where they get written up for something and then they had a period of time to maybe either get better or improve before they were probably terminated.**

Q. Did you all have any formal, like write-up forms or maybe there's like a place to check, whether it's a verbal, first warning, second warning, final warning, anything like that?

**A. I'm pretty sure we had something like that -- or we have something like that.**

Q. Did you have policies regarding progressive discipline in any sort of like employee handbook at this time?

**A. No.**

Q. Did you have an employee handbook at all from 2020 to 2024?

**A. Yeah.**

Q. Okay. So I'm going to briefly talk or ask you a couple questions kind of about his pay, and I know we just talked about the -- that kind of staggered pay system in his employment agreement.

Do you recall any sort of concern or complaint or issue where Philip didn't get that raise up to the 90K as scheduled in the agreement?

**A. No.**

Q. Okay. In your role, whether or not as, you know, just in your position or just as the Plaintiff's supervisor, would that have been something that would have come to or would that have been something that

Justin maybe would handle or HR?
**A. If there was issues with his pay?**
Q. Yeah, if he didn't get that 90,000 raise per the agreement, who would have dealt with that?
**A. I mean, that would have probably been brought up in a leadership meeting between Justin, Rema and I, if that were the case.**
Q. You don't remember anything about that?
**A. No.**
Q. Okay. Now if you want to pull it up, it's the compensation agreement, it's going to be Exhibit 2.
(Exhibit 2 marked)
Q (By Ms. Davidson) I've got to label these for you, Cindi. Sorry. One second. I'm trying to make it easy for our court reporter after we're done.
Okay. So you got it on your screen?
**A. Yes.**
MS. DAVIDSON: Liz, are you good?
MS. ROUSSEL: I'm good, yes.
Q (By Ms. Davidson) Okay. Have you seen this document before?
**A. Yes.**
Q. Okay. And what is this?
**A. Compensation agreement.**
Q. So how did this document come about? And it

looks like about a little over two years after Philip was -- started with the company.

**A. Philip wanted a raise, a pay raise, so Justin and I decided to put something like this in front of him. And instead of just giving him a raise, this is what we came up with.**

Q. Okay. I want break that down just a little bit.

**A. Sure.**

Q. It sounds like Philip came to management or leadership, you know, including you and Justin, saying that he wanted a raise.

And then you and Justin had a separate conversation with just the two of you about how that's going to work; is that right?

**A. Yes, correct.**

Q. Okay. Okay. And then when you were talking to Justin, were you throwing numbers around, were you offering other, you know, maybe non-monetary perks or other types of monetary perks, like stocks or anything like that whenever you were considering how and if we're going to give a raise to Philip?

**A. No. We were just trying --**

Q. What was --

**A. -- to get -- on how to incentivize him to**

**continue to help grow the division without just throwing money out there. And just to be clear, we were -- we were, you know, we were in agreement on this.**

Q. Sure. No, I'm just trying to figure out, you know, before everything was reduced to writing what ideas were kind of thrown around as to what the raise should be, what it should look like, and things like that. I'm trying to figure out what happened in that conversation.

**A. I mean, I'm sure we discussed, you know, he's asking for this, you know, what -- you know, can we do something different, you know, different ideas. We were always spit-balling ideas.**

Q. Did Philip ask for a specific number in the request for a raise?

**A. I believe he asked for 120, a salary of 120.**

Q. And was he still at the 90,000 prior to that request?

**A. Yeah, I would assume so. Yeah.**

Q. Okay. So he asked for 120, and you and Justin talked and then ultimately offered him some sort of agreement -- or some sort of raise, I'm trying -- and other -- and other benefits; is that fair to say?

**A. We would have probably verbally going about these six things before we put it in writing.**

Q. Okay. And then did he have any back and forth with you about that, like other ideas or did he contest anything or say, I want a bigger percentage or anything like that?

**A. If anything, he was more adamant about the title change than anything else.**

Q. Okay. So he didn't say, you know, 100 is not good enough, I want 120 or anything like that related to the six points here?

**A. I don't believe he did, after we presented him with this.**

Q. Okay. So if I'm hearing you correctly, you and Justin talked, and then one or both of you offered verbally kind of the sum of this agreement, and then he accepted and then the compensation agreement was developed; is that right?

**A. Yes.**

Q. Who drafted this?

**A. I would assume Justin and I drafted that together. I'm not exactly sure who typed it up, though.**

Q. Did you run it by a lawyer?

**A. I don't remember.**

Q. Do you have any sort of template in place for, you know, a compensation agreement that you maybe revised to make this agreement?

**A. No.**
Q. Okay. All right. So you don't remember if Philip had any revisions, suggestions or -- whether big or small, right, whether from typo to different percentages prior to signing?
**A. No.**
Q. Okay. And I want to ask you a couple questions about the very first sentence.
So it says, this agreement made November 17, 2022, by and between Philip Carrillo, Sanders Offner, Justin Farrae and Crescent and Impact HR, a division of Crescent.
Do you see that?
**A. Yes.**
Q. So do you know why you and Justin are listed here as parties to this agreement?
MS. ROUSSEL: I'm just going to object to the form of the question, but you can answer.
**A. We just typed this thing up and threw our names on it. I don't think there was any -- I don't think there was any reason why we listed ourselves.**
Q (By Ms. Davidson) And then can you help me understand so -- it says and Crescent and Impact HR, a division of Crescent.
Is Impact HR, was it a different entity

or a subsidiary or some other separate fictional or real entity other than Crescent?

**A. No. It was a -- it was a division within Crescent.**

Q. If -- if Philip -- if Philip Carrillo, Sanders Offner, Justin Farrae and Crescent and Impact HR, a division of Crescent, were all involved in this agreement, do you have any knowledge about who signed for what here at the bottom?

**A. I mean, this is just something that Justin and I signed.**

Q. Okay. And then do you recall how quickly this was implemented?

**A. Oh, I would assume it was like right away or maybe -- maybe the salary adjustment and the bonus were on a, you know, prorated or given on the next payroll.**

Q. Okay. Do you recall if Philip ever asked for a lawyer to review this document?

**A. I don't believe so, no. It's possible he showed a lawyer this, but not to our knowledge.**

Q. And did you -- whenever all the revisions were done or all of the typing was done, you know, it's either -- it looks like it was printed out, those look like wet signatures.

Did you read it thoroughly before you

signed it?
**A. Yep.**
Q. Okay. Did you specifically -- do you recall if you specifically, like, drafted the little asterisk on, like, I think it's on 5, 4, and 3, in here and then it goes at the bottom right before the witnesses.
Do you see that?
**A. I don't, but I'm sure there's a reason why we have it in there.**
Q. And then -- so, you know, generally speaking, it looked like there's -- the first -- the first point is wage increase, you know, salary increase; it looks like the second one is a bonus; and then .3 and .4 mention a percentage -- actually .5 does too, and then .5 has a 5 percent revenue share.
Do you see that? So like there's a quarterly percentage here, 10 percent in .3, same thing in .4, and then 5 percent revenue share of Impact HR in .5.
So who was doing those calculations of the percentages?
**A. Justin put those together at the end of each quarter, and those were used to pay Philip those percentages on there.**
Q. Do you know if he collaborated with anyone,

like a CPA or any sort of financial expert or analyst with regards to those numbers?

**A. Who being Philip or who being Justin?**

Q. Justing, the person who is doing the calculations.

**A. No, he did those himself. He didn't need help to do that.**

Q. How do you know?

**A. Because I watched him do it for years and he was always right with his calculations.**

Q. He was always right. I wish I was right with my math calculations all the time.

**A. He was.**

Q. Do you -- so you said you watched him do it for years.

With regards to Philip's calculations, specifically as it relates to his compensation agreement in Exhibit 2, what documents were reviewed for the calculations, if you know? The invoices, contracts, receipts, bills of sale.

**A. He would have probably cross-referenced invoices from the particular clients and then used that to come with the calculation after pulling out expenses.**

Q. And then were these stored in some sort of database or software, all these invoices and things?

**A. The invoices, I mean, we just pulled those directly from our payroll system. Those weren't -- those weren't kept, you know, in a shared file or anything.**
Q. Did you or are you aware of anyone sending a copy of those documents to Philip so that he could confirm his pay was correct?
**A. I believe so, yes.**
Q. Was that you or was that somebody else that you noted that?
**A. I believe the first couple Justin would send to me, which I would give to Philip. And I think from there, they were just either sent to him or I think they were maybe in a shared folder for that division.**
Q. Sure. And I just want to be clear, I'm not talking about the -- like the spreadsheet or calculations. I'm actually talking about the underlying documents that --
**A. No. I don't believe so, no.**
Q. Did Philip have access to those documents, like the invoices and maybe knowledge or somewhere to look at the expenses that would be deducted from the -- the sales?
**A. He did not have access to our QuickBooks, no. Now I'm not sure if I remember if he had access to be**

**able to pull invoices, because he did have some type of limited access in our payroll software.**

Q. Do you ever recall a time where he contested that it was correct, his pay and percentages paid out?

**A. I think there was one discrepancy one time about he maybe wasn't paid for a recruiting placement that he made. But other than that, no, there were -- there were no other discretions.**

Q. Then what happened in that conversation whenever there was some sort of discrepancy?

**A. I think Justin sent him an email that -- I guess it was going to be either -- it was on there, he just didn't look correctly or that was -- that was really it.**

Q. As the person who Plaintiff reported to, did you ever look or check or cross-check that his paystubs were accurate, you know, maybe with someone who has, you know, ADP experience?

**A. Did I look to make sure his paystubs were correct?**

Q. Yes. Did you ever look at his paystubs just to ensure that percentages were being paid out, salary was correct, anything like that?

**A. I may have done that once. But outside of that, I left that up to Rema who was processing the**

**payroll and then it rolled into Jessica.**
Q. And then that one time that you did look, was it related to that -- that one dispute that we were just talking about?
**A. No. I mean, I probably glanced in there from time to time.**
Q. What would be the reason that you would glance --
**A. That wasn't in particular to just looking at his paystub, that was something I did on company level.**
Q. What was the reason for it?
**A. Just oversight.**
Q. Whenever you were conducting these kind of audits, I'll say, kind of spot audits, did you ever find issues that needed to be fixed or did things typically look okay to you?
**A. Yeah, things were always -- typically looked good.**
Q. Did you ever have an issue where you were like this doesn't look right, and then brought that to Rema or Jessica?
**A. No.**
Q. Okay. Did you ever have a conversation with Rema or Jessica about an itemization on Philip's pay stub regarding these points in Exhibit 2?

**A. No.**

Q. Did it ever cross your mind that maybe these things should be itemized so it can clearly say on his paystub which -- which pay was for which point in the compensation agreement?

**A. No.**

Q. So what documents would I need to look at to figure that out? What part of the pay was for .3, what part was .4, what part was .5, et cetera?

**A. Well, .4, there was only one recruiting placement, so that -- that was only one time. In terms of Number 3, that -- that was just a process that we went through at the end of each quarter to determine what the net profits were for that division for Impact, and then Number 5 has nothing to do with that.**

Q. I'm going to ask you a few more questions and then, you know, we can take a quick -- quick little break. Do you want to -- we'll -- let me ask the questions, we'll go on a break, and we'll talk about if anybody needs lunch.

Was Philip ever promoted while he worked at Crescent?

**A. Promoted?**

Q. Yes.

**A. I would -- I mean, this was probably, if**

**anything, I wouldn't say a promotion, because Philip, you know, was doing the job as an advisor and then when we brought advisors on, became a manager. I wouldn't say there was a formal promotion. This was -- if this was anything, just a title change.**

Q. Well, it sounds like there was at least one because wouldn't an advisor to a manager of advisors be a promotion?

**A. Yeah, you could say that.**

Q. Okay. Other than title changes, maybe duty changes, and not including salary increases, like raises, any other promotions other than from advisor to a manager of advisors, generally speaking, without saying anything about position title?

**A. No.**

Q. And tell me how that one promotion went with regards to the decision that he's now going to be managing advisors?

**A. We probably just decided he was at a point where we needed to bring in some help, just for growth and, you know, ultimately he was going to manage those folks.**

Q. At the time when he started to get direct reports, do you believe he was doing satisfactory -- a satisfactory job in his position?

**A. Yeah, I do.**

Q. How many people did he manager whenever he was a manager, and I understand it's probably like a ramp-up situation, like a range?

**A. Sure. It was probably, you know, at least two full-time employees. And then we had -- we had an intern and then we had a part-time employee.**

Q. Did he ever manage -- sorry. Go ahead.

**A. The intern didn't last long. That was 90 days or something.**

Q. Was that because the intern wasn't doing well or just -- it was just a temporary internship?

**A. It was temporary in nature, but ultimately, they weren't equipped to become a full-time employee.**

Q. And then you said -- you mentioned a part-time employee.

Was that the intern or was there another part-time employee?

**A. That was -- there was another lady that was a part-time employee. She needed part-time hours and she had experience. We brought her on to assist at the time the two -- the two full-time employees being able to kind of help with some administrative burden that they were doing, as well as some stuff Philip was probably doing as well.**

Q. Did he ever have anyone in his department or staff that didn't work in New Orleans, who worked remotely or worked in Houston or worked in another town?

**A. Yeah, we had one out of his department, maybe in Biloxi, Mississippi. He was a full-time employee, though.**

Q. Did Philip ever report to anybody other than you during his employment?

**A. There was a brief stint where he was -- he would report to Justin, but that was really towards the end of his employment.**

Q. Whenever you were his supervisor or manager, did you ever give him a verbal warning about anything?

**A. Not until up to the end.**

Q. And what was your verbal warning?

**A. Verbal warning?**

Q. Yeah. So let me -- let me back up.

So I'm an employment lawyer, so there's -- I think there's a difference between, like, a verbal warning and, like, a writeup, right, or, like, even a PIP where you've got kind of stages of discipline. So I was going to start with like the first level in my mind, which is like a verbal, like a coaching or like a, hey, "don't do that again," sort of thing. So that's kind of what I was referring to, so

that was --

(Overlapping Speakers)

**A. I probably would verbal warning -- it wasn't a warning. He was given feedback on who his employees that shared some not so good feedback to our -- to Jessica at the time.**

Q. So when you say that, you mean two -- two employees complained about Philip?

**A. Yes.**

Q. Okay. And that was towards the end of his employment; is that right?

**A. Yeah, it was probably within the last, maybe six months of his employment. It was towards --**

Q. Got it. Prior to that, did you ever write him up or put him on a PIP or do any sort of disciplinary action against Philip?

**A. No.**

Q. What were the complaints by the two employees?

**A. Not responsive, you know, wasn't around to help them, you know; they were just disgruntled at the time.**

Q. Was there an investigation into those complaints?

**A. Yes, Jessica conducted interviews with both of them to get -- you know, obviously hear from them.**

Q. Did she interview Philip?
**A. Not sure.**
Q. What's that?
**A. I'm not sure if she did or she didn't.**
Q. Okay. And if she didn't, what happened with those complaints in the investigation?
MS. ROUSSEL: Objection to form. Calls for speculation. You can answer if you can.
**A. I'm quite positive he was given the feedback because he, in his own effort, I think went and tried to amend that between the two employees -- those two direct reports.**
Q (By Ms. Davidson) So when you say feedback, who was giving the feedback?
**A. I don't remember if it was me or it came from Jessica.**
Q. Did he contest the truth of those complaints or the merit of them?
**A. I'm not sure. I'm not sure if it had anything to do with, I think, his personal relationship at the time, wasn't going well. I don't know if that's -- that was part of what he told them was his problem.**
Q. But that's -- so you know, to me that would be something else.
I'm asking, like, did he dispute

specifically what those employees complained about; like, I did not do that or that is not accurate, is what I mean.

**A. He never disputed that.**

Q. Are those employees now employed at the LLC of Crescent?

**A. One -- one still is. One just recently left, a couple months ago.**

Q. Which one left?

**A. Alex Vial left.**

Q. I think the other one's name is Conner; is he still there?

**A. Yeah, he's still there.**

Q. Okay. Does -- does Jessica -- her name is Johnson, right, Jessica Johnson?

**A. Yes.**

Q. Okay. I was like that sounds like a super hero name, but I -- maybe I'm thinking of somebody else.

Does she have some sort of, like, investigative license to do investigations?

**A. No, I doubt it.**

Q. Do you recall who all was involved in the conversation with Philip about the -- these two employee complaints?

**A. It was between him and Jessica.**

Q. You weren't on the call?
**A. No.**
Q. Did she tell you or report to you about what happened in that call afterwards?
**A. Yeah, she always gave me detail on the conversations.**
Q. And what was your reaction to the details?
**A. I don't know. It would get better.**
Q. And do you know about what point in time these complaints came about the investigation and then the conversation with Philip with regards to his termination? So like, I think, you said the last six months there was issues.
Was it six months before, three months before?
**A. Well, you know, I think the conversations, he was having, I guess, communication issues with his two direct reports leading up to, you know, it might have been March or April, if my -- if I can remember the timeframe, and then within a period of 90 days, we had moved on.**
Q. And then I got another question about Ms. Johnson.
Did you have any hand in hiring her?
**A. Yes.**

Q. So do you know or recall if she has any sort of HR certifications or had any experience prior to coming to Crescent?

**A. Her experience was -- was HR related. She was -- she had helped, I think, her husband run a few of his companies. So she had obvious experience.**

Q. As Philip's direct supervisor, did you have knowledge of kind of the duties that he was performing day-in and day-out during the last two years of his employment? For example, like HR meetings or events in the evenings, were you in an office next to his and saw him work, things like that?

**A. Philip had a very flexible management, I would say. You know, like we gave him a lot of autonomy to come and go as he pleased, obviously, but made sure that he was continuing with one goal in mind, to help grow the division. So I mean, he wasn't punching a clock.**

Q. Were HR events in the evening something that was common or requested or, you know, maybe indirectly required to be better at his job?

**A. I wouldn't say they were -- they were forced. They were voluntary in nature.**

Q. Did you ever go to those?

**A. You mean specific to just HR events?**

Q. Yes.

**direct reports didn't come on until 2023, maybe late '22, I'm not quite sure.**

Q. Sure. And like the timeline when they come on, but generally speaking around the last year of Philip's employment is when he was in a management role; is that fair to say?

**A. Yes.**

Q. Okay.

**A. Yes.**

Q. So and, you know, correct me if I'm wrong, but I understand your testimony that there were no -- there were no issues with his performance or anything prior to the -- the last year of his employment.

Is that -- do I have that right?

**A. Yes.**

Q. Okay. So we'll -- so we'll just have the director of HR be Exhibit 3, and the director of HR -- director of HR Services be Exhibit 4.

And so now I just want to focus on Exhibit 4.

**A. Okay.**

Q. So reading all of this, let's start with the -- the mental qualifications, kind of at the bottom of that first page of 193, where it talks about the degree and certifications and, you know, experience,

things like that, and continues on to the second page.
Did he have all of that, "he" being Philip?

**A. I know he got -- he got his SHRM or his HCR -- HRCI certifications when he was working here. He didn't have that when he was -- when we hired him. Minimum of eight years of proven HR resource consulting experience, I'm -- I'm quite positive with his background and here he did. All the other stuff he was very good at, yeah. So yeah, he met the minimum qualifications.**

Q. And then the -- all is contained here and then we'll go back up to the job duties because that's quite a bit of bullet points.
Did he have the key competencies in -- in your opinion as his supervisor?

**A. Yeah, for the most part, he did.**

Q. And I don't think there's any physical demands or work environment things at issue in this case. I mean, you can correct me if you think so but I was just going to skip that section.
So let's go back up to the essential functions and responsibilities. If you'll just read through those and let me know if he performed these essential functions and responsibilities.

(Short Pause)

**A. Yeah, he did. He effectively did all these things.**

Q. Okay. I'm also going to jump back to whenever we talked about -- I think you said earlier how you would and Philip would, at some point, the numbers relating to the compensation agreement and possibly, you know, some -- like maybe a spreadsheet or a screen shot of his spreadsheets.

Do you remember talking about that?

**A. Yes.**

Q. Okay. So this is going to be Exhibit 5. It's the PDF that I labeled Comp spreadsheet and email.

(Exhibit 5 marked)

Q (By Ms. Davidson) Just let me know when you've got that up.

**A. I have it up now.**

Q. So this looks like an email from you to Philip, January 3rd, 2024, subject: Comp Spreadsheet.

Do you see that?

**A. Uh-huh.**

Q. And then I believe that the next page is the next page in the production in order, it's actually the attachment that was referred to in the email.

Do you see that?

**A. Yeah.**

Q. Is that -- is this kind of what you were referring to when you were talking about how you emailed him relating to the -- the underlying documents or the calculations that would ultimately be on his paycheck relating to the compensation agreement?

**A. This is something completely different.**

Q. Okay. So what is this then?

**A. So when Philip said he was moving to Houston, obviously, you know, his role was certainly one that we needed in-house.**

**We gave him -- or we showed him the opportunity of what it would look like if he moved -- when he moved to Houston if he wanted to go and do sales, if he wanted to go sell HR opportunities. We put this together for him so he could get an idea if you sold this many new HR accounts, this is the amount of money you can make and presented that to him. He ultimately decided that he didn't want to do that.**

Q. So you mentioned that you needed him in-house.

Did you tell him that?

**A. I mean, I told him that. Look, preferably, this role needs to be here. So if you're going to move to Houston, here on your options.**

Q. And one of the options was to sell in the Houston market, and what was the other option?

**A. The other option was -- was an opportunity to see how any type of remote work would work, and that's what we ultimately decided on, give him a shot.**
Q. So is it fair to say that, even though you preferred in-person, you did ultimately approve that he work remotely in that role in Houston?
**A. Yes.**
Q. So Exhibit 6 is going to be entitled, the PC Forecast Pay. So maybe you can just help me understand that as well.
(Exhibit 6 marked)
Q (By Ms. Davidson) Well, I mean, first I'm going to ask you a couple questions.
Do you have that?
**A. Yeah, I do.**
Q. Okay. Perfect.
Okay. So to me this looks like -- like someone printed a PDF, a spreadsheet. Have you seen kind of this data before, even though it may have been in an Excel format?
**A. Yeah, I've seen this before.**
Q. Okay. Can you explain to the judge and the jury what this is?
**A. This is just a snapshot of probably over the course of the quarter that he was being, you know,**

**percent for what those bullet points mean, but that's what -- that's what I remember.**

Q. Sure. Do you recall if Jessica Johnson kind of discussed what had gone on in her investigation, who she talked to, like what the employees were saying, things like that?

**A. Yeah, I don't remember specifically but I would imagine that she would have filled us in on that feedback in that meeting.**

Q. So based on what she was telling you and your knowledge of Philip, what -- what was the story about these employees complaining about Philip and what you thought about those complaints?

**A. I think it was -- as a group, they just didn't -- you know, they didn't sound good. You know, he -- you know, from their feedback, he was -- you know, I think he was disengaging himself from them for personal reasons, is what he told them. I would assume that's just having to do with his breakup with his boyfriend. But, you know, when he started to tell his own direct reports, like, I'm going to -- I may not be around, that was alarming for us.**

Q. So in light of, you know, you saying that he had been performing really well in his role up until these complaints, and that these employees were, by your

label, disgruntled, why did you believe these complaints were valid or had merit?

**A. Well, I think that -- that was just based off our observation of what, you know, those two direct reports had told Jessica. Jessica corroborating that as well, because she interviewed both of them, and then his disconnection when he moved. You know, he wasn't -- he wasn't -- wasn't doing his job that we were requiring him to do as he was before.**

Q. So did these employees complain directly to you about Philip?

**A. Directly to me? No, they went -- they went to Jessica.**

Q. So just so I understand.

So they complained to Jessica, and then Jessica's investigation involved talking to him again, but we don't know if -- or you don't know if she even talked to Philip about it directly; is that right?

**A. She -- she interviewed both of the employees and interview -- and then I believe she talked to them again. I'm not sure 100 percent if she talked to Philip about that or not.**

Q. Did you talk to Philip about it?

**A. I don't remember.**

Q. Did you ever tell Philip, like, in 2023, to

move all his clients to -- to the advisors, that they could kind of work on that, and then he would do the managing aspect of it?

**A. Yeah, but that was part and parcel to the job description for Director of HR services. So as we continued to grow that division, it was impossible for Philip to effectively manage the number of clients we had. But we needed him to really manage probably our -- our higher revenue clients, our bigger HR clients, so we wanted to make sure he maintained some type of client control there as he transitioned off those other clients to the two other advisors.**

Q. And then it sounds like the employees told Jessica, Jessica told you that there was some sort of comment by Philip that he wouldn't always be there.

Is that what I heard?

**A. Yeah, right.**

Q. What did you take that to mean?

**A. I took that to mean that if you're not going to be there for when your employees need you, that's a problem.**

Q. So -- okay. So you took that to mean he wouldn't always be there for his employees generally, not just he wouldn't be able to hold the hands of his employees or that he might be suicidal or any other

explanation of that -- that phrase?

**A. I wouldn't know what you would think of it, but when you tell your employees, Hey, I'm going to disconnect from you all for a period of time, and then I find out about that, that becomes a problem for any business.**

Q. But you heard that statement through Jessica who heard it through the employees who allegedly heard it from Philip; is that right?

**A. Yes.**

Q. And you think that's -- that's a valid -- that's a valid statement then?

**A. Sure.**

Q. Have you ever played the game Telephone?

MS. ROUSSEL: Objection, form. Argumentative. You can answer and tell her if you played the game.

**A. Maybe when I was, like, five years old.**

Q (By Ms. Davidson) When you heard this in this meeting from Jessica, did you initiate a conversation with Philip?

**A. I -- I don't remember.**

Q. And there's another bullet point, it says Implementation Specialist, and it says one or two.

I don't know what that means, so do you

Philip, Sanders to let him know.

Do you remember talking about a car allowance and terminating that and the reasons for that?

**A. Yeah. When he -- when he decided to move to Houston and work remotely, there was -- there was no longer he needed to get a car allowance. So we pulled that from him.**

Q. What was the car allowance for previously?

**A. Probably something we negotiated to give him some gas money if he was -- if he was going from, you know, client meeting to client meeting.**

Q. Okay. So it was -- it was like -- possibly like mileage, maybe like wear and tear on the car for -- for going around, you know, New Orleans to meet with clients; it wasn't not like an allowance for, like, a car payment?

**A. Correct.**

Q. Okay. And did you let him know you were terminating the car allowance?

**A. Uh-huh.**

Q. And what was his response?

**A. I don't remember.**

Q. Okay. You don't recall if -- maybe not his direct response, but do you recall if he was upset about that at all?

**A. I don't -- no, I don't remember if he was upset about it. I don't think he was upset about it.**

Q. Okay. And then the next bullet point, it says, Philip Carrillo, and then underneath it says, Concerns of termination. Sanders to discuss with him in meeting today. Needs reassurance.

So the first and the third bullet point under this one, concerns of termination and needs reassurance, to me, it seems like those are concerns of Philip. But is -- that may not be accurate.

Do you know what those mean?

**A. Concerns of termination (reading to himself). I don't remember specifically, but if -- the way I read it, maybe Philip was concerned that maybe his move to Houston he wouldn't be able to maintain his position any longer. But I'm not 100 percent sure of that.**

Q. Sure. Let me ask you this: Do you know who was drafting these minutes? Maybe it was the same person every time or possibly different people?

**A. It was Jessica. That was her responsibility.**

Q. And so just looking at this, do you remember her sharing, you know, that Philip -- he was concerned about termination, that he needed reassurance from you or something like that?

**A. I mean, if it's on here, we discussed it.**

Q. Do you remember talking to Philip about his concerns about losing his job and you possibly reassured him or anything like that?

**A. I don't remember.**

Q. And then just going down that page is one more bullet point. It's got your name on it and then underneath it says, Meet with Philip. Beneath that, it says, Discuss present state of mind, review performance.

Do you see that?

**A. Uh-huh.**

Q. Do you recall if you met with Philip in or around May 20th or maybe, you know, the week after or the week following?

**A. I mean, this was a to-do for me, so I probably had this conversation with him, I just don't remember it. If anything, it was just to make sure that he was doing okay, I would assume. He had a lot going on at the time.**

Q. Did you express concerns to him on directly about performance -- or your concerns -- your concerns about his performance?

**A. I don't remember, Bridget.**

Q. Did he -- do you remember if he explained -- or expressed at all that he was concerned about performing his duties, whether, you know, during -- due

to a prior relationship or due to his move or an injury or anything like that?

**A. No. I mean, when he decided that he didn't want to take the sales role, that he was going to do his best to try and make his current role work, you know, that's -- we gave him the opportunity to do that.**

Q. Okay. So it sounds like in your talk with him he was hopeful?

**A. Yeah -- yeah, I definitely think he was hopeful.**

Q. All right. The next meeting agenda is dated June 17, 2024, and the first page is all redacted, so we're going to go to -- it's 201, Page 201, and it says, Philip's status, looks like it's No. 4, and there's several bullet points.

Three current impact opportunities. Sanders has information on all. Sanders running until replacement found. Greyson leading HR sales effort in place of PC, which I believe is Philip Carrillo, and then Alex and Conner as follow-up on technical questions.

Do you see that?

**A. Yeah.**

Q. Do you recall what that means, three current impact opportunities?

agenda where she wrote before the things that y'all were going to discuss in the meeting?

**A. These -- these were scribed after the meeting as the meeting -- she would take notes and then --**

Q. Got it. The words agenda with meeting minutes threw me off. So that's good to know.

Okay. So in that conversation where it was discussed that Philip would be terminated, do you recall who initiated that conversation or that topic, I should say?

**A. I mean, that was probably a group topic, a group discussion. I'm not sure if one person initiated it.**

Q. Well, sure, but I'm assuming you didn't all in unison say, Let's fire Philip, right?

**A. I mean, look, I think this is where it was coming to a head. His performance, obviously, some realization around the fact that he wasn't working, you know, got us to the point where we knew we had to make a decision on -- on which way we were going to take this.**

**You know, collectively, as a group, I think we all knew we were probably going to have to move on from him, when we were going to do it, there was some disagreement. That was -- that was the reason for that conversation. So we started to -- these other C, D, and**

**E, was more planning for getting ready for that.**
Q. So other than the two employee complaints, if you go back to Exhibit 4, the job description for what he was doing kind of around this time, what part of his job was he not doing, because you mentioned job performance?
**A. He wasn't responding to emails --**
**(Overlapping speakers)**
Q. Was that in the job description?
**A. Was it in the job description --**
Q. Yes.
**A. -- specifically that?**
**No, but I would think that's a responsibility of anyone leading a division.**
**(Overlapping speakers)**
Q. Didn't want to say -- go ahead.
**A. He did a lot of personal stuff during working hours, which was not good either.**
Q. Anything else?
**A. No.**
Q. Okay. So when you say he wasn't responding to emails, he wasn't responding at all or it was a matter of he wasn't responding maybe within a certain period of time, that was maybe an unwritten expectation?
**A. No, there was -- you know, you would think in**

**a day, based on his role, you would have any emails going out or being received, there wasn't either. It's like he wasn't doing anything.**

Q. Was he typically emailing with clients or was he typically calling or doing face-to-face meetings, since he had a car allowance at some point?

**A. He was doing both. The majority of his communication to clients and/or his direct reports was via email.**

Q. So how long -- well, let me ask you this: Were you specifically looking at his email to see if emails were going in and out within a day?

**A. (Inaudible).**

Q. Sorry, I didn't hear you.

**A. I -- I was not doing that, no.**

Q. Do you know who was?

**A. Yeah, when we -- when we knew we were having a problem with his performance, I believe Justin started to monitor those emails.**

Q. Okay. And then do you have any idea how many days he monitored? Did he tell you this has been going on for a week or I've been monitoring for two weeks or I've been monitoring all day, anything like that?

**A. I'm not sure of the specific timeframe, but it was enough for Justin to pay attention to that and make**

**A. That he was not responding to emails within a day? I'm not -- he wasn't responding to email. I'm not sure if it was within a day or more than that.**

Q. Right. Okay. So it came up in this meeting that he wasn't responding to emails, right?

**A. In this meeting? It was probably brought up because it was a point of contention.**

Q. Okay. Well, was it multiple meetings that this was discussed?

**A. If I remember correctly, Justin told me on numerous occasions, not just in this meeting, that there's very little emails traffic from Philip.**

Q. Okay. And he was not at all point in time when he was talking to you about this, Philip's direct supervisor, right?

**A. No, but I don't -- no.**

Q. Were you concerned that Justin was spending a lot of work time going through employee emails and not doing his own work?

**A. No.**

Q. Why not?

**A. Why wouldn't I? Because I knew -- I knew the reasons were valid, that he was investigating Philip's emails.**

Q. Did he investigate Teams, as far as you know?

A. **Team chats?**
Q. Yes.
A. **No, I think -- I don't think he had access to that. I think it was just emails that he was looking at.**
Q. Okay. So he investigated but he either wasn't able to look at all the media Philip was able to contact employees on or he just didn't look?
A. **I'm not sure. I knew of the emails. That's all I know of.**
Q. Did you have access to Teams?
A. **To other people's Teams?**
Q. Yes.
A. **I'm assuming we did, but I never looked at that.**
Q. Did y'all have some sort of phone system or maybe like an app, you know, if people were on the road where you call through like a work line?
A. **Yeah, we did.**
Q. What was the company or the service?
A. **Three -- 3CX.**
Q. Do you know if -- if Philip's call logs were reviewed, in-going and out-going calls, made text messages sent from the work line, anything like that?
A. **There wouldn't -- you couldn't have gone in**

**and accessed his text messages because that was done on his personal device. I mean, I'm not sure if the call -- I'm not sure if any call logs were reviewed. I believe it was just emails.**

Q. Do you know if during this peek at Philip's emails, was there any talk about, like, the substance of that, for example, like this client emailed on this day and Philip did not respond and this was important?

**A. I don't remember.**

Q. Okay. And then at some point after some meetings, after some talks, was there some conclusion that the termination would happen with Philip?

**A. Justin and I disagreed on whether or not we were going to terminate him right away. You know, my -- my stance was, we put him on a PIP, see if he can work through it, and ultimately we -- we disagreed on that as well.**

Q. Okay. And then as far as I know, he wasn't just terminated, there was a PIP issued; is that right?

**A. There was a PIP issued.**

Q. Okay. So it sounds like you kind of won on that disagreement and --

**A. Well --**

**(Overlapping speakers)**

**A. -- to be clear, the decision to put him on a**

**PIP was made by Jessica and I. Justin was not involved in that. Ultimately once we put him on a PIP, Justin was not happy at the time we did that.**

Q (By Ms. Davidson) I do remember some testimony about that.

Did you and Justin have angry words about the PIP, maybe more so on his side than yours?

**A. He wasn't happy with me that we did that. He wanted --**

Q. Did he raise his voice?

**A. I wouldn't say he raised his voice. He was -- he was frustrated and voiced his opinion.**

Q. Did he tell you why he was frustrated?

**A. I think, in his opinion, he thought that Philip needed to be terminated immediately.**

Q. Who was Philip's supervisor at the time the PIP was issued?

**A. It was probably me.**

Q. So at Crescent, wouldn't it be a supervisor's ultimately decision -- a direct supervisor's ultimate decision whether he issues a PIP or terminates or is it always a collaborative effort over there?

**A. It's always a collaborative effort. He and I always --**

**(Overlapping speakers)**

Q. So was there ever a time when he wanted to terminate an employee and he would have to collaborate with you first?

**A. Yeah.**

Q. Was there ever a time that he terminated or maybe placed someone on a PIP and you didn't agree and he did it anyway?

**A. No.**

Q. So do you recall the length of the PIP, how many days, 30 days, 60 days, 90 days, something like that?

**A. It was a 30-day PIP.**

Q. And so what do you believe a PIP is?

**A. A PIP is a process that you go through with an under-performing employee to, you know, let them know that they're underperforming and here's what they need to do within those 30 days to -- to get better and basically prove to us that you are doing all the right things again.**

Q. Would you agree you with me that a PIP is essentially a company saying here's your last chance, fix these within this timeframe or we can't keep you?

**A. Ultimately, that's the definition of a PIP, yes.**

Q. And did Philip work out his PIP, work the full

30 days?

**A. No.**

Q. Why not?

**A. We just decided that it wasn't going to work out, so we terminated him within a week or so of the PIP.**

Q. So why did you offer him this chance and then revoke it by terminating him?

**A. We just changed our minds.**

Q. Do you think that's a good business decision?

MS. ROUSSEL: Object to the form. You can answer.

**A. Yeah, that was the right -- that was the right business decision.**

Q (By Ms. Davidson) Do you recall if there was ever a PIP form that was actually executed by all the proper parties, including Philip?

MS. ROUSSEL: Objection to the form. You can answer.

**A. There was ever a PIP, no.**

Q (By Ms. Davidson) So just like there is a form -- y'all had a form, right?

**A. For the PIP?**

Q. A PIP form.

**A. I don't know if we had a physical form. I**

**think the PIP required maybe daily or weekly summaries of what he was doing. I'm -- Jessica may have had him sign something, though.**

Q. Okay. That's okay.

Were you involved at all at preparing, like, kind of a written guideline or expectations within the PIP or was that Jessica or maybe someone else?

**A. Jessica put it together but I'm assuming, if I remember correctly, we collaborated on it.**

Q. Okay. But she maybe typed it up and everything; is that --

**A. Yeah.**

Q. Okay. So what was -- I do understand that, you know, your testimony is that things were a collaborative effort, but what were your reasons that you wanted to terminate Philip?

**A. He just wasn't the person that we hired anymore. When he moved to Houston, he was a different person. He wasn't -- wasn't doing his job effectively, wasn't working out, so we -- we moved on.**

Q. When you thought about terminating him, did the terms of the compensation agreement ever cross your mind?

Sorry, did you say no? I saw you shake your head.

**A. No, it didn't.**

Q. Okay. Got it. Sometimes Zoom cuts out like at the first part of the answer, so I didn't hear that part.

Was Philip the only employee that you remember during this specific timeframe when he worked there, that had this subsequent compensation agreement outside an employment agreement?

**A. Yes.**

Q. Okay. Is there any specific reason for that or it was just kind of each employee had their own terms or something else?

**A. Well, I mean, they -- all employees signed a similar employment agreement, but his comp -- that compensation agreement was just something unique that we did for Philip.**

MS. DAVIDSON: Okay. I think that's all my questions. I'm going to go ahead and pass the witness.

MS. ROUSSEL: All right. Sanders, I have just a few questions for you.

EXAMINATION

BY MS. ROUSSEL:

Q. First of all, regarding the compensation agreement that was marked as Exhibit 2, if Philip

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

PHILIP CARRILLO, )
PLAINTIFFS, )
)
vs. )CASE NO. 2:25-CV-01787
)
CRESCENT PAYROLL SOLUTIONS, )
INC., ET AL, )
DEFENDANT. )

****************************************************

REPORTER'S CERTIFICATION OF THE
ORAL AND VIDEO DEPOSITION OF
SANDERS OFFNER
AUGUST 3, 2026

********************************************************

I, Cindi L. Bench, a Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, Sanders Offner, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(f)(i) that the signature of the deponent:

XX_____was requested by the deponent or a party before the completion of the deposition and that the signature is to be before any notary public and returned within 30 days from the date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons

therefore;

________was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me on this, the __14th day of _______August, 2026.

Cindi Bench

______________________________

Cindi L. Bench, CSR
Texas CSR 752
Expiration: 6/30/27
CINDI BENCH REPORTING
10701 Corporate Drive, # 172
Stafford, Texas 77477
281 565-8222
Firm Registration No. 56