IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| PHILIP CARRILLO<br>*Plaintiff*, | §<br>§<br>§ | |
| v. | §<br>§<br>§<br>§ | NO. 2:25-cv-01787<br><br>JURY TRIAL DEMANDED |
| CRESCENT PAYROLL SOLUTIONS, INC., CRESCENT PAYROLL SOLUTIONS LLC, SANDERS OFFNER, and JUSTIN FARRAE,<br><br>*Defendants*. | §<br>§<br>§<br>§ | |

**PLAINTIFF'S FIRST AMENDED RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW Plaintiff Philip Carrillo ("Plaintiff") and files this First Amended Response in Opposition to Defendant's Motion for Summary Judgment per the Court's deficiency notice on August 26, 2026. In support thereof, Plaintiff provides the following:

## I. Defendants Misstate the "Undisputed Facts" Are Neither Undisputed Nor Facts.

### A. Defendants' "Undisputed Facts" are Neither Undisputed, Nor Proven "Facts"

In Defendants' Motion for Summary Judgment, they cite "undisputed facts."[1] However, many of these "undisputed facts" are actually very much disputed opinions, second-hand assertions, credibility determinations, and inferences drawn in Defendants' favor. Plaintiff submits a separate Statement of Disputed Facts with this First Amended Response. Specifically, Defendants repeatedly present the following disputed facts as settled facts: 1) Plaintiff was "barely working;" 2) Plaintiff was "disengaged;" 3) Plaintiff was unavailable; 4) Plaintiff's supervisors

[1] *See generally*, Doc. 28, pp. 4-10.

concluded he was not doing his job; 5) the alleged complaints made by Alex and Connor were accurate and proven; 6) Plaintiff's termination had "nothing to do" with future compensation rights; and 7) the May 2025 reorganization was not contemplated before Plaintiff's termination.[2] These are not objective facts. These are witness opinions and inferences.

Much of these allegations – not facts – are based on 1) Alex and Connor's alleged complaints (which are in dispute as to whether they happened or have any merit);[3] 2) a dubious investigation performed by Jessica Johnson;[4] 3) Farrae's cursory review of a small percentage of emails;[5] and 4) Offner's interpretation of events.[6] For example, Offner admits in his deposition that he never personally received the complaints from Alex and Connor and relied on what Jessica told him (who relied on what Alex and Connor told her).[7] Offner could not even definitely say whether Jessica interviewed Plaintiff regarding these complaints.[8] He also did not recall, as of the date of his deposition, talking to Plaintiff about many of the complaints himself.[9] Similarly, Farrae testified that some complaints were reported through others and that termination decisions were discussed repeatedly in leadership meetings, he only talked to Alex.[10]

B. Key Issues of Material Fact

**1. The allegations that Plaintiff was "barely working," "disengaged," and/or unavailable is in dispute**

---

[2] *Id*. (citing various testimony from the three depositions taken in this case).
[3] *Compare*, Exhibit 1: Excerpt of Deposition of Philip Carrillo, 116:23-119:19, 120:2-15, 120:21-121:8; *with*, Exhibit 2: Excerpt of Deposition of Justin Farrae, 106:15-24 (only discussed an alleged complaint by Alex, not Alex and Connor); *and*, Exhibit 3: Excerpt of Deposition of Sanders Offner, 64:7-14.
[4] *See*, Ex. 3, 45:22-46:4, 48:14-48:6, 49:1-6.
[5] Ex. 2, 101:5-12, 119:20-120:13; *see also*, Ex. 3, 72:2-14, 72:19-73:19, 75:25-77:4.
[6] *See generally,* Ex. 3.
[7] Ex. 3, 63:13-64:14.
[8] *Id*. at 45:22-46:4.
[9] *Id*. at 62:14-24.
[10] Ex. 2, 106:15-24, 117:4-10.

Defendants' Motion repeatedly states that Plaintiff "was barely working," "was not doing his job," and was disengaged as if these accusations were settled facts.[11] The evidence Defendants use in support of these *disputed* facts are overstated. Specifically, Farrae testified that he did an approximated one-hour review of Plaintiff's emails.[12] He testify that he specifically reviewed Teams, or texts, or call-logs to judge Plaintiff's productivity and/or work performance.[13] Yet, to Defendants, this minimal and ambiguous review of Plaintiff's email activity is solid (and undisputed) evidence that proves Plaintiff "wasn't working." However, Justin's Farrae's subjective interpretation that led to that conclusion consisting only of a review of Plaintiff's emails for an unspecified period of time is a material fact that is in dispute.

With regard to the alleged issues of Plaintiff's performance, there was no prior discipline initiated against Plaintiff prior to the PIP.[14] Moreover, Farrae testified that he personally observed Plaintiff working; he saw Plaintiff attending sales meetings, going on sales calls, working with clients, attending SHRM events, and attending Honey Badger events.[15] Farrae admitted he did not even read the PIP himself.[16] Farrae's conclusion was based largely on his interpretation that two or three emails a day was insufficient, a personal belief.[17]

Offner, on the other hand, who was actually Plaintiff's direct supervisor (not Farrae) testified that Plaintiff "effectively did all" essential functions of the position described in the Director of HR Services job description[18] and he simply trusted that Justin looked into Plaintiff's work product sufficiently.[19] Notably, even Farrae acknowledged in his deposition that Plaintiff's

---

[11] Doc. 28, pp. 4-10.
[12] Ex. 2, 120:9-13.
[13] *See generally*, Ex. 2; *see also*, Ex. 3, 75:8-20, 75:25-77:4.
[14] Ex. 2, 80:23-81:23.
[15] *Id.* at 110:17-112:4.
[16] *Id.* at 121:23-24, 122:12-15.
[17] *See generally*, Ex. 2.
[18] Ex. 3, 54:21-55:2, 72:2-14.
[19] *Id.* at 73:10-19, 75:8-20, 75:25-77:4.

role included client support, sales support, staff management, conferences, and activities that would not necessarily appear as email traffic.[20] Plaintiff even had a car allowance when he worked in New Orleans due to his role requiring driving around town meeting with clients.[21] Offner further testified that Plaintiff had no performance problems prior to his final year of working for Defendant, which is a contrast from Defendants' claims in its Motion that Plaintiff was chronically underperforming.[22] In fact, Offner admitted that Plaintiff was doing a satisfactory job when he was promoted into management.[23]

Conversely, Plaintiff expressly disputed being disengaged, stating "I would say I was as engaged as they needed me to be"[24] and "[t]here was no lack of engagement with the business and the requirements of my job."[25] In light of this evidence, a reasonable jury could conclude Defendants' current characterization regarding Plaintiff's performance substantially overstates the record.

**2. Grounds for Terminating Plaintiff are Internally Inconsistent**

Regarding the reason(s) for Plaintiff's termination, Farrae (again, not Plaintiff's direct supervisor and having done only a brief review of Plaintiff's email for about an hour) testified the reasons were lack of performance, lack of growth of Plaintiff's division, client retention issues, Plaintiff being in Houston, and complaints from subordinates.[26] Offner, Plaintiff's direct supervisor, testified that Plaintiff was terminated due to his alleged inability to manage remotely from Houston, complaints from Connor and Alex, and Farrae's hasty email investigation.[27]

---

[20] Ex. 2, 122:7-11, 122:24-123:21, 110:20-112:4.
[21] Ex. 3, 66:2-17.
[22] *Id*. at 53:10-15.
[23] *Id*. at 41:21-42:9, 42:16-43:1.
[24] Ex. 1, 122:6-17.
[25] *Id*. at 125:2-23.
[26] Ex. 2, 121:25-122:15.
[27] Ex. 3, 77:10, 71:7-80:9.

However, Sanders told Plaintiff that Plaintiff was terminated because "they wanted their leaders in the general New Orleans area."[28] That is a materially different reason than "poor performance." Notably, Defendants have not cited to any documentary evidence, other than the purported PIP that Plaintiff never actually signed, supporting the assertion that Plaintiff was actually performing poorly.[29] When Offner went through the actual job description for Plaintiff's role in his deposition, that listed the essential functions and duties of the role, he testified, "[h]e effectively did all these things."[30]

Plaintiff was issued a Performance Improvement Plan ("PIP"), which is not a fact in dispute. In his deposition, Offner described the purpose of a PIP as giving an employee time to improve and prove they can do the job.[31] But then, Plaintiff was terminated prior to the expiration of the 30-day PIP, roughly a week after it was issued.[32] The reason? Offner testified that he, Farrae, and Jessica Johnson "just changed [their] minds."[33]

Defendants' Motion alleges that the individual Defendants, as well as Jessica Johnson, had a unified view of Plaintiff and terminating him.[34] However, both Offner and Farrae admitted that they disagreed on the best course of action for Plaintiff.[35] Farrae wanted immediate termination and Offner wanted (and ultimately did issue) a PIP first.[36]

**3. The alleged complaints by Alex and Connor**

Defendants repeatedly state in their Motion that "Alex and Connor complained that Carrillo was unavailable and disengaged" but that remains unproven proven or, a fact that will come down

---

[28]Ex. 1, 127:15-128:4.
[29] *See generally*, Doc. 28.
[30] Ex. 3, 54:21-55:2.
[31] *Id*. at 79:9-80:9.
[32] *Id*.
[33] *Id*.
[34] *See generally,* Doc. 28.
[35] Ex. 2, 84:14-17, 85:4-19, Ex. 3, 77:10-78:18.
[36] *Id*.

to credibility.[37] It is also a problem that Farrae testified that Alex only Alex—not Connor—complained directly to him and many of the statements regarding these complaints came through Jessica.[38] Farrae took no notes, there was no complaint form, and Defendants have not shown that it did a thorough investigation by and through Jessica Johnson into these complaints.[39] When asked if there were any documents that substantiated the alleged complaints, Farrae responded, "No. You'd have to talk to Alex."[40] As for Offner's ability to substantiate these alleged complaints, Offner admitted that much of his understanding simply came from what Jessica reported to him.[41] Plaintiff, on the other hand, expressly disputed those complaints and their validity.[42]

**4. Defendants' admissions regarding the PIP**

Though Defendants argue that Plaintiff was terminated for performance, the admissions of Farrae and Sanders that undermine the genuineness of the PIP are notably absent from the Motion. Specifically, Farrae testified that prior to the issuance of the PIP, everyone (Farrae, Offner, Jessica Johnson, etc.) had already agreed that Plaintiff was going to be terminated.[43] Farrae further testified that when he learned the PIP was issued, he was *furious* because the prior group decision had been termination.[44] Farrae even went as far as to say that "regardless of [Plaintiff's] actions over a 30-day period, there's nothing that could have reversed that [decision]."[45] This testimony creates a major factual dispute as to whether the PIP was genuine.

---

[37] *See,* Doc. 28, pp. 4-10.
[38] Ex. 3, 45:22-46:4, 62:14-24, 63:13-64:14; *see also*, Ex. 2, 106:15-24, 116:19-117:10.
[39] *Compare*, Ex. 2, 116:1-25; *and,* Ex. 3, 61:23-62:22; *with*, Ex. 1, 116:23-119:19, 120:2-15, 120:21-121:8.
[40] Ex. 2, 155:14-18.
[41] Ex. 3, 61:23-62:22, 47:14-48:6, 45:18-46:4.
[42] Ex. 1, 116:23-121:8.
[43] Ex. 2, 27:20-28:2, 100:2-16, 114:7-25; Ex. 3, 77:10-20.
[44] Ex. 2, 113:24-114:25.
[45] *Compare, id.; with*, 77:10-78:18.

It is also notable that Defendants admit they had no documentary evidence that Plaintiff failed the PIP.[46] As Offner testified, Defendants simply "changed [their] mind" on offering Plaintiff the PIP and terminated him instead.[47]

**5. Defendants forget they Plaintiff's approved remote work from Houston**

Defendants argue that Plaintiff's move to Houston was an inherently problematic arrangement.[48] However, Offner admitted he approved Plaintiff's remote work from Houston.[49] In fact, Offner approved Plaintiff's move to Houston after considering alternatives.[50] Plaintiff didn't unilaterally move and force the arrangement, Offner approved it. Defendants cannot characterize Houston as unilateral misconduct when they expressly approved it. Moreover, Offner did not express any concern to Plaintiff about Plaintiff doing his same job remotely.[51]

## II. Arguments & Authorities

### A. Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[52] When the court reviews the evidence on the issues presented for summary judgment, it must view the facts in the light most favorable to the nonmoving party.[53] Credibility determinations, the weighing of

---

[46] *See*, Exhibit 4: Defendants' Responses to Plaintiff's Requests for Admissions (in response to Request No. 66 Defendants states "no contemporaneous documentation exists demonstrating Plaintiff failed any PIP milestone during the five days between June 19 and June 24.").
[47] Ex. 3, 79:25-80:9.
[48] *See,* Doc. 28, pp. 8-9.
[49] Ex. 3, 56:19-57:7; *see also*, Ex. 1, 103:15-140:16.
[50] Ex. 3, 56:8-57:7.
[51] Ex. 1, 53:18-24.
[52] Fed. R. Civ. P. 56(a).
[53] *Lavaspere v. Niagra Mach. & Tool Works*, 910 F.2d 167, 178 (5th Cir. 1990), *abrogated on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994).

evidence, and the drawing of legitimate inferences from the facts are strictly jury functions, not those of a judge ruling on a motion for summary judgment.[54]

## B. The Timeline Favors Plaintiff's Theory the Reason(s) for Termination were Disingenuous

In other types of employment cases wherein an employee must show pretext, it is a "but for" analysis.[55] The Fifth Circuit allows trial courts to "infer pretext where a defendant has provided inconsistent or conflicting explanations for its conduct."[56]

Plaintiff's theory of the case is essentially this: But for Plaintiff's entitlement to payments under the Compensation Agreement that allowed for profit-sharing, he would not have been terminated and any reasons to the contrary were merely disingenuous and so that Defendants would not have to pay Plaintiff any further shares of the profits.[57] Defendants, on the other hand, argue that Plaintiff was terminated because of poor performance.[58]

The problem with Defendants' theory is that their own evidence (as well as the attached evidence) shows that 1) the leadership team discussed and even agreed upon terminating Plaintiff prior to implementing the PIP;[59] 2) alleged complaints were not thoroughly investigated or substantiated;[60] 3) Offner and Johnson nevertheless placed Plaintiff on a 30-day PIP;[61] and 4) five (5) days after the PIP was issued, Plaintiff was terminated.[62] Moreover, Offner's reason for this was vague and unconvincing, they "just changed [their] minds."[63] Moreover, Defendants

---

[54] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).
[55] *See generally, Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 427 (5th Cir. 2017)(discusses the "but for" analysis for pretext with regards to a discrimination and retaliation claim against an employer by an employee).
[56] *Nasti v. CIBA Specialty Chems.*, 492 F.3d 589, 594 (5th Cir. 2007) (internal citations omitted).
[57] *See generally*, Doc. 13, ¶¶ 35 – 64.
[58] *See generally*, Doc. 28.
[59] Ex. 2, 27:20-28:2, 100:2-16, 114:7-25; Ex. 3, 77:10-20.
[60] *See*, Ex. 3, 45:22-46:4, 48:14-48:6, 49:1-6.
[61] *Id*. at 77:10-20.
[62] *Id*. at 79:25-80:9.
[63] *Id*.

presentation of disputed witness accusations against the Plaintiff regarding alleged complaints by Alex and Connor as established facts is improper.

A jury, with this evidence, could reasonably conclude that Defendants had effectively decided on termination prior to implementing the PIP, the PIP was not a genuine improvement opportunity, the stated reason(s) for termination changed or was meritless, and thus, the PIP process was disingenuous. This is a classic issue of material fact that must be decided by the fact finder.

## C. The Contract Dispute is not as Clear-Cut as Defendant Claims

Under Louisiana law, when a contract is ambiguous or susceptible to more than one reasonable interpretation, extrinsic evidence is admissible to determine the parties' true intent, and questions regarding that intent become factual issues that generally cannot be resolved on summary judgment.[64] Resolving such factual disputes and weighing conflicting evidence on a material fact has no place in summary judgment proceedings.[65]

To resolve a doubtful provision of a Louisiana law-governed contract, courts look to the nature of the contract, equity, usages, and the conduct of the parties before and after the formation of the contract.[66] Moreover, the interpretation of a contract is the determination of the common intent of the parties.[67]

### 1. Ambiguous Language at Issue

In the present case, Defendants' entire interpretation depends on the asterisk language in the Compensation Agreement that states "all forms of remuneration end upon termination."[68] The

---

[64] *Rieder v. New Orleans & Baton Rouge Steamship Pilots Ass'n,* No. 24-C-513 (La. App. 5 Cir. Dec. 13, 2024), 2024 La. App. LEXIS 2153, at *3-4, *15.
[65] *Liem v. Austin Power, Inc.*, 569 So. 2d 601, 607-08 (La. App. 2nd Cir. 1990).
[66] *See generally, Rieder v. New Orleans & Baton Rouge Steamship Pilots Ass'n*, No. 24-c-513 (La. App. 5th Cir. Dec. 13, 2024); *Derbes v. GBS Props., LLC*, 04-1460 (La. App. 5th Cir. Apr. 26, 2005), 902 So. 2d 1109, 1111-12.
[67] *Rieder*, at *3-4, *15; *see also*, La. Civ. Code, Art. 2045.
[68] *See generally*, Doc. 28; *see also*, Exhibit 5: Compensation Agreement.

issue with focusing only on the asterisk language with regard to the monies owed to Plaintiff under Paragraph 5 is that it does not account for the fact that paragraph 5 is different from Paragraphs 3 and 4.[69] Similarly, it is important to not that Paragraphs 3 and 4 concern quarterly future compensation while Paragraph 5 concerns a future triggering event (divestiture or recapitalization).[70]

Plaintiff's interpretation of the Compensation Agreement is that Paragraph 5 is not compensation for future labor. Instead, it compensates Plaintiff for previously-created enterprise value. Plaintiff's concern about an eventual sale or recapitalization of the company was part of why the provision exists, which Plaintiff did have a role in drafting.[71] Because a recapitalization is inherently future-facing, reading the asterisk to extinguish Paragraph 5 renders Paragraph 5 largely meaningless which was never the intent of the Parties.

**2. Intent of the Parties**

Even Offner testified that the Compensation Agreement was to "incentivize Plaintiff to grow the division" that would ultimately grow the profits of the company.[72] This supports Plaintiff's broader-context theory regarding Paragraph 5 of the Compensation Agreement. Even Plaintiff's testimony, which Defendants rely on, repeatedly distinguishes Paragraph 5 from Paragraphs 3 and 4.[73] As such, it is a reasonable interpretation that the Compensation Agreement granted a contingent contractual economic interest tied to a future recapitalization event.

It is also important to note that projections and forecasting were created concerning what Plaintiff could earn under the Compensation Agreement.[74] This shows that, based on Farrae's

---

[69] *See*, Ex. 5.
[70] *Id*.
[71] Ex. 1, 55:25-57:15, 91:23-94:24.
[72] Ex. 3, 31:17-32:3.
[73] Ex. 1, 55:25-57:15, 91:23-94:24.
[74] Ex. 2, 52:21-24.

testimony, there were future-value discussions, talks of an economic upside for Plaintiff to sign this agreement, and negotiated incentives. Farrae even testified that "there was definitely more upside [to Plaintiff's salary] as well.[75] Notably, the language in Paragraph 5 was not introduced until later (i.e., it was not boilerplate as Defendants contend).[76] This was separately negotiated. Farrae acknowledged that, during the course of these negotiations, Plaintiff expressed that "he wanted five percent in the event that [they] sell."[77]

**3. Other Factual Disputes Regarding the Compensation Agreement**

Offner testified that the Compensation Agreement between the Parties was unique, no one else had that type of compensation agreement.[78] This, paired with all the testimony surrounding the compensation agreement, including the intent of the parties, further supports Plaintiff's argument that the Compensation Agreement was a negotiated special incentive arrangement tied to growth of the Empact HR division of Crescent.

**4. Defendants' Reliance on Louisiana Civil Code, Article 2046**

In their Motion, Defendants rely on Civil Code art. 2046 with regard to their arguments against Plaintiff's breach of contract claim. But as asserted above, contract interpretation becomes a fact issue when 1) provisions conflict; 2) provisions create ambiguity; 3) provisions require examination of parties' intent; and 4) surrounding circumstances become relevant.[79] Defendants essentially argue the Compensation Agreement is crystal clear. But the record shows that there were multiple rounds of negotiations and revisions surrounding the Compensation Agreement,[80]

---

[75] Ex. 2, 51:2-14.
[76] *Id*. at 51:21-52:6.
[77] *Id*.
[78] Ex. 3, 5-16.
[79] *Rieder v. New Orleans & Baton Rouge Steamship Pilots Ass'n, No.* 24-c-513 (La. App. 5th Cir. Dec. 13, 2024); *Derbes v. GBS Props., LLC*, 04-1460 (La. App. 5th Cir. Apr. 26, 2005), 902 So. 2d 1109, 1111-12.
[80] Ex. 1, 62:14-64:14.

repeated oral discussions and conversations about future growth,[81] references to long-term upsides to Plaintiff's signing the Agreement,[82] and typographical errors in the Agreement.[83] The individual Defendants even dispute that they were parties to the Compensation Agreement, despite being specifically named separate and apart from both the company Crescent as well as the department of Crescent that Plaintiff worked in, EmpactHR.[84] Moreover, the very existence of this lawsuit shows that there is a fundamental disagreement about the true meaning of Paragraph 5.[85]

### 5. Ownership versus Contractual Right

In their Motion, Defendants asks the Court to decide whether Plaintiff owned part of Cresent.[86] However, the actual question the Court must decide is: Did the Compensation Agreement grant Plaintiff a contractual right to receive a defined economic payment upon a future divestiture or recapitalization? Whether Plaintiff received shares, executed an operating agreement, voted, or had formal ownership rights is irrelevant.[87] Plaintiff is not suing to enforce shareholder rights.[88] Plaintiff is seeking to enforce a bargained-for contractual right to receive compensation upon the occurrence of a specified future corporate event.[89]

## D. PLAINTIFF'S DETRIMENTAL RELIANCE CLAIM SURVIVES SUMMARY JUDGMENT

A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was

---

[81] Ex. 1, 62:14-64:14; Ex. 3, 15:9-16:15, 31:17-32:3, 49:7-17, Ex. 2, 123:9-18, 137:7-10.
[82] *See*, Ex. 2, 52:21-24.
[83] Ex. 1, 159:6-22 (Plaintiff testified that the asterisk next to Paragraph 5 was a typographical error because that did not align with the spirit of the agreement); *see also*, Ex. 5.
[84] Ex. 3, 34:15-35:11, Ex. 2, 55:1-17.
[85] *See generally*, Section I of this Response (citing the relevant testimony of these topics).
[86] Doc. 28, pp. 8-9.
[87] *Id.*
[88] *See generally*, Doc. 13 (there is no claim for any recovery or relief regarding shareholder rights).
[89] *Id*. at ¶¶ 65-75 (Plaintiff's breach of contract claim).

reasonable in so relying.[90] To establish this claim, Plaintiff must prove three elements by a preponderance of the evidence: 1) a representation or promise by conduct or word; 2) made in such a manner that the promisor should have expected the promisee to rely upon it; and 3) justifiable reliance by the promise.[91] Plaintiff does not require proof of a formal, valid, and enforceable contract because the detrimental reliance doctrine is not based on an intent to be bound, but rather on the premise that a person should not harm another by making promises he will not keep.[92]

Whether reliance was reasonable is generally a fact-intensive inquiry.[93] This is because justifiable reliance, a fact-intensive inquiry, must evaluate the plaintiff's individual characteristics, abilities, and appreciation of the facts and circumstances at or before the time of the alleged promise or representation.[94]

Defendants argue that Plaintiff got a raise, a bonus, and profit sharing, and therefore there was no detriment to Plaintiff.[95] However, that is too simple a characterization and/or limitation of the facts in this case. Offner testified that Philip was concerned that his move to Houston would jeopardize his position with the company.[96] Plaintiff has alleged and testified to several forms of detriment including but not limited to declining outside opportunities, remaining with Crescent, expanded responsibilities, moving to Houston.[97] Further, Plaintiff specifically testified in his

---

[90] *See generally*, LA. CIV. CODE, ART. 1967; *see also*, *First La. Bank v. Morris & Dickson, Co., LLC*, 45, 668 (La. App. 2nd Cir. Nov. 3, 2010), 55 So. 3d 815, 825; *Harris v. Bd. of Supervisors of Cmty. & Tech. Colls.*, 2021-0844 (La. App. 1st Cir. Feb. 25, 2022), 340 So. 3d 1121, 1126.

[91] LA. CIV. CODE, ART. 1967; *Drs. Bethea, Moustoukas and Weaver LLC v. St Paul Guardian Ins. Co.,* 376 F.3d 399, 403 (5th Cir. 2004).

[92] *Suire v. Lafayette City-Parish Consol. Gov't*, 907 So. 2d 37, 59-60 (La. 2005) (explaining that detrimental reliance does not require proof of a formal, valid, and enforceable contract because the doctrine is based on the principle that a person should not harm another by making promises he will not keep).

[93] *IAS Servs. Grp., L.L.C. v. Jim Buckley & Assocs.*, 900 F.3d 640, 650-51 (5th Cir. 2018) (recognizing that reasonable reliance is a fact-intensive inquiry that depends on the plaintiff's characteristics, abilities, and appreciation of the facts and circumstances); *see also, Suire v. Lafayette City-Parish Consol. Gov't*, 907 So. 2d 37, 59-60 (La. 2005).

[94] *Id*.

[95] *See generally*, Doc. 28.

[96] EX. 3, 67:3-16.

[97] EX. 1, 127:15-130:2, 139:16-25, 116:23-118:2.

deposition that he relied on the assurances of the individual Defendants when purchasing a home in Houston.[98] Plaintiff told Sanders during the termination call that he "would not have moved to Houston" and he "would certainly have not gotten in the middle of a full home renovation" had he thought he would lose his job for it.[99] Moreover, when discussing the meetings that occurred with management regarding Plaintiff, Offner testified that Plaintiff had concern about maintaining employment after moving.[100] Whether Plaintiff's reliance was reasonable is a fact-intensive inquiry that depends upon the surrounding circumstances and must be resolved by the factfinder where genuine disputes exist regarding the parties' representations and conduct.[101]

E. PLAINTIFF'S TORTIOUS INTERFERENCE CLAIM SURVIVES SUMMARY JUDGMENT

Louisiana courts recognize a narrow cause of action against a corporate officer who intentionally and unjustifiably interferes with the contractual relationship between the corporation and a third party.[102] A viable claim for tortious interference includes five elements: 1) the existence of a contract or legally protected interest between the plaintiff and the corporation; 2) the corporate officer's knowledge of the contract; 3) the officer's intentional conduct to cause the corporation to breach the contract, or his intentional rendition of its performance impossible or more burdensome; 4) the absence of justification on the part of the officer; and 5) causation of damages to the plaintiff brought about by the breach of the difficulty of performance.[103]

---

[98] Ex. 1, 127:15-130:2.
[99] *Id*. at 128:5-14.
[100] Ex. 3, 67:5-16.
[101] *Suire v. Lafayette City-Parish Consol. Gov't,* 907 So. 2d 37, 60-61 (La. 2005); *IAS Servs., Grp., L.L.C. v. Jim Buckley & Assocs.*, 900 F.3d 640, 650-51 (5th Cir. 2018)*; see also, Harris v. Bd. of Supervisors of Cmty. & Tech. Colls.*, 340 So. 3d 1121, 1126-27 (La. App. 1 Cir. 2022).
[102] *Petrohawk Props., L.P. v. Chesapeake Louisiana, L.P.,* 689 F.3d 380, 395-96 (5th Cir. 2012) (discussing Louisiana's narrow tortious-interference claim recognized in *9 to 5 Fashions, Inc. v. Spurney*).
[103] *Id.* (discussing the elements of Louisiana's tortious interference cause of action).

While Louisiana law restricts tortious interference liability, contracting parties themselves are governed by a statutory duty of good faith.[104] Under Louisiana Civil Code Article 1759, good faith must govern the conduct of both the obligor and the oblige in everything pertaining to the obligation.[105] Louisiana law imposes a duty of good faith on contractual performance and prohibits deliberate efforts to evade contractual obligations.[106]

Here, Defendants' own summary judgment evidence shows that the individual Defendants' motive for terminating Plaintiff is in dispute. Specifically, Defendants highlight that Farrae testified that he was angry a PIP was issued when he wanted immediate termination, he pushed for immediate termination and even reviewed emails and advocated for termination.[107] In the same Motion, Defendants argue that termination eliminated future obligations under Paragraph 5, which is what Plaintiff contends is the motive for termination.[108] As such, the motive for termination is in dispute. Defendants have not resolved all material fact issues in their Motion regarding the motive behind Plaintiff's termination and/or the interference with the rights due under the Compensation Agreement. Further, at a minimum, the evidence creates a factual dispute regarding whether the individual Defendants acted with justification and thus, the summary judgment should not be granted on this claim.

## III. Conclusion

Defendants have failed to meet their burden under Rule 56. The summary judgment record contains genuine disputes of material fact concerning Plaintiff's alleged performance deficiencies, the legitimacy of the complaints relied upon by Defendants, the circumstances surrounding the

---

[104] *Wilson v. Waggener*, 837 F.2d 220, 223 (5th Cir. 1988) (recognizing that Louisiana law imposes a duty of good faith on every contract); LA. CIV. CODE, ART. 1759.
[105] LA. CIV. CODE, ART. 1759.
[106] *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 975 F.2d 1192, 1200-01, (5th Cir. 1992).
[107] Doc 28, p. 9.
[108] *Id.* at p. 11.

PIP and Plaintiff's termination, the parties' intent regarding Paragraph 5 of the Compensation Agreement, Plaintiff's detrimental reliance, and Defendants' motive for terminating Plaintiff.

Defendants' Motion repeatedly asks the Court to resolve credibility disputes, weigh competing testimony, make factual findings regarding contractual intent, and draw inferences in Defendants' favor. Those are functions reserved for the fact finder, not the Court on summary judgment. Accordingly, Plaintiff respectfully requests that the Court deny Defendants' Motion for Summary Judgment in its entirety and grant Plaintiff all further relief to which he may be justly entitled.

Respectfully submitted,

SPACE CITY LAW FIRM, PLLC

BDavidson

Bridget Davidson
TX Bar No.: 24096858
SPACE CITY LAW FIRM, PLLC
440 Louisiana St., Ste 1110
Houston, Texas 77002
*bdavidson@spacecitylaw.com*
Tel: 713.568.5305

and

William Most
MOST & ASSOCIATES
LA Bar No.: 36914
201 St. Charles Ave., Ste 2500, #9685
New Orleans, Louisiana, 70170
*williammost@gmail.com*
Tel: 504.509.5023

**Attorneys for Plaintiff**

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this First Amended Response was filed and served on all parties and counsel of record in this case via the Court's CM/ECF system on August 26, 2026.

BDavidson
Bridget Davidson