# EXHIBIT 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

*************************************************

| | | |
|---|---|---|
| PHILIP CARRILLO | * | CIVIL ACTION NO.: 2:25-cv-01787 |
| Plaintiff, | * | |
| | * | JUDGE: SARAH VANCE |
| VERSUS | * | |
| | * | |
| CRESCENT PAYROLL | * | MAGISTRATE JUDGE: |
| SOLUTIONS, INC., | * | EVA DOSSIER |
| ET AL. | * | |

*************************************************

The deposition of PHILIP CARRILLO, taken on Wednesday, June 3, 2026, commencing at 9:08 a.m., in the offices of Adams & Reese, LLP, 701 Poydras Street, Suite 4500, New Orleans, Louisiana 70139.

* * *

# I N D E X

PAGE

CAPTION .....................................1
APPEARANCES .................................4
STIPULATION .................................5

Examination

MS. ROUSSEL ...............................6

Examination

MS. DAVIDSON ............................151

WITNESS' ATTESTATION ......................167
REPORTER'S CERTIFICATION ..................168

EXHIBITS:

| | | |
|---|---|---|
| EXHIBIT NO. 1 | Resume | 8 |
| EXHIBIT NO. 2 | Employment agreement | 29 |
| EXHIBIT NO. 3 | Acknowledgment of the receipt of Crescent's employee handbook | 46 |
| EXHIBIT NO. 4 | Work From Home Agreement | 51 |
| EXHIBIT NO. 5 | Enrollment and Investment Election Form | 54 |
| EXHIBIT NO. 6 | Compensation Agreement | 55 |
| EXHIBIT NO. 7 | Statement of Earnings 11/16/22 - 11/30/22 | 66 |
| EXHIBIT NO. 8 | Crescent Payroll Solutions/empact Job. Description hr | 68 |
| EXHIBIT NO. 9 | Crescent Payroll Solutions Job Description | 68 |
| EXHIBIT NO. 10 | 4/20/23 Paystub | 77 |
| EXHIBIT NO. 11 | 7/20/23 paystub | 78 |
| EXHIBIT NO. 12 | 10/20/23 paystub | 78 |
| EXHIBIT NO. 13 | 1/19/24 paystub | 79 |

EXHIBITS (cont.)


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT NO. 14 | 4/19/24 paystub | 79 |
| EXHIBIT NO. 15 | 7/19/24 paystub | 79 |
| EXHIBIT NO. 16 | Discovery responses | 95 |
| EXHIBIT NO. 17 | Verification | 95 |
| EXHIBIT NO. 18 | Plaintiff's First Amended Complaint | 99 |
| EXHIBIT NO. 19 | December 6th, 2023 email | 105 |
| EXHIBIT NO. 20 | December 15th, 2023 email | 107 |
| EXHIBIT NO. 21 | January 3rd, 2024 email | 111 |
| EXHIBIT NO. 22 | May 23rd, 2024 Letter to EquiMax Mortgage | 113 |
| EXHIBIT NO. 23 | 12/20/22 paystub | 115 |
| EXHIBIT NO. 24 | 12/20/23 paystub | 115 |
| EXHIBIT NO. 25 | Employee Warning Notice | 121 |
| EXHIBIT NO. 26 | June 20, 2024 email | 126 |
| EXHIBIT NO. 27 | 7/1/24 Email regarding Termination of employment | 130 |
| EXHIBIT NO. 28 | Notice of Unemployment Claim Filed | 131 |

A P P E A R A N C E S:

Representing the plaintiff, Philip Carrillo:

SPACE CITY LAW FIRM
440 Louisiana Street, Suite 1100
Houston, Louisiana 77002
bdavidson@spacecitylaw.com

BY: BRIDGET DAVIDSON, ESQ.

Representing the defendant, Crescent Payroll Solutions, LLC:

ADAMS AND REESE LLP
4500 One Shell Square
701 Poydras Street
New Orleans, Louisiana 70139
(504) 581-3234
liz.roussel@arlaw.com

BY: ELIZABETH A. ROUSSEL, ESQ. and
TAYLOR P. SMITH, ESQ.

Also present: Jessica Johnson

Reported by: Kathleen Barrett Ward
Certified Court Reporter
State of Louisiana

S T I P U L A T I O N

It is stipulated and agreed by and between Counsel that the deposition of PHILIP CARRILLO is hereby taken under the appropriate statutes of the Rule in accordance with the Rule.

The formalities of sealing and certification are hereby waived. The witness reserves the right to read and sign the deposition. The party responsible for service of the discovery material shall retain the original.

All objections, save those as to the form of the questions, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence, and are to be made in accordance with the Code of Civil Procedure.

* * * * *

Kathleen Barrett Ward, Certified Court Reporter in and for the State of Louisiana, officiated in administering the oath to the above-mentioned witness.

Philip Carrillo, after having been duly sworn, was examined and did testify as follows:

EXAMINATION

BY MS. ROUSSEL:

Q. Good morning, Mr. Carrillo, or Carrillo? How do you pronounce it?
A. However you want.
Q. How do you prefer?
A. I would say Carrillo, but you can say Carrillo is fine.
Q. Okay. Well, nice to meet you. We're here today, obviously, to take your deposition. I'm sure your attorney has prepared you for the deposition. The purpose is for me to understand the facts about the lawsuit that you've brought against Crescent Payroll Solutions, my client.
I'm going to ask you a series of questions. If you don't understand a question, let me know. If you need a break, let me know. Otherwise, I don't think we're going to be here very long so we'll just get started. All right?
A. Thank you.
Q. Would you state your full name for the record, please?
A. It's Philip Carrillo.

Q. -- I'm focused on the 10-year period before you went to work at Crescent.
A. Okay. I didn't build anything new at that point.
Q. Okay. But you have since?
A. Yes.
Q. Did you purchase real estate to hold, or did you purchase it to renovate and flip?
A. Both.
Q. How many residential properties do you currently own today?
A. I have three.
Q. Where are they located?
A. Houston.
Q. Have you acquired them all since you left Crescent?
A. Yes.
Q. Did you continue buying and selling real estate during the time you worked for Crescent?
A. I invested in projects on the side that were being conducted by others, and I did have ongoing projects that were concluded and finalized during my early days at Crescent.
Q. There was nothing about your work at Crescent that prohibited you from engaging in that

type of investment activity?

A. Well, I think it was -- that's a good question. It can be somewhat time-consuming. And so I think it was -- my understanding was that it was -- it could have been distracting.

Q. Okay. Was it -- I understand that, but the company didn't tell you one way or the other, you can or cannot do this; is that true?

A. I don't remember.

Q. Okay. Is it more fair to say that because you had a commitment of time to Crescent, you didn't have the same time available to dedicate to that real estate investment effort?

A. Yes.

Q. When you and Brad moved to New Orleans in August of 2020, where did he work?

A. I continued working for his family business, TELA Construction.

Q. Where is that company located out of?

A. They're located in, I believe, Jefferson Parish now.

Q. And what did he do for them?

A. He's their CFO.

Q. Is he still doing that job for them?

A. I don't know.

Q. I realize I asked you the question about how you learned about the job at Crescent. You said you didn't remember. Tell me in general terms what you remember about the application process.

A. Actually, I think I may have reached out to them on LinkedIn. I'm not really sure if I saw a job thing or if it was one of those situations where you see a company that maybe -- I just don't know.

Q. Okay. But at some point, Sanders -- you -- the first thing you remember is having some conversation with Sanders?

A. Yes.

Q. And he was telling you what the business was trying to do?

A. Yes.

Q. Do you remember what he told you?

A. That they were attempting to build out an HR Advisory Department service.

Q. Okay. At that point, you had gotten your master's degree, you were done with that work, right?

A. Uh-huh.

Q. Were you working for anyone else?

A. No, I was actively flipping a couple of houses in Houston and was nearing the conclusion of those projects.

Q. Were you seeking a new job?

A. Yes. I was moving here to New Orleans, and I wanted to find employment here.

Q. After you had that phone call with Sanders, did you meet with anybody else at Crescent before you were offered employment with the company?

A. Oh gosh. I don't -- I don't remember that.

Q. All right. Let me show you a document we'll mark as Exhibit 2, which is your employment agreement. You're welcome to take your time to look at this document, but I assume you're familiar with it, yes?

(Exhibit No. 2 marked.)

A. Yes.

Q. All right. This reflects that the position that you were offered was human resources advisor. Does that agree with your recollection?

A. Uh-huh.

Q. What was your understanding of the job you were being hired to do?

Q. Okay. So was your schedule Monday through Friday, and you worked from home on Tuesday, or you were at work five days a week?

A. I was at work five days a week. I mean, I worked five days a week.

Q. Okay. I'm trying to understand whether you worked in office five days a week or not.

A. I did not work in office five days a week. I was often deployed at client sites. I was -- there were -- there was a hybrid schedule. I mean, I don't know how else to describe that.

Q. Yeah, well, I'm trying to understand whether it was a fixed -- I didn't understand your testimony about, "Tuesday was a day off."

So did you have a regular schedule where you worked in office certain days of the week and out of the office on certain days of the week?

A. Yes, at a certain point. Yes, I did.

Q. Okay. And what was that schedule?

A. I don't remember it.

Q. Okay.

A. Because I was on a different sort of -- I was often in the office when we were supposed to -- when we were allowed to work from home and often at client sites. I was often working on

weekends and evenings at sales events and HR events and so on.

Q. But the best of your recollection is that for others in the office, Tuesday was a work-from-home day typically?

A. Yes.

Q. When you were hired for the company, the compensation arrangement was that for the first 180 days you were going to earn a salary of $60,000, right?

A. Yes. Uh-huh.

Q. And then after six months, it would increase to $75,000, right?

A. Uh-huh. Uh-huh.

Q. Yes?

A. Yes.

Q. And then after another six-month period, it would increase to $90,000, right?

A. Yes.

Q. And after that, it would be at the company's discretion whether to give you an additional salary increase, right?

A. Yes.

Q. At the time you were hired, you did not have any incentive plan in place with the company;

is that right?
A. I don't remember. I don't think so.
Q. Do you know who drafted this employment agreement?
A. No.
Q. Were you represented by counsel in the negotiation of it?
A. No.
Q. Did you seek advice of counsel before signing it?
A. No.
Q. No one prevented you from doing that; you just chose not to. Is that right?
A. Yes.
Q. Your discovery responses state that you made several times more than $60,000 doing part-time consulting and flipping houses before you took the job at Crescent. My question to you, is it true that before you took the job at Crescent, you were making more than $180,000 a year doing the real estate investment and flipping?
A. Certainly.
Q. Why did you choose to stop doing that and take a job that paid a third of what you were

currently earning?

A. That's a multifaceted answer. The first answer to that is, I was moving to New Orleans where I did not have any established real estate connections whatsoever. So I had no intention or expectation that I could just immediately dive into the market here doing the same thing I was doing.

I was working part-time at Catholic Charities right up until, I would say -- I mean, if I had to take a stab at the last week or two of being there, it was into May, maybe, of Houston -- in Houston, that is. And I was working on a part-time basis. It was actually a great schedule. I could do my own real estate stuff several days a week, and I worked most of the time remotely for Catholic Charities on the other days that I worked for them.

I moved to Houston -- or to New Orleans, because my ex had finished his construction work in Houston, which was rebuilding, reconstructing communities after one of the hurricanes that occurred there.

So the primary reason I moved to New Orleans is because my ex was here, and that's the

primary reason I took this job. I took the job, too, because my understanding, when I was offered this job, they knew that they were offering a very low salary. Although I -- I mean, many times they sheepishly would describe, "We know you're making far less than what you would make elsewhere." There was an understanding that it was a sacrifice to work for their company, that I was investing my time into something that would ultimately pay off and be gainful for me.

I worked long hours for $60,000. I mean, I was in the office early, and I was in -- out of the office very late those first couple of years, gruelingly creating a project that had never been done before there. Had no guidance internally from anyone in the business. No one had the expertise at the business to guide any of my work.

I took the $60,000, obviously, with this explicit understanding that it would be raised to $90,000 within a short amount of time, really believing I was investing in something that would pay off, doing something that I thought I genuinely loved, and that was -- that it would be honored.

Q. You did not have an ownership interest in Crescent at any point in time; isn't that right?

A. Until that agreement was made -- arrived at, no.

Q. Okay. The compensation agreement is what you're referring to?

A. I'm referring to an agreement where I was -- I had negotiated with Sanders and Justin a -- what they termed and described as an ownership stake. I was constantly told, "This is your product. You are Impact Review. You are Crescent HR -- empact hr, excuse me. Conflating things with other companies.

Q. So just to be -- I think we're going to look at this document. This is the document you all wrote and executed --

A. Yeah.

Q. -- in 2022?

A. No, I wrote it. Yeah. Uh-huh.

Q. Okay. You wrote that document. All right.

And your contention is that that document gave you an ownership interest in the company?

A. My contention is that my understanding of that arrangement was that I was given an ownership stake. And, indeed, had I continued working there when they were, you know -- had there been any kind of recapitalization or any kind of investment from private equity, et cetera, any other company, merger, acquisition, activity, that I would have been compensated, had my department been involved in that transaction, to -- to the degree of 10 percent of the valuation of the company or my department.

Q. You never made any financial contribution or investment into Crescent, correct?

A. Very often I made a regular financial contribution in the -- in the -- in the form of paying for team lunches; in the form of allowing my team to stay at my home because they were unwilling to subsidize my team's stays in New Orleans or their longer stints of work in New Orleans; in the form of paying for training for my employees that was not approved and paid for by the company.

Q. Did you ever write a check to Crescent Payroll Solutions?

A. No.

Q. Okay. So you would agree that you were compensated for your time that you worked?
MS. DAVIDSON:
Objection to form.
BY MS. ROUSSEL:
Q. I'll ask it again. Do you agree that your salary was the compensation for the time that you committed to the business?
A. I believe that there was an implicit understanding that there was a larger payoff to be had down the road for all of my time investment and all of my investment in the company, all of my innovation and investment in the company.
Q. And where is your understanding that that implicit understanding came from?
A. It was a constant conversation of, "We understand we're not paying you what you're worth. We understand that you're -- no MBA is working for this amount. We know that you could go elsewhere. We know that, you know, the value of your work and your expertise and your credentials and so on, and we do want to get you there. We want to get you there. And we, you know" -- just myriad and explicit and implicit, a regular understanding.
Q. Have we discussed all of the ways in

to it.

Q. Okay. Do you, as you sit here today, have an independent recollection of what -- of how you changed it? Did you increase contribution, decrease the contribution?

A. I think it could have gone either way. I mean, I don't -- to my recollection, I think it probably went up at one point and probably went down at one point. I don't know.

Q. Was there ever a time you didn't participate in the 401(k) plan?

A. Possibly. Possibly. I don't know.

Q. All right. I'm going to go ahead and show you Exhibit 6, which we've already discussed, which is the compensation agreement. My understanding from your prior testimony is that you are the person who drafted this agreement; is that right?

(Exhibit No. 6 marked.)

A. Yes.

Q. And your testimony is that you understood that this agreement gave you an ownership interest in the company?

A. Yes.

Q. Identify the language in this agreement

that you understand reflects that you were
receiving an ownership interest in the company.
A. This revenue share of empact hr is where
this -- this understanding sort of centers.
Q. Which paragraph are you referring to?
A. This is point five.
Q. Okay. All right. So your understanding
is that paragraph five gave you an ownership
interest in Crescent?
A. As well as the share of the net profits.
I mean, these are implicit, obviously, and have a
very high degree of conversational assertions and
implicit and explicit conversations about the --
how they wanted me to feel about the business,
which was constantly, "You are Crescent HR. You
are empact HR. We want you to see this as your
own business. You do have a stake here in the --
the success of the business. You have a stake."
I had -- the reason why this entire
thing happened, this whole agreement came up,
because I had worked for several legal services
companies. In each of those instances, we had
gone through multiple M&A activities. When I
say -- when I use the word "consolidation" or
"recapitalization," this is all within that

business ownership, the transactional space. And I had always found that it was those who had agreements of profit share as well as revenue sharing in terms of -- not revenue sharing, I'm sorry, excuse me -- a stake in the event of a financial transaction that had something to do with the ownership of the company, that those are the only ones who ever made out with anything worth their time.

And at this point, having only made up to $90,000 a year, that -- I can definitively say to that point it was not worth my time. There was, you know, so this was, this was a -- and in -- within that context, that's where this came from.

Q. Okay. And I appreciate the explanation, but just so the record is clear, can you identify the paragraphs by number in the Compensation Agreement that you contend gave you an ownership interest in Crescent?

A. Yes. Three, four, and five.

Q. And effective what date did you acquire an ownership interest in Crescent?

A. Well, it appears November 17th, but I don't believe this went into effect until January,

Q. To do what?
A. Fiscally manage the company.
Q. Who did you understand owned Crescent prior to November 17th, 2022?
A. There was a CPA, local CPA, who had some ownership stake -- I can't remember his name -- Justin, and Sanders.
Q. Where did you get that understanding?
A. It was ambient. It was -- I mean, we all understood that there were -- who the owners were.
Q. Do you know how they acquired their ownership interest in the company?
A. No.
Q. empact hr was the division that you managed, right?
A. Yes.
Q. Was it also the name of the product that you developed?
A. Well, it went through an evolution of names as well, so I don't -- yes, essentially it was representative of the HR Advisory Services products and services that I developed. Yes.
Q. Do you remember -- sorry. I forgot to cover this up. Do you remember having a

performance evaluation 90 days after you started with the company?

A. Yes, I do.

Q. And Rema Gray gave you that performance evaluation?

A. Yes. I think there were multiple people in the room.

Q. Was she at that time your supervisor?

A. Yes, she was.

Q. And so if I understood your testimony earlier, at some point that changed and you became her supervisor?

A. Correct.

Q. All right. I want to talk about the compensation agreement. Before the compensation agreement was put into writing, it's my understanding that you went to Justin and Sanders and you requested a pay raise. Is that true?

A. I think so, yes.

Q. Did you request to be paid $120,000 up from $90,000?

A. I don't remember exactly what the request was. I -- there was lots of back and forth. There were, I think, four -- three or four different offers that they made to me, options I

should say. I don't remember how those numbers came about.

Q. Who initiated the conversation about the pay raise? Was it you, or was it them?

A. It could have been me. I don't remember. It's certainly, you know --

Q. It's my understanding that in addition to requesting a pay raise, you requested a title change; is that correct?

A. Probably.

Q. And --

A. It's evident here in this compensation agreement, yes, that that was part of the transaction.

Q. Okay. And just to be clear, I'm -- I know this is what the end result was. I'm trying to ask about sort of what happened before that leading up to this.

A. Uh-huh.

Q. It's my understanding that you also asked for a bonus before this agreement was entered into; is that true?

A. I -- my memory, if it's correct, I did not ask for the bonus. That was a -- an offer by Sanders knowing that I was accepting a -- what he

felt was less than what I wanted.

Q. To the best of your recollection, when you first had discussions with Sanders and/or Justin that led up to the entry of this agreement, what did you ask for?

A. I don't remember.

Q. Okay.

A. I mean, everything was a negotiation, so it's -- it's all very convoluted.

Q. All right. Was the negotiation between you and Sanders and Justin?

A. I don't remember how -- when -- when Justin became involved in that sort of negotiation.

Q. Was there anyone else in -- who participated in the negotiation?

A. I don't think so. My understanding was that this was a very unusual situation for them. I mean, you know, folks there had not perhaps the tenacity or the -- the expectation on employers that I had.

Q. Okay. But just to be clear, my question was, did anybody else participate in this negotiation?

A. I don't remember.

directly doing here has to do with the -- well, the compensation benefits, although that was something that I was certainly involved in with my team. And then the -- when complex, specialized, and sensitive issues arise. I -- I was not directly responsible for internal teams on that except with my own team, obviously, but I was regularly consulted by various people at the business for HR advice, as no one had former HR experience.

Q. When you received the pay increase from 90,000 to 100,000 a year and the job title change to Director of Human Resources, did you consider that a promotion?

A. In -- nominally, yes. Otherwise, it was everything I had been doing already. I mean, so...

Q. Did your job responsibilities change at all, or did only your title change?

A. Well, I think shortly thereafter, I had made more hires, and so, you know, naturally things evolve and are responsive to market conditions, customer needs, and so on. Yeah, I mean, it would have evolved every day. Did it evolve directly as a result of this? Possibly.

Q. Do you remember what your job title was immediately before you became the Director of HR?

A. I don't.

Q. Exhibit 8 is a job description for Director of HR Services. Now, you testified a moment ago there's a glaring hole in number 6. And --

A. Well, just the glaring hole being, as I explicitly said, Director of HR Services is what it should have read. In my, you know, recollection, looking back, that's what I would say is the glaring hole that I see.

Q. Do you --

A. Because I was not an internal director of HR.

Q. Okay. Did your job -- I think you testified earlier when I asked you to give me the different job descriptions or titles that you'd held, one of them you said was Director of HR Services. So did your job title again change to Director of HR Services?

A. What I'm saying is, I'm not really sure that I remember why this says Director of HR. I don't know why it would omit -- why I would have omitted the Director of HR Services.

And by the way, this document evolved quite a bit. You know, this was back and forth, back and forth with myriad, you know, changes, some minuscule, some grand. So I don't -- you know, I don't know where that happened.

Q. Okay. I guess the question I have is, we have two different job descriptions, one for Director of HR; one for Director of HR Services. My question is, did you have another title change from Director of HR to Director of HR Services?

A. I don't remember.

Q. After you signed this compensation agreement, you were still employed at will with Crescent, right?

A. Yes.

Q. And you could have left your employment with the company at any time, correct?

A. Yes. And let me give it, actually, a longer form answer to that. So I -- there was a point after having moved to New Orleans where I was iffy on whether I wanted to stay. I do not like this city. I do not like the dysfunction. I do not like any of it.

I was especially repelled by many experiences that I had, but in particular with

to leave, give me lead time." The same courtesy was not accorded. The same degree of civility was not accorded. Hat in hand in my office, sitting in a chair begging me not to leave surreptitiously quickly, you know. There's -- there's so much context here that it's very hard to -- hard to -- so much understanding.

Q. I appreciate your explanation, but in answer to my question, you did understand that you could leave the company at any time?

A. Yep. Yes.

Q. All right. Looking at paragraph three of Exhibit 6, the compensation agreement, it states that, of empact hr's net profits starting January 1st, 2023, you would be paid a quarterly percentage share of 10 percent, right?

A. Yes.

Q. All right. So I understand that to mean -- well, let me ask you, what is your understanding of net profits?

A. The net profits.

Q. Revenue minus expenses, correct?

A. Yes.

Q. All right. So you understood that on a quarterly basis, the company would look at the

revenue for empact hr, deduct the expenses, and pay you 10 percent of -- of the profits?

A. Yes.

Q. And it did that, didn't it?

A. I don't know.

Q. Okay. Let me show you some documents. All right. I'll mark the first one 10. All right. Exhibit 10 is your pay stub. Looking back at Exhibit 6, the understanding was you would receive this profit-sharing payment for empact hr's net profits in the second check following the quarter for which you earned that profit-sharing payment, right?

(Exhibit No. 10 marked.)

A. Yes.

Q. All right. And so if we look at Exhibit 10, this is the second check that was issued in the month following the first quarter of 2023, correct?

A. Yes.

Q. And it reflects a commission payment?

A. Yes.

Q. Of $3,282.59?

A. Yes. And commission, by the way, is a designation within a payroll system. It could

have been designated in myriad different ways for tax purposes. I'm not really sure why the commission was -- was chosen. It was not what I would consider a commission.

Q. Understood. But you understood this was the payment to you --

A. Yes.

Q. -- for the amount that you were owed pursuant to either paragraph three or four of the compensation agreement, correct?

A. Yes.

Q. All right. All right. I'll hand you another document we'll mark as 11. All right. Exhibit 11 is another pay stub that reflects the profit-sharing payment that was made to you for the second quarter of 2023, correct?

(Exhibit No. 11 marked.)

A. Yes.

Q. All right. I'll hand you a document we'll mark as Exhibit 12. Exhibit 12 is a pay stub that reflects the profit-sharing payment that was made to you for the third quarter of 2023, correct?

(Exhibit No. 12 marked.)

A. Yes.

Q. All right. I'm going to hand you Exhibit 13. Exhibit 13 is the profit-sharing payment that was made to you for the fourth quarter of 2023, correct?

(Exhibit No. 13 marked.)

A. Yes.

Q. All right. I'm going to hand you a document we'll mark as Exhibit 14. Exhibit 14 is the profit-sharing payment that was made to you for the first quarter of 2024, correct?

(Exhibit No. 14 marked.)

A. Yes.

Q. All right. I'm handing you a document marked as Exhibit 15. Now, Exhibit 15 reflects "bonus" instead of commission. This is a paycheck issued July 19th, 2024. That is after you separated from employment at the company, correct?

(Exhibit No. 15 marked.)

A. Uh-huh.

Q. It is my understanding that although it is marked as a bonus, this is the profit-sharing payment that was made to you for the second quarter of 2024. Do you agree?

A. I don't know why that would have been. I hesitate to make any assertion on this. Bonuses

are taxed differently than commissions. It just -- to me, this reflects more of the same sort of strange practices.

Q. Do you have any reason to disagree that the amount reflected on the bonus here is the fourth -- the second quarter 2024 profit-sharing payment that was made to you?

A. All of these are distillations downstream from what I'm assuming was some accounting work. And they were -- yes, they were paid to me, if that's what you're asking. Whether they are accurate in terms of you know, net profitability and -- and that there was proper allocation, I can't say.

Q. Understood. I just want to make sure that you agree with me that although it is marked as a bonus, the $3,292.62 payment is the payment that was made to you for the profit sharing for the second quarter of 2024?

A. Well, presumably, yes.

Q. I realize you say you don't know whether those calculations that were made to determine the profit sharing were correct or incorrect; is that right?

A. Yes.

Q. Do you know who made those calculations?
A. I'm assuming it was Justin.
Q. Do you know how he made those calculations?
A. From my vantage, it was via a spreadsheet.
Q. Do you have any facts that you can tell me today that would support a conclusion that those calculations were not correct?
A. Well, I can say that I contended with at least one of the allocations that was regularly made from the very beginning with him and Sanders. I voiced, and I believe I may have even emailed, some dissent over the allocation of some 14 percent of my overhead, that is my -- rather, my income, to the sales team, to subsidize the sales team, when in, fact all, of my efforts were being stretched and -- between the sales team and management of my team.
And, actually, more than anything, my job had shifted to supporting the sales team almost exclusively, because, I mean, they're salespeople. They don't understand HR. I'm the expert person in the room, you know, when they're going on sales calls. And, if anything, my

department should have been allocated to from
others. So that was my one contention of my very
limited insight into the accounting practices.

Q. Okay. So one line item on the expense side of the ledger for how these profit-sharing payments were made to you, you had dialogue with --

A. Yes.

Q. -- Sanders and Justin about?

A. And, actually, I should say that I don't remember what the percent was. I think it may have been 14. I don't remember.

Q. Okay. But you had a discussion with Sanders and Justin about that, and you said, "I don't think that this should be accounted for as an expense in this way"?

A. I don't think that revenue from my department should be allocated over to the sales department. If anything, the other way around.

Q. Okay. So I got it wrong. It was a -- it was a component of revenue from HR that was not included in the revenue number for the profit-sharing calculation?

A. Well, it was considered overhead for my department. It was like an expense that we sort

of were, you know, just right off the top.

Q. Okay. So when you discussed that with them, they said, "We disagree with you, we think this is the appropriate way to account for this in this calculation"?

A. I don't recall their responses.

Q. Okay. Do you remember how many times you discussed that with them?

A. I would say at least three or four times if I had to assert any number.

Q. Do you know if they ever adjusted the calculation based on what you shared?

A. I do not.

Q. Do you have any training in finance?

A. Well, I have an MBA, so I have, you know, several classes on it. It's not anything foreign to me.

Q. Okay. What about training in law?

A. I had legal courses in the course of my MBA, business law. And then, obviously, I was exposed extensively to litigational practices in previous careers. This does not make me an expert in any way. Just lots of exposure. More than average.

Q. In Exhibit 6, the compensation

more like a -- like the fractional HR services. It's going to look like a service fee paid on a regular basis for a contracted period of time or term. And there may be some incremental increases based on certain numbers of placements.

So say you're, you know, certain levels, you might have varying degrees of extra fees paid for, say, an expert-level placement. I do not remember any more detail than that. Just generally, that's my understanding of that play out.

Q. Are you aware that Justin Farrae kept a spreadsheet that reflected the amount of profit-sharing payments in his calculation of what was to be paid to you each quarter?

A. Can you ask me that again?

Q. Yeah. Are you aware that Justin maintained a spreadsheet to calculate the profit-sharing payments that were owed to you each quarter?

A. Yes.

Q. Did you ever see it?

A. Yes, he showed me on his computer screen a few times.

Q. Did you ever take issue with what he

showed you?

A. Well, yes, that's where I took issue with the allocation toward the sales department. I mean, there were other things maybe, but it was beyond recollection.

Q. All right. Looking back at Exhibit 6, paragraph five mentions that you would get five percent revenue share of empact hr of the trailing twelve months at the given multiple of evaluation in the event of divestiture or recapitalization.

My first question is, was that intended to say, "Divestiture or recapitalization"?

A. Or -- or recapitalization, yeah.

Q. Okay.

A. And I -- by the way, I asked -- on this particular compensation agreement, I asked no fewer than three or four times, "Can we please let an attorney look at this?" I am not an attorney. I mean, I have no idea what I'm writing here. And I wanted my interests protected. And I trusted that they -- and that they had good faith, that they -- all of the myriad conversations we had about how integral I was and how much a part of their strategy and plan Philip Carrillo was. This -- looking back on this, it's very difficult

to look at this as anything short of a setup.

Q. Nothing prevented you from getting an attorney to look at this before you signed it, right?

A. Lot prevented me in -- in terms of good faith, yes.

Q. No one stopped you from doing that?

A. No one stopped me from doing that. And I'm not -- listen, that's not what I'm saying. I'm not trying to abscond with some, you know, responsibility here and that I did write this, and there was back and forth. I did request many times -- actually, I requested that they have an attorney look at it so that it would be copacetic with their practices, with their ownership agreements.

I didn't want this to be anything short of defensible, beneficial to all, motivating for me, fair to me for the amount of investment that I made in terms of my time and my life and my intellectual wherewithal. I was operating in very good faith and it was -- yes, that's it.

Q. There is an asterisk that applies to paragraphs three, four, and five, correct?

A. Uh-huh.

Q. And, essentially, what that asterisk says, all forms of remuneration end upon termination of employment, correct?

A. Yes, and this is what I was asked to put in by Justin.

Q. Okay. So that was a request by the company to include that, and --

A. And this was after we had gotten to the point of finalization, and he said, "Hey, I want you to add one thing to this. I want you to make this final addition change."

Q. Okay. In other words, he wanted to see this language in the agreement before he was willing to sign it?

A. Yes.

Q. And do you understand that this means that the compensation or other consideration that is described in this agreement would not be owed to you if you did not continue to work for the company?

A. No.

MS. DAVIDSON:

Object to form.

BY MS. ROUSSEL:

Q. All right. Is it your understanding

that even after you left the company, you were going to continue to be entitled to a share of empact hr's net profits?

A. To date, what I had earned, and under one auspices, yes. If there had been, during my time there, any negotiations related to recap or acquisition or M&A in any way, shape, or form.

Q. I have a separate question. I'm focused on paragraph three, because you said your under -- you do not agree, if I understood you, that the language that says, "All forms of remuneration end upon termination of employment" means that you were not entitled to additional money or consideration after the termination of your employment, right? That's your testimony, correct?

A. That's what's in this agreement.

Q. Let me go back and ask this question. Do you disagree that all forms of remuneration outlined in paragraphs one through six of this agreement end upon termination of your employment?

A. I understand that that is a disagreement.

Q. My question is, did you understand that was the case, that if you lost your job, you

were --

A. My answer is no.

Q. Okay.

A. That did not jive with the conversational preceding and -- and post.

Q. Okay. So let's look at paragraph three. Paragraph three, which has the asterisk, right? You see that?

A. Yes.

Q. All right. Paragraph three says of empact hr's net profits, you are going to receive 10 percent of those every quarter beginning January 1, 2023, right?

A. Uh-huh. Yes.

Q. Do you contend that you were entitled to a 10 percent share of empact hr's net profits in the first quarter of 2026?

A. No.

Q. Because -- do you agree that you were not entitled to a 10 percent share of empact hr's net profits after you lost your job?

A. No, I do not on that point.

Q. Okay. Do you believe you were entitled to a 10 percent share of empact hr's net profits in the third quarter of 2024 when you no longer

worked for Crescent?

A. No.

Q. Why not?

A. Because that was work performed that I did not perform. In this other point here, in this other term here, this five percent revenue share of empact hr in the event of divestiture or recapitalization or any M&A activity, whatever would lead to the valuation of my department and be calculated in a transaction, the five percent revenue share, that would be something that, in my opinion, should have been excluded from that. And certainly my understanding was different, that it was excluded from that, that I had built a product that I would be paid for.

Q. Okay. I want to -- I want to focus still on paragraph three.

A. I just said no.

Q. Okay. So you and I agree that at least as it relates to the asterisk -- let me rephrase this question.

You agree, at least as it relates to paragraph three, that where this agreement says that form of remuneration ends upon termination of your employment, that's true?

A. Yes.

Q. All right. And you agree that the asterisk, when applied to paragraph four, means that you were no longer entitled to a 10 percent share of the gross revenue of RPO after you lost your job, correct?

A. Correct.

Q. But you contend that the meaning of the asterisk in this agreement is different for paragraph five than it is for paragraph three and paragraph four?

A. That is not what I'm contending. I'm saying that there should not be an asterisk there, that it -- that there's a different -- completely different implication for that, for five.

Q. So you're saying although the asterisk appears at paragraph five, you don't think it should be there?

A. Yes.

Q. So is it your contention that you were entitled to a five percent revenue share of empact hr after the termination of your employment in perpetuity?

A. No, I am not contending that. What I said earlier is what I'm attending now, which is

that I had this -- not only in the spirit of this agreement, but in the many, many conversations and many negotiations pursuant to this agreement, my understanding was that I was essentially a partial owner of my department, of my product, and that I would be compensated in the event that there were -- was M&A activity or any kind of transactional activity on the business that would include my department.

Q. Regardless of whether that transaction happened five years after you lost your job?

A. Sure.

Q. Ten years after you lost your job?

A. I don't think it'll last that long, but yeah.

Q. How long would you be entitled?

A. I would say it makes sense to me within a discrete period where my fingerprints are still on the -- on the business and on the product, directly on the employees who are part of the valuation, for training these employees. These were very untrained, crude, crude, uneducated people. That's as far as I, you know, I have lasting impact on empact.

Q. No pun intended.

I want to show you a document we'll mark -- thank you -- as Exhibit 16.

MS. ROUSSEL:

Can I have 17 also? Thank you.

(Exhibit No. 16 marked.)

BY MS. ROUSSEL:

Q. Do you recognize those discovery responses? Sorry. I didn't hand this to you. Do you recognize those discovery responses?

A. Yes.

Q. You reviewed them, correct?

A. Yes.

Q. And Exhibit 17 is your signature verifying that they are accurate, correct?

(Exhibit No. 17 marked.)

A. Yes.

Q. If you look at the second page of the document, there's Request for Admissions. You see that?

A. You're talking about second page?

Q. Second page where it says, "Request for Admission Number 1."

A. Uh-huh.

Q. Okay. This says, "Admit that Crescent paid you a $5,000 one-time bonus in December of

2022." And the answer is, "Deny." Why did you deny that?
A. I don't know.
Q. Okay. The second one says, "Admit that you received quarterly payments representing 10 percent of empact hr's net profits for each quarter you remained employed with Crescent from January 2023 through June 2024." And the answer is, "Deny."
A. That I do deny. I mean, I certainly was paid a -- what they designated as a commission and then finally as a bonus, but I don't -- I did not have insights into the numbers. And I can say what I tracked in terms of the income, what I understood of our revenue from my customers, it did not ever seem to quite jive. I never did a deep dive. I'm not a forensic accountant, but I deny it based on this.
Q. How did you track it?
A. I tracked it using -- I don't remember -- Google spreadsheet or something.
Q. Do you still have it?
A. I don't.
Q. Did you ever bring it to the company's attention that the payments were incorrect?

A. I shared the -- actually, maybe it was in a Microsoft Drive or something. It was shared with all in management, including Grayson Reno. I had been asked to share it pretty early on. It was just a very basic P&L.

Q. You never chose to leave your employment because you didn't think you were being paid the correct amount of quarterly payments, correct?

A. No, but I often suspected that that was the case.

Q. Request Number Three, "Admit that Crescent paid you all base salary owed to you during your employment." Response, "Deny." Why did you deny that?

A. Probably because I didn't have a base -- well, actually because there were delays in the implementation of each of those.

So the agreed 90,000 increase in the employment agreement had to be extracted through great pain and debate with Justin. And I'm not sure that that was paid in the time that it was contracted. I don't -- I didn't have access to that agreement when I was making this assertion, so I don't remember exactly whether it jives or not.

Q. Did you sell it at that point?
A. We listed to sell sometime in January, I think.
Q. At what point did you tell Sanders and Justin that you wanted to move out of state after this breakup?
A. Immediately. I told them I wanted to move to Florida. That was my -- my goal. And --
Q. Go ahead. I'm just going to get some water.
A. -- that's it.
Q. Did you discuss that with both Sanders and Justin?
A. Yes. I probably over shared.
Q. Why did you ultimately move to Houston?
A. I was pushed to move to Houston by Sanders. I am from Houston, born and raised there. Houston seemed to Sanders to be a better opportunity. At one point, he offered me a different job within the company as a salesperson in Houston. We had hired multiple salespeople there, although they were consistently turned over, severed.
And he said his reasoning for why I should not consider, and why, in fact, he could

not support me moving to Tampa or anywhere in Florida -- I don't remember there being explicit to an exact place -- was that one of his -- one of the partner bureaus, one of the associated bureaus had a salesperson there or something.

So there was, you know, some sense that there would be a breach of his gentleman's agreement with all of these other -- other -- whatever you call it.

I decided ultimately to move back to Houston because I was going through so much change, and I just said, well, might as well just keep the job and move to -- I did offer to leave when I asserted that I had planned to move away. I was not going to stay in New Orleans. That was the gist of it.

Q. And you had family in Houston, right?

A. Yes.

Q. Did you have family in Florida, too?

A. No.

Q. Sanders was talking to you about changing your position and doing a sales job if you moved away, right?

A. He offered that because, in his words and in the words of Grayson Reno, who was the

right?

(Exhibit No. 23 marked.)

A. Yes.

Q. So the information represented to the mortgage holder was correct?

A. Yes.

Q. All right. And for 2023, Exhibit 22 reflects that you received a profit share of $11,210.43, correct?

A. Yes.

Q. All right. I'll show you a document we'll mark as 24. Exhibit 24 confirms that you indeed did receive profit share of $11,210 for the year 2023, right?

(Exhibit No. 24 marked.)

A. Yes.

Q. Okay. And I'm going to refer you back to Exhibit 15. I can show you mine.

A. Yeah.

Q. Here. I can show you mine.

Exhibit 15 reflects that in 2024 you received profit-sharing payments of $12,501.91, correct?

A. That's what it shows in the paystub, yes.

Q. Which means that the information that you -- you reported to the mortgage holder here is correct, right?
A. Yes.
Q. Do you have any reason to dispute that what Crescent reported to the mortgage holder on May 23rd, 2024, was incorrect -- I'm sorry -- that -- do you have any reason to believe what Crescent reported to EquiMax Mortgage in May of 2024 was incorrect?
A. No.
Q. I believe you told me at the beginning of this deposition that you no longer own or do not own your home in Houston. Did you sell the home that you purchased in 2024?
A. I did, yes.
Q. Did you sell it at a profit?
A. I don't lose money on real estate.
Q. So that's a yes.
A. Yes.
Q. Do you recall how much profit you made?
A. No.
Q. After you declined to work in sales, tell me about the conversations you had that resulted in you moving to Houston and working on a

fully remote basis continuing to do empact hr work.

A. Well, Sanders rather insisted that Houston was the only option if I wanted to stay working at Crescent. I stayed in my role because I was going through tremendous dynamics, and I didn't want to add to the upheaval. I mean, it's -- it's -- despite how people may think, gay relationships are the same as straight relationships. When they dissolve, they're as difficult as straight relationships when they are as commingled as our relationship was financially.

We had multiple assets together. The dissolution of that is of an extreme and complex nature and imposition on the life and a major strain on the life of the person who's going through it, the person who's going through it.

Q. Did Sanders express any concern about you doing your same job on a fully remote basis?

A. No.

Q. Did Justin?

A. Not to my knowledge. We had worked so much remotely over the course of the COVID chaos. We had worked, at that point, at least a year in a hybrid schedule, and one of my employees was fully

remote anyway. It just -- it was not a -- it's not a thing.

Q. After you moved to Houston, Connor Boleware and Alex Vial -- is that how you pronounce his last name?

A. Vial, yeah.

Q. -- complained to Jessica Johnson about your unavailability and lack of attention to work. Are you aware of that?

A. They came to me and said that they felt as though I was very distracted. This -- I don't remember what the time frame was, but we're talking very shortly after I had been on a work trip in San Diego after I had been -- had moved all of my property, which was practically an 18-wheeler, from my Houston home -- or my New Orleans home, rather, to my Houston storage.

I had been living with my ex for almost six months and was in the process of renovating the home that I ultimately financed in June or May, whenever it was.

And I said, "Look guys, I mean, I'm downcast, to say the least. I apologize, and I'll try to be better. I'll try to be more attentive and more" -- you know, they had been so accustomed

to a tremendous amount of hand-holding. I mean, they would barely send an email without asking for help. And this is the truth. I mean, there's a lot of -- I can say incredulity.

And the truth of the matter is these guys were not consultant ready. I mean, one of them had one year of experience in HR. They were in their 20s, young, young kids. I mean, I think Connor was 25, 26. Their communication style was subpar, to say the least, to advise leaders of businesses on what can be very complex issues and matters.

So they were very accustomed to lots and lots of handholding. I mean, I would stay late all day long for these guys. I loved helping them become better consultants. When I said they were crude earlier, that was the truth. They were very crude. In fact, that was the complaint. In fact, when I interviewed both of them --

THE WITNESS:

I'm sorry. Are you taking a picture?

MR. SMITH:

No. I'm sorry.

THE WITNESS:

Oh, okay.

A. When I interviewed both of them, Justin said, "Connor's going to sound dumb because he has a lisp. He's not going to sound credible to clients. Are you sure you want to hire him? I know this is a good hire. He's smart." When I hired Alex, Justin's feedback was, "He's really weird. Is he autistic or something?"

These are the things that I was -- these are the diamonds in the rough that I was genuinely working hard to refine. And that is without dispute what I did do with them, actually, grueling over each and every word, you know, of communications and -- and the implications of things.

BY MS. ROUSSEL:

Q. Is Connor the guy you talked about earlier living in Mississippi?

A. Yes. Yes. Yeah. I didn't remember his name.

Q. When you spoke to Connor and Alex and they raised their concerns to you, did you assure them at that time that you would be more engaged?

A. I assured them that I was working with a therapist and that I was trying to be more --

achieve better equanimity in my life.

Q. Are you aware that Connor and Alex later complained to Jessica again after that phone call with you that they felt you were unavailable and disengaged?

A. Yes.

Q. Do you dispute that?

A. Yes, I do.

Q. All right. I'm going to show you Exhibit 23. Exhibit 23 --

MS. ROUSSEL:

I'm sorry, is it 25? I'm sorry.

Sorry. Sorry. Thank you.

BY MS. ROUSSEL:

Q. Exhibit 25 is an Employee Warning Notice that was delivered to you by Jessica and Sanders, correct?

(Exhibit No. 25 marked.)

A. Yes.

Q. They met with you on June 13th, 2024 in person to deliver this to you?

A. Not in person. I was in Houston.

Q. Okay. I'm sorry. That's right.

So they met with you by Teams?

A. Some media. I'm not sure.

Q. Okay. And they told you at the conclusion of this meeting that you were going to be put on a 30-day performance improvement plan, correct?

A. Something like that.

Q. All right. It states here, "Philip Carrillo has not been as engaged or attentive to his staff, clients, or job responsibilities for several months." Do you disagree with that?

A. Yes.

Q. Did you feel that you were equally engaged with your staff, clients, and job responsibilities in the several months before this warning notice, notwithstanding what was going on in your personal life?

A. I would say I was as engaged as they needed me to be.

Q. It says, "On May 8th, one of the staff of empact hr, Philip's department, brought to the company's attention his concerns and evidence of continued disengagement on Philip's behalf. This employee and another full-time member of hr -- empact hr, discussed their concerns with Philip Carrillo within the next two days, just prior to his vacation."

That's referencing the conversation we just discussed with Alex and Connor, right?

A. Yes.

Q. Okay. It says, "Philip acknowledged their observations and committed to improve upon his return." Presumably, that means from the vacation that's mentioned the sentence before.

Did you acknowledge their observations and commit to improve upon your return from vacation?

A. I acknowledged their observations. I did not agree to their observations. I expressed in that phone call -- are we talking about my phone call with -- with Alex and Connor or --

Q. I am, yeah.

A. Okay. In that phone call with them, I expressed to them, "Look, guys. There has been a tremendous amount of change here. I mean, I'm constantly traveling, you know, back and forth to New Orleans and Houston, between New Orleans and Houston, in this -- this sea change in my life, and you're prepared to do your jobs without constant hand-holding." There was an unnecessary weaning that I felt they were unable to commence or embrace.

Q. Did you tell them you were committed to improve after you got back from vacation?

A. I don't remember what I told them exactly. I mean, I don't -- I don't remember acknowledging that there was an improvement needed. I had been on phone calls with Sanders that morning. I had been in constant communication with sales. I had never had a vacation where I was not in constant communication with all, including Sanders.

So engagement to me or to them looked like -- in fact, as I was on that vacation, I was responding rather regularly to communications from my team. And Alex, I believe, in an email or text or whatever, after asking me a question to answer, said, "You really need to disconnect, boss. You really need to disconnect," on that vacation.

So there's some real dissonance in my perspective and memory here. This is just, you know, it doesn't make sense.

Q. All right. In any event, Sanders and Jessica told you that after you had spoken to Connor and Alex, they came to Jessica and made a second complaint, right?

A. And Sanders, I believe, told me that in

this meeting, in this PIP meeting.

Q. And this says, "Philip acknowledged his personal life, including, but not limited to his move from Houston -- to Houston, has been a distraction, and committed to improve."

Do you disagree with that?

A. I explained that where there had been a distraction, perhaps, that the circumstances -- I gave context. I mean, sure, I was renovating a house to move into. I was moving across the state, you know, to a new state. I was in the throes of divesting two properties with my ex. I was traveling for Crescent to HR conferences. There were multiples in that month, actually, April, May timeframe.

It's just, you know, my job also had -- had shifted a lot to sales. I mean, I can tell you that I was in constant contact with the sales team. So where -- maybe there was a distraction on the -- on the part of managing the minutiae of my team's goings-on, day-to-day details. There was no lack of engagement with the business and the requirements of my job.

Q. When you met with Sanders and Justin, did you tell them that you disagreed with what

Q. Yeah. And if you look at the second page, Jessica says, "You're correct in your understanding. You're required to submit a weekly activity report," and she makes a change. Do you remember that happening?

A. I didn't remember that happening, but thank you for bringing it to my attention.

Q. And so after that meeting, it was your understanding that you were on a 30-day performance improvement plan with an obligation to make weekly reports --

A. Yes.

Q. -- about your activity?

A. Yes, which I did. Uh-huh.

Q. And before the end of that 30-day period, you were notified that the company had changed its mind; it was going to terminate your employment, right?

A. That's right, yes.

Q. Who told you that?

A. Sanders called me.

Q. Tell me what you remember to the best of your recollection about that call.

A. He called me. I was on my way home from the gym. I had -- I had a habit of going to

classes at my lunchtime, and said that he had decided to go in a different direction with the department and they wanted their leaders in the GNO area. That was it.

And I said to him on that conversation, in response, "I'm so gravely disappointed in this. I relied on my employment at Crescent Payroll Solutions. I would not have moved to Houston." I expressed all the things that he knew already, that I would not have moved to Houston had I known. I would certainly not have gotten in the middle of a full home renovation, an addition, and all the things had I known that my time there would be so curtailed.

I said -- they all knew that I had been involved in AA. This was a topic of constant conversation with folks in the office, and that I had, you know, experienced extreme emotional distress over the course of my divorce, separation, from my ex, and all the top things that can happen to a person in their life, stressful things that can happen to a person in life-- happened in short order for me.

I had to sell a home. That's top 10 stressors. Buy a new home; top 10 stressors.

Renovate a home; top 10 stressors. Divorce; top 10 stressor, et cetera. Myriad, myriad of things.

And I said, "You always say this is a family, and that's not true. You asked me one time after I expressed to him that I had broken up with Bradley how I was doing." When it came to other employees who were going through things, like Grayson Reno expressed to me one time when we were on a trip to Florida, we'd gone to Florida for some HR thing, and talked about how close he had become to Sanders and Justin over the course of his divorce. He was hired, evidently, in the throes of his divorce, and he said, "I really got close to them in this time frame. They were so attentive and they were so caring." One time is what I clocked.

Sanders canceled a good chunk of our meetings over the next six months after that October time frame. Our monthly check-ins, our semi-monthly, whatever the sequence was, I don't remember -- the cadence was -- is immaterial, but it was very -- it felt very evident to me that I was, you know, just expected to walk it off. And that's -- and I said, "This is by no means what you claim it to be. This is not a family. This

is not a caring organization that's there for their employees when they need it."

Q. Did you ask if he would reconsider the decision?

A. No, I did not. I didn't -- that was not an option. I don't know how many separation phone calls you've been on, but that's typically not an option to ask for that.

Q. I'm going to hand you Exhibit 27.

Was Sanders the only person on that call?

(Exhibit No. 27 marked.)

A. As far as I know, yes.

Q. All right. Exhibit 27 is an email from Jessica Johnson dated July 20 -- excuse me, July 1st, 2024, that begins, "Further to your conversation with Sanders offer at 1 p.m. on Monday, June 24th, 2024, Crescent Payroll Solutions has decided to terminate your employment effective June 24th, 2024," right? You see that?

A. Yes.

Q. June 24th, 2024, was the effective date of your termination from the company?

A. As far as this says, yes, that's correct. And, sure, I remember that.

received?

A. I didn't receive any job offers after that, after I was laid off. When I say "job offer," what I mean is overtures, and I revised that earlier, from companies, recruiters, via LinkedIn, wherever, whatever else -- platforms I was on. I don't know. I don't have any social media anymore, and I don't keep any of these job sites anymore here.

Q. Let me just make sure that we're -- we're communicating, because I want to ask you both about overtures that were made while you worked for Crescent and job search efforts that you made after.

A. Uh-huh.

Q. So let's talk about while you still worked for Crescent. You said that you eschewed overtures that were made. I think you're telling me now that those were communications over social media, LinkedIn, and the like; is that right?

A. Yes.

Q. Did you receive any job offers from anyone while you worked for Crescent?

A. No, I never pursued any overture to the extent of even an interview.

So you have -- you didn't purchase it. You just originally organized it?

A. Yes.

Q. Okay. Are you the sole owner of it?

A. Yes. I was not in the beginning, but I am now.

Q. All right. And then the other business, you do some consultancy?

A. Yes.

Q. Are those all of the businesses that you have been engaged in since January 2025?

A. I think so.

Q. In the aggregate, it does -- the revenue from the real estate investing, the funerary business, and the consultancy, is it greater than $100,000 a year?

A. It's highly mitigated with expenses and overhead.

Q. Okay. Is the -- is the profit from the businesses more than you were earning at Crescent?

A. I don't know. I have -- I'm actually in the process of auditing right now. I can't say. I can say that I was making double or triple before I started with Crescent on --

Q. On the real estate alone?

A. Real estate projects, yes.
Q. Right. With respect to the emotional distress that you attribute to losing your job at Crescent, have you sought any treatment from any healthcare providers --
A. Yes.
Q. -- counselors? From whom?
A. There's -- there are multiple. You're talking therapists?
Q. Yes.
A. They're in Houston. Do you want their full names and numbers?
Q. Well, I, I -- what I think I'd like to do is ask you if you would supplement your interrogatory responses, which did not provide this information, so that we can seek discovery from those providers. Are you willing to do that?
A. I'm not willing to allow you to seek private discussions between me and my therapist.
Q. Okay. Are you willing to stipulate that you can't recover emotional damages in this case? You can discuss that with your attorney, and we can leave that there if you're unwilling to answer my questions about your healthcare providers and treatment today.

A. Yes.

Q. Okay. Regarding kind of the staggering -- sorry. Not the compensation agreement, the employment agreement. I think that's 2. I have to get to it. I don't know if those are in order.

A. No, they're not actually.

Q. It's one of the first couple. There. So regarding this staggering compensation raise situation on the bottom of page one into page two, did Crescent follow that?

A. At each of those milestones, I had to remind them of those things. The 90,000 milestone we were at, we were working remotely. I was in Houston. We had the hurricane, so it was something like August or whatever. Yeah, it was August. We were there for some -- I guess it was Ida that happened here in New Orleans.

And I called Justin, and I said, "Hey, I'm not seeing reflected on my paystub my pay increase that was documented in the employment agreement, and you" -- Justin mentioned something to the effect of, "Well, I've got to go back and check the -- the employment agreement and I'm not -- I wasn't aware of that." And it was very,

very obviously perturbed about the pay increase. It was not a -- there was not a positive receptivity there in my perception.

That dallied for a bit. I don't remember how long it took to execute, but I do remember that they had to retroactively back pay because there was such reticent to implement the agreed terms.

At another point, I got a phone call from Justin saying, "Would you really have quit?"

I said, "Well, I mean, it's -- you can honor that, or I really would quit." And I said, "Well, certainly if my employer is not going to honor their contractual agreement with me, their contracted agreement with me, then, yes, I would have quit." I -- yeah. That's how that went.

Q. I'm going to jump around a little bit on topics. So switching to, earlier you testified to somewhat about travel expenses --

A. Uh-huh.

Q. -- being reimbursed at Crescent. Do you remember that?

A. Uh-huh.

Q. Did you ever witness Justin or Sanders discipline anyone regarding expenses?

A. Dramatically. There was -- we hired -- when we hired Connor, Rema took Connor, Alex, and me to lunch and put it on the company card, the lunch. And it was something like 45 bucks, 50 bucks maybe. And she was so reamed over that, Rema was so reamed over the coals, raked over the coals for that, that she -- I think that began a --a -- a real friction between -- I mean, it certainly was not the beginning of her friction with Justin. It was notorious at the company, but it began a process of her ultimately separating from the business in extreme distress.

Q. All right. Switching gears --

A. Reamed over the coals, raked over the coals for the -- for the -- the welcome lunch for Connor expense.

Q. Other than your understanding of -- of the agreement -- this one I am talking about 6, Exhibit 6, the compensation agreement --

A. Uh-huh.

Q. -- were there any specific promises made to you in conversation about the ownership interest you had or would have?

A. Well, yes. I mean, there was a constant affirmation, confirmation that empact hr, at this

point Crescent HR, is the -- "Carrillo, is -- this is your baby." Crescent -- Sanders would constantly say to me, "You should be treating this as your own, you know. This is yours. You need to be treating this as your own business."

And I had a high degree of hesitation upfront with this because I had been through so many of these business transactions where there was consolidation or something that would leave me out to dry. And so I really didn't have -- I feel as though I had been sort of manipulated into a false sense of security with this company, a false sense of agreement, a false sense of -- that I was forced to ride under, you know, with -- without any real, you know, capability within this area. This was all -- it feels very much like chicanery to me.

Q. Also earlier today you mentioned there was tons of turnover at Crescent. Remember that?

A. Uh-huh.

Q. Were those instances of turnover resignations or terminations, layoffs, a mixture of the three, or something else?

A. Well, going back to my comment earlier about the sales team and why I had absolutely no

have been? Yes. I mean, I don't know. I do not rely on the numbers. I do not believe or -- or -- and it's not that I disbelieve. I just don't. I'm neutral here in that there's some degree of suspicion, but also I was ingratiated to these people. I genuinely believed these people cared for me and that I was engaged in a legitimate, above-board operation. And, yeah, I was there for my colleagues when they needed me, for sure, and they could testify to that.

Q. Do you have any knowledge of Justin's qualifications with regards to financial calculations for revenue shares?

A. No, I do not. Not at all. My understanding is that both his and Sandra's backgrounds are pure sales, which makes a lot of sense.

Q. Did you ever receive the underlying documents, whatever those are -- I don't know if they're invoices or contracts -- where those calculations were coming from of the revenue sharing?

A. I don't believe I had any exposure at all to QuickBooks or however they were billed. I think they were billed maybe through iSolved. I

don't know. I had no access to any of that information. I only knew what we had -- the numbers that we had contracted at the beginning outset. I didn't know what was actually coming in and being paid.

Q. So looking back quickly to Exhibit 6, I think earlier we testified that there's at least one typographical error in this -- in paragraph five, the word "of."

A. Uh-huh.

Q. Do you remember looking at that? Okay. And then I think you also testified something along the lines of -- but correct me if I'm wrong -- that you also believe this asterisk on five should not have been there; is that right?

A. Yeah, it absolutely does not jive with what I would have -- the spirit of what I understood and what I would have wanted to agree to. Also, the director of HR would have, in my humble -- I mean, in my recollection, it doesn't quite make sense. It should have been Director of HR Services.

Q. Got it.

A. Maybe we hadn't settled on a name yet. We were going through a rebrand.

Q. And then with regards to, you know, the parenthetical here in five, do you believe that's -- that part is different than the rest of these?

A. I honestly am having trouble understanding what I or we intended with the upper term twelve months at the -- at the given multiple evaluation. What -- what that would have meant to me is that -- what I thought this line meant and how I operate and understood was that in the event that we were going to be selling the business or that we were going to seek outside investors or that there would be some merge or merger or acquisition, divestiture, whatever, that I would get five percent of the sale of the valuation of empact hr. In my mind, I thought it was ten percent up until just seeing this right now, but five percent was great -- would have been great.

Q. Do you believe there is some ambiguity with this agreement?

MS. ROUSSEL:

Objection to the form. It calls for a legal conclusion.

BY MS. DAVIDSON:

Q. Do you have a clear understanding of

what this agreement means as you sit here today?
A. Well, not now.
Q. Surrounding the conversations you had with Sanders and Justin before this was executed, were you offered any other options of compensation other than the ones written here?
A. Yes. Sanders, I think, said something like, "Let me go back and think about this, and I'll give you some options," which appealed to me. I mean, I -- my expertise is not compensation.
And so he came back with three different options and one of those was $120K flat salary for -- for in perpetuity was my understanding. That it would not be renegotiable for any time soon.
I can't remember exactly how it was put, but we had lots of discussion over it. And I toiled and I took it home and I asked my partner, I was like, "What do you think? I mean, it's kind of a fledgling business so far. Should I take the 120 and just be happy with it?"
And I came back and I sat across from Sanders. I believe Justin was in the office. I could be wrong. And I said, "This is the one I'd like to go with, not the" -- and then I said

something like, "Not these others." But then I said something like, "Was the 120K -- what would y'all have done if I had chosen the 120K?"

And they said, "It would have given us a very clear understanding of how invested you were in our company and how much you wanted to be a part of this company."

And I said, "So 120K as an option was a setup?"

And Sanders looked at me and he said, "Yeah, that's what it was."

It's very distressing to think back on the chicanery stratagem.

Q. Looking back at the complaint, it is number 18, Exhibit 18. And earlier today, we looked at paragraphs 60 and 70, I believe. So 60 says, "Defendant did not pay Plaintiff any of the profit-sharing payments listed above." Just let me know when you get there. You see that?

A. Uh-huh.

Q. One page back. So should the word "any" be "all"?

A. Yes. So this was absolutely just a -- I never thought for a minute that I was not being paid any of my due compensation.

I -- I'm sure I could have emailed for a password reset. I don't know how long they keep pay stubs.

Q. And at that time, or any time during your employment, did you have the direct access to the underlying documents for calculating the profit-share percentage?

A. Oh, no. No.

Q. And then were you terminated before the expiration of the 30-day PIP?

A. Yes.

Q. And then there was an email about the PIP. It's Exhibit 26. You wrote to Jessica Johnson, CC'ing Sanders and Justin. The second line says, "I do not have a printer and the Adobe license I use has too many users for me to use the electronic form creation/signature. Can you send me a paper copy to sign and mail back?"

Do you see that?

A. Yeah.

Q. Okay. Did you ever receive that PIP in the mail?

A. No.

Q. I believe it's the previous exhibit. It's 25. Okay.

And then looking at 25, did you ever

receive a fully executed version of this PIP?
A. No. There was no place, as well, for me to exercise any degree of pushback or explication or, you know, perspective.
Q. From -- you know, based on you working there and your general knowledge about, you know, your superior's job duties, whose responsibility was it to ensure that this was signed and sent to you?
A. I would have said Jessica's duty. I think she was the administrative person there.
Q. And then was she also the person that was typically tasked with sending out the COBRA emails like the one that you got in Exhibit 27?
A. I would assume so. I mean, I don't know where they came from, as I only have only ever received one.
MS. DAVIDSON:
Okay. Thank you so much. I'll pass the witness.
MS. ROUSSEL:
I don't have any further questions.
THE COURT REPORTER:
Read and sign?
MS. DAVIDSON:

C E R T I F I C A T E

This certification is valid only for a transcript accompanied by my original signature and original required seal on this page.

I, Kathleen Barrett Ward, Certified Court Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that PHILIP CARRILLO, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 167 pages; that this testimony was reported by me in the stenomask reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board and that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services; that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board; that I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter, nor is there any such relationship between myself and a party litigant; that I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

This the 22nd day of June, 2026, at COVINGTON, LOUISIANA.



KATHLEEN BARRETT WARD, CCR
Louisiana Certification No. 2016004